IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AVADEL CNS PHARMACEUTICALS, LLC, and AVADEL PHARMACEUTICALS PLC, <br> Plaintiffs, <br> v. <br><br> JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, <br><br> Defendants. | C.A. No. <br><br> ███████████████ |

## COMPLAINT

1.      Plaintiffs Avadel CNS Pharmaceuticals, LLC and Avadel Pharmaceuticals PLC (collectively "Plaintiffs" or "Avadel")[1] seek redress for Defendants Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited's (collectively "Defendants" or "Jazz") misappropriation of Avadel's trade secrets and related breach of confidential disclosure agreements ("CDAs").  Jazz's trade secret misappropriation and breach of its confidentiality obligations are part of Jazz's continuing efforts to keep Avadel's revolutionary *once*-nightly formulation of sodium oxybate ("FT218") for the treatment of excessive daytime sleepiness ("EDS") and cataplexy in adults with narcolepsy off the market.

2.      For almost two decades, Jazz has marketed and sold immediate-release, *twice*-nightly sodium oxybate formulations, first under the trade name Xyrem® and more recently under the trade name Xywav™.  Both of Jazz's sodium oxybate products require narcolepsy patients to

---

[1] References to Avadel include certain predecessors in interest to Avadel Pharmaceuticals plc that operated under the name Flamel in some cited documents.

take a first dose right before bedtime, and to then wake up in the middle of the night and take a second dose.  Because narcolepsy is a sleep disorder, waking up in the middle of the night for treatment is counterintuitive and represents a major problem for these patients.

3.      Accordingly, there is a significant need for a once-nightly sodium oxybate drug product.  Jazz informed the marketplace of this unmet need at least as early as 2016, ████████

███████████████████████████████████████████████████████████

████████████████ *See* Ex. 1, Jazz Pharmaceuticals plc, Annual Report (Form 10-K) (Feb. 23, 2016), *available at* https://investor.jazzpharma.com/node/14886/html (Jazz is "also pursuing other activities related to the potential development of options for narcolepsy patients that would provide clinically meaningful improvements compared to Xyrem, including once-nightly dosing."). ██████████████████████████████████

4.      Avadel ultimately succeeded ████████████  Avadel developed FT218 and has submitted a New Drug Application ("NDA") to the FDA seeking approval to provide its revolutionary narcolepsy treatment to patients.  Recognizing its potential superiority over Jazz's existing twice-nightly formulations, the FDA has granted FT218 Orphan Drug Designation for the treatment of narcolepsy.  With approval and a grant of Orphan Drug Exclusivity, FT218 would be awarded a seven-year period of market exclusivity in the United States.

5.      When Avadel filed its NDA, Jazz faced a choice: either allow Avadel to provide  a narcolepsy treatment that met patient needs unmet by Jazz's products; or file frivolous patent infringement lawsuits in an effort to prevent Avadel's once-nightly treatment from reaching the patients who need it in an attempt to preserve its market share.

6.      Jazz chose the latter approach, filing three patent infringement lawsuits seeking to keep Avadel's once-nightly product off the market. (C.A. No. 21-691-MN, C.A. No. 21-1138-MN

2

and C.A. No. 21-1594-MN) (collectively "Jazz's Suits").   Together, Jazz's Suits allege that Avadel's FT218 infringes U.S. Patent Nos. 10,758,488 (the "'488 patent"), 10,813,885 (the "'885 patent"), 10,959,956 (the "'956 patent"), 10,966,931 (the "'931 patent"), 8,731,963 (the '963 patent) 11,077,079 (the "'079 patent"), and 11,147,782 (the "'782 patent").   As Avadel has explained in its responsive pleadings, Jazz's lawsuits are meritless and seek to enforce patent claims covering work that Avadel, not Jazz, invented.[2]

7.     ███████████████████████████████ led it to track Avadel's successes, including closely monitoring Avadel's patent filings.   But Jazz did more than just engage in legal monitoring of Avadel's public disclosures of its work; Jazz also improperly accessed and used Avadel's confidential information regarding its successful clinical studies and the proprietary technology that ultimately allowed Avadel to develop FT218.   To secure such access, Jazz repeatedly entered into agreements with Avadel—ostensibly for purposes of assessing a possible collaboration between the companies.   But Jazz never collaborated with Avadel.   And instead of honoring its obligations not to misuse Avadel's confidential information obtained under these agreements, Jazz distributed that information internally at Jazz and did precisely what it had agreed not to do, pretending that Jazz scientists invented subject matter associated with that confidential information and trade secrets, and using it to guide its patent prosecution efforts as well as its own drug development efforts.   In addition to rendering Jazz's copycat patent claims invalid, Jazz's conduct violated confidentiality agreements and misappropriated Avadel's trade secrets.

---

[2] Pursuant to FED. R. CIV. P. 10(c), Avadel incorporates all responsive pleadings in Jazz's suits by reference.

8.      Through this action, Avadel now seeks: (1) to recover the damages it has suffered as a result of Jazz's breaches of its collaboration agreements; (2) to recover the damages and other available remedies as a consequence of Jazz's willful and malicious misappropriation of Avadel's trade secrets; and (3) to obtain certain equitable remedies to address the threats imposed by Jazz's misappropriation of those trade secrets.

## The Parties

9.      Plaintiff Avadel CNS Pharmaceuticals, LLC is a limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.

10.      Plaintiff Avadel Pharmaceuticals plc is a public limited company organized and existing under the laws of the Republic of Ireland and has its principal place of business at Ten Earlsfort Terrace, Dublin 2, D02 T380 Ireland.

11.      On information and belief, Defendant Jazz Pharmaceuticals Ireland Limited is a corporation organized and existing under the laws of Ireland, having a principal place of business at Waterloo Exchange, Waterloo Road, Dublin, Ireland 4.

12.      On information and belief, Defendant Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 3170 Porter Drive, Palo Alto, California 94304.

## Jurisdiction and Venue

13.      This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1.

14.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

15.    This Court has personal jurisdiction over Defendant Jazz Pharmaceuticals Inc. because Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware.

16.    This Court also has personal jurisdiction over Defendant Jazz Pharmaceuticals Ireland Limited because it has purposely availed itself of the benefits and protections of Delaware's laws such that it should reasonably anticipate being haled into court in Delaware, at least by filing Jazz's Suits.  On information and belief, Jazz Pharmaceuticals Ireland Limited is in the business of, *inter alia*, developing, manufacturing, marketing, offering for sale, and selling pharmaceutical products throughout the United States, including within this District, either on its own or through its affiliates.  Therefore, Defendant Jazz Pharmaceuticals Ireland Limited transacts business within the State of Delaware related to Plaintiff's claims, and/or has engaged in systematic and continuous business contacts within the State of Delaware.

17.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1391 and/or pursuant to Jazz's consent.

██████████████████████████████████

18.    Sodium oxybate is the sodium salt of gamma hydroxybutyric acid ("GHB"), a central nervous system depressant that is capable of providing individuals suffering from interrupted nighttime sleep with normal, physiologic sleep.  This improvement in nocturnal sleep can lead to significant clinical improvements in symptoms of narcolepsy, such as cataplexy attacks and excessive daytime sleepiness.

19.    Jazz currently markets the ***twice-nightly*** sodium oxybate product Xyrem®, which it obtained when it acquired Orphan Medical in 2004.  In 2002, Xyrem® was approved for use by the FDA to treat cataplexy in patients with narcolepsy.

20.     Because of the high dosage required for sodium oxybate's therapeutic efficacy and its short half-life in humans, Xyrem® must be taken twice during the night—once at bedtime and again 2.5 to 4 hours later.  This means that narcolepsy patients already suffering from a sleep disorder sleep have to wake up in the middle of the night to take the second dose of Xyrem®, which is a major source of reduced quality of life, raises patient safety concerns, and often leads to non-compliance or discontinuation of the drug.

21.     █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

22.     █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

**In 2010, The Parties Discuss Using Avadel's Micropump® Platform With Oxybate**

23.     Avadel, through its subsidiary Flamel Ireland Limited, owns numerous United States patents that cover Avadel's FT218 product, an innovative once-nightly formulation of sodium oxybate for the treatment of excessive daytime sleepiness and cataplexy in adults with narcolepsy.

24.     FT218 was developed by Avadel based on certain aspects of Avadel's patented Micropump® platform, which Avadel had used successfully to develop other modified release formulations using microparticulate beads to provide controlled release of drug products.  Avadel ultimately directed its efforts to develop a once-nightly formulation of GHB.  Avadel's Micropump® drug delivery platform has been and remains important to Avadel, and Avadel has taken steps to protect this technology, including by keeping aspects of it confidential and by patenting certain aspects and implementations of it.  And even with regard to the latter category, Avadel maintained confidential and/or trade secret status of those aspects until the patent process mandated public disclosure.

25.     In 2010, Avadel contacted Jazz to discuss a potential partnership that would take advantage of Avadel's experience with the Micropump® platform to develop a once-nightly formulation of sodium oxybate.  Ex. 4.

26.     At the time, Avadel's business practice and course of conduct when engaging in discussions with potential commercial partners was to disclose confidential information pursuant to a written, executed CDAs prohibiting the disclosure or use of Avadel's confidential information.

27.     On information and belief, at least some of Avadel's discussions with Jazz, including the disclosures detailed herein, were undertaken under the protection of such a CDA and/or an oral agreement ("2010 CDA") prohibiting the disclosure or use of Avadel's confidential information.

7

28. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█

29.     On information and belief, the 2010 CDA prohibited the use of Avadel's confidential information for any purpose other than to evaluate a potential partnership between Avadel and Jazz.

30.     ████████████████████ in 2010, Avadel prepared two slide decks for Jazz describing Avadel's proprietary drug delivery technologies.  One slide deck described the use of Avadel's Trigger Lock™ technology to deter abuse of pharmaceuticals (the "2010 Trigger Lock™ Deck").  Ex. 6.  The other slide deck described Avadel's Micropump® platform technology and the applicability of certain aspects of it to a potential once-nightly sodium oxybate formulation (the "2010 Micropump® Deck").  Ex. 7.

31.     The 2010 Micropump® Deck was prominently marked "CONFIDENTIAL" on every slide to indicate to Jazz that its contents contained "confidential" Avadel information that had not been publicly disclosed at the time.  Ex. 7 at JPION00030010.

32.     The 2010 Micropump® Deck contained confidential information detailing Avadel's technology and its development that had not been disclosed to the public.  The 2010 Micropump® Deck explained that "[d]oses of sodium oxybate administered are large, 4.5 g and 6 g" and highlighted the "[i]ncompatibility with pill or tablet forms" of these high sodium oxybate dosages.  *Id.* at 2.

33.     The 2010 Micropump® Deck further disclosed the solution to this problem that Avadel had kept confidential: a new liquid suspension system for sodium oxybate once-nightly dosing in the form of microparticulate beads provided in a sachet.

34.     The 2010 Micropump® Deck further disclosed the idea of using a combination of controlled release and immediate release microparticles to create a pulsatile PK profile.  *Id.* at 16.

35.     The 2010 Micropump® Deck further described the usefulness and unique attributes of this system and disclosed simulated pK modeling of a once-nightly sodium oxybate formulation using such a combination of microparticles.

36.     In addition, the 2010 Micropump® Deck recommended a proposed sachet-based dosage form using sodium oxybate microparticles.  *Id.* at 17.

37.     ████████████████████████████████████████
████████████████████████████████

38.     ████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████
██████████████████████████████████████████  ████████████

39.     ████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

9

██████████████████████████████████████████████████████████

████████████████████

40.     Upon information and belief, and as described in further detail below, Jazz's renewed interest in a meeting with Avadel was the result of reports in 2014 that Avadel was successfully advancing its efforts to develop a once-nightly oxybate product.

41.     Upon information and belief, this meeting was proposed by Jazz not due to a genuine interest in establishing a collaboration with Avadel, but as a pretense to obtain confidential information regarding Avadel's sodium oxybate product after Jazz became aware of reports of Avadel's success in developing a once-nightly product.

42.     On March 18, 2015, Jazz, Avadel, and Jazz's Designated Recipient, Dr. Leslie Z. Benet, entered into another confidential disclosure agreement in advance of the diligence for a potential deal, preventing either party from disclosing or misusing any confidential information obtained from the other party (the "2015 CDA").  Ex. 11, 2015 CDA;  *see also e.g.*, Ex. 9 (discussing a non-disclosure agreement); ████████████████████████████████████

43.     In Paragraph 3, the 2015 CDA states:

> The Designated Recipient and Jazz Pharmaceuticals agree to maintain the Confidential Information in confidence. Without the prior written consent of Flamel, except as set forth herein, the Designated Recipient and Jazz Pharmaceuticals shall not disclose Confidential Information to any third party or use Confidential Information for any purpose other than to evaluate and, if a decision is made to proceed, to negotiate such business relationship (the "Purpose"). Ex. 11, ¶ 3.

44.     Specifically, the 2015 CDA defines "confidential information" to include:

- Number of subjects
- Population (healthy subjects / or patients), demographics
- Fluid and Food intake
- Dosing/titration schedules

█

- Time of day of dosing
- Study design (e.g. complete crossover vs parallel groups)
- PK sampling times relative to dose
- Concomitant therapy allowances, if any
- Key statistical analysis considerations, if any
- Brief description of bioanalytical methodology (e.g. LC-MS-MS) lower limit of quantification
- Tables and graphs should identify the dose properly
- PK curves showing plasma concentration over time
- Mean and standard deviation should be included
- Statistical difference (p<0.05) should be identified
- Spaghetti plots by treatment
- PK parameters (90% confidence intervals, means, standard deviation, median, min, max, or individual subject values by treatment)
- Cmax
- Tmax
- Apparent elimination rate constant (λ)
- Terminal half life
- AUC (t)
- AUC (inf)

Ex. 11, at 6.

45.     Once the 2015 CDA was in place, Jazz acquired additional Avadel information that was confidential at the time regarding the success of Avadel's clinical study of FT218 and information critical to the success of Avadel's once-nightly program.

46.     On April 1, 2015, Avadel sent Jazz a summary report of its pilot clinical study in humans ("2015 Study Report").  Ex. 13, 2015 Study Report. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



47.    The 2015 Study Report was prominently marked confidential.

48.    The 2015 Study Report contained Avadel's confidential information regarding

49.    After reviewing Avadel's confidential information in the 2015 Study Report, Jazz once again declined to partner with Avadel.

50.

51.



55. 

56.

57.

58.

---

[3] Emphasis added except where noted



████████████████████████████████████████████████████

████████████████████████

62.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

63.    ████████████████████████████████████████

████████████████████████████████████████████████ .

**Jazz's Contemporaneous Misappropriation**

64.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

█



65. ████████████████████████████████████████

████████████████████████████████████████████

66.    Meanwhile, certain public information in 2014 indicated that Avadel was successfully advancing its efforts to develop a once-nightly sodium oxybate product. ████████

████████████████████████████████████████████████████

█

██████████████████████████████████████████████████████

████████████████████████████████

67.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

68.     In April 2014, however, Avadel announced in a press release that it had completed a proof-of-concept study of sodium oxybate using its microparticle technology.  Ex. 28 at  5.

69.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████



70. ████████████████████████████████████████
████████████████████████████████████████
██████████████████████

71. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



72. ███████████████████████████████████████████
██████████████████████████████████████████

73. ███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████



77.     The 2010 Micropump® Deck disclosed what was at the time Avadel's confidential proposed dosage form of "1 pack containing one sachet of powder (controlled release microparticles) and one bottle of oral solution."  Ex. 7 at 17.

78.     ██████████████████████████████████████ on February 18, 2015, Mr. Allphin and named co-inventor Scott Bura filed a provisional application 62/117,889 which ultimately matured into the '782 patent.  One year later (and six years after the 2010 interaction with Avadel), Messrs. Allphin and Bura filed utility Application No. 15/047,586.  Collectively, those comprise the "'899 Applications."

79.     While the applications were filed under the guise of describing ion-exchange resinate technology, the '899 Applications track the confidential disclosures of the 2010

Micropump® Deck, particularly when viewed from the perspective that its claimed subject matter is not limited to resinate technology, but encompasses microparticulate technology, as Jazz now surprisingly claims in Claim Construction disclosures in C.A. No. 21-1138-MN, Dkt. 45, dated March 4, 2022. For example, the initial slide of the Micropump® Deck notes that because "[d]oses of sodium oxybate administered are large, 4.5 g and 6 g" they were "incompatib[le] with pill or tablet forms." Ex. 7 at 2. The '899 Applications, in turn, recite that "while extended release oxybate dosage forms are known, such extended release dosage forms are provided as solids, *e.g.*, as tablets," but "[b]ecause the required dose of oxybate is high, such tablets can be quite large," which "can be problematic." Ex. 42, '899 Applications, 2016-02-18 Specification at ¶ 23.

80.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

81.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

82.    The very next part of the 2010 Micropump® Deck contains Avadel's confidential conclusion that microparticles could be utilized as an alternative to solid oral dosing, including by way of "sachet or oral suspension, which allow large dose formulations that are completely tasteless." Ex. 7 at 2. It also proposed a dosage form of "one sachet of powder (controlled release microparticles) and one bottle of oral solution." *Id*. at 17. Similarly, immediately after explaining

the limitations of solid oral dosage forms for sodium oxybate extended release, the '899 Applications state that "it would be desirable to provide oxybate . . . in extended release, oral liquid dosage form (including suspensions of oxybate-containing particles as described herein, which in some embodiments can be supplied as a sachet . . . .)."  Ex. 42 at ¶ 23.

83.  ███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████

84.    The 2010 Micropump® Deck also disclosed that one could use a "combination of immediate release AND delayed release in a single administration" in order "to obtain the desired PK profile," and that the dosage form may contain 50% sodium oxybate in solution and 50% controlled release microparticles.  Ex. 7 at 2.

85.    Notably, Jazz's '889 Applications state "controlled release and immediate release formulations can be dosed together to a subject to provide quick onset of action, followed by maintenance of therapeutic levels of the drug substance over a sustained period of time."  Ex. 43, '889 Applications, 2015-02-18 Specification ¶ 18.  The '899 Applications contain multiple other references to a combination of immediate and controlled release formulations.  *See e.g.*, *id.* at ¶ 14 ("[T]here can be an immediate release GHB formulation that is present in or accompanies the controlled release formulation"); *id.* at ¶ 17 ("The immediate release component can form part of a controlled release unit or liquid dosage form or may be a separate immediate release composition."). On information and belief, these ideas, among others, came from the 2010 Micropump® Deck and not from anyone at Jazz.

86.     On information and belief, Jazz's desperation to develop or at least patent a once-nightly sodium oxybate product led it to improperly rely on confidential information previously disclosed by Avadel to Jazz during the 2010 diligence process.

87.     On information and belief, Jazz misused the confidential information from the 2010 Micropump® Deck by including that information in the '899 Applications, but hid that misuse by means of (a) including it in a disclosure that exclusively related to ion-exchange resinate technology, and then later (b) when Jazz attempted to pretend that the subject matter of the specification was not so confined, file a nonpublication request with the PTO to conceal that effort from public view and maintain submarine applications that were never published until issuance.

88.     █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

89.     █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

90. ███████████████████████████████████████████

91. ███████████████████████████████████████████

**Jazz Also Resorted to Monitoring and Copying
Avadel's Patents and Confidential  Information**

92. ███████████████████████████████████████████

93. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

94. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████ On information and belief, Jazz responded by improperly using Avadel's confidential information and trade secrets as detailed above, and further embarking on a strategy of copying Avadel's patent applications, and filing claims covering Avadel's once-nightly sodium oxybate product in hopes of illicitly and illegitimately preventing FT218 from ever reaching market.  In doing so, Jazz not only committed fraud on the U.S. Patent and Trademark office ("PTO"), but intentionally sought to deprive patients of a life changing therapeutic that it recognized was superior to its twice-nightly Xyrem® product.

95. One of those patents, U.S. Patent No. 10,272,062 (the "'062 patent"), entitled "Modified Release Gamma-Hydroxybutyrate Formulations Having Improved Pharmacokinetics," was filed on July 21, 2017 and issued to Avadel.  The '062 patent lists as its inventors Claire Megret, Herve Guillard, and Jean-Francois Dubuisson (collectively the "Avadel Inventors"). Avadel's '062 patent claims priority to several provisional applications with the earliest provisional application No. 62/365,812 filed on July 22, 2016.  The application that ultimately issued as Avadel's '062 patent was first published on January 25, 2018 as U.S. Publication No. 2018/0021284 (the "'062 patent publication").

96. Thus, by January 25, 2018, Avadel's '062 patent publication disclosed modified release formulations of GHB containing methacrylic acid-methyl methacrylate co-polymers, with

certain dissolution profiles when tested in deionized water using USP apparatus 2 and where the dissolution medium was maintained at 37°C ± 0.5°C with the rotating paddle speed fixed at 50 rpm.

97.     U.S. Patent No. 10,736,866 (the "'866 patent") is a continuation of Avadel's '062 patent and was filed on February 21, 2019 and issued on August 11, 2020.  The application that gave rise to the '866 patent was first published on June 20, 2019 (the "'866 patent publication").

98.     Thus, by June 20, 2019, Avadel's '866 patent publication disclosed claims relating to a sachet formulation of GHB comprising an immediate release component and a controlled release component.

99.     U.S. Patent No. 10,952,986 (the "'986 patent") is a continuation of the '866 patent and was filed on May 23, 2019 and issued on March 23, 2021.  The application that ultimately issued as the '986 patent was first published on September 12, 2019 (the "'986 patent publication").

100.    Thus, by September 12, 2019, Avadel's '986 patent publication disclosed claims relating to formulations of GHB comprising an immediate release portion and a modified release portion, as a skilled artisan would understand the plain meaning of those terms, with a suspending or viscosifying agent separate and distinct from the immediate release and modified release portions.

101.    On information and belief, Jazz engaged in a pattern and practice of copying Avadel's inventive work by drafting claims based on the disclosures in Avadel's patent publications and guided by its improper use of the confidential information disclosed by Avadel during the diligence process, rather than any commensurate disclosure of Jazz's underlying applications.  Jazz, and the named inventors on the asserted patents, along with others responsible

27

for the prosecution of same, misled the PTO by concealing that they had copied the disclosures set forth in Avadel's patent publications.

### The Sustained Release Patents

102.    As one example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that Avadel's '062 patent publication was published on January 25, 2018, Jazz had not filed any patent applications that gave rise to the patents asserted in Jazz's initially-filed Complaint (C.A. No. 21-691-MN), *i.e.*, Jazz's Patent Nos. 10,758,488 (the "'488 patent"), 10,813,885 (the "'885 patent"), 10,959,956 (the "'956 patent"), and 10,966,931 (the "'931 patent") (collectively, the "Sustained Release Patents"). Instead, Jazz was prosecuting the parent application to the Sustained Release Patents, U.S. Application No. 13/071369 (the "Jazz '369 Application"). The then-pending claims of the Jazz '369 application were directed to a "controlled release dosage form for oral administration" including "a compressed tablet controlled release core," comprising at least one polymer comprising ethylcellulose, at least one polymeric "pore former," and also recited "providing a time dependent release" measuring release of the drug from time of administration. *See, e.g.*, Ex. 44, Jazz '369 Application File History, 2017-10-04 Response to Final Office Action at claim 1. One dependent claim recited that "at least one polymeric pore-former is at least one of a polyethylene glycol, poloxamer, polyvinyl alcohol, copovidone, povidone, a water soluble sugar, a water soluble organic acid, such as carboxylic acids and their salts, and a hydroxyalkyl cellulose selected from hydroxyethyl cellulose, hydroxypropyl methylcellulose, and hydroxypropyl cellulose." *See id.* at claim 16. The Jazz '369 Application claims therefore corresponded to the substance of the specification, which disclosed controlled release dosage forms containing a compressed tablet controlled release core, ethylcellulose, and hydroxypropyl cellulose or poloxamer. *See, e.g.*, Ex. 45, Jazz '369 Application at Examples 1-13. While claim 1 of the Jazz '369 Application was originally directed to "a controlled release dosage

form for oral administration," the applicant narrowed claim 1 first to a "compressed tablet" and later to include a "compressed tablet controlled release core," in response to rejections finding that claim 1 was obvious over a prior art patent application to Liang *et al*., U.S. Patent Publication No. 2006/0210630 ("Liang"). *See* Ex. 46, Jazz '369 Application File History, 2013-05-28 Response to Office Action at claim 1; Ex. 47, January 27, 2014 Response to Office Action at claim 1. These narrowing amendments conformed the claims to the disclosure of the Jazz '369 Application, which was limited to a compressed tablet dosage form. Further, the Jazz '369 Application had no claims or teachings of dissolution testing or the release profiles resulting from such testing of formulations containing methacrylic acid-methyl methacrylate co-polymers in deionized water using apparatus 2 at a temperature of 37°C and a paddle speed of 50 rpm, as described in Avadel's '062 patent publication.

103.    On information and belief, by July 2018, ███████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████

104.    █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

██████████████████████████████████████████████████████████████. Ex.

███████████████████████████

105.    After Avadel's '062 patent publication was published, however, Jazz let its '369 application become abandoned on November 2, 2018.  Jazz did not file the application that ultimately led to the issuance of the first of the Sustained Release Patent, the '488 patent, until July 2, 2018—approximately six months *after* Avadel's '062 patent publication was published.

106.    Jazz was aware of the disclosures in Avadel's patent publications since at least as early as when it was published.  ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

107.    On information and belief, based on its access to Avadel's trade secret and confidential information, Jazz concluded that at least Example 1 and Example 1bis of Avadel's '062 patent publication disclosed the formulation of FT218, Avadel's once-nightly sodium oxybate formulation for the treatment of excessive daytime sleepiness and cataplexy in adults with narcolepsy.  ███████████████████████████████████████████████████

30

████████████████████████████████████████████████████████████

████████████████         As a result of the confidential disclosures accompanying the 2015 CDA, Jazz

uniquely had access to ██████████████████████████████████████████████

███████████████████████████████████         For example, the confidential 2015 Study

Report provided by Avadel to Jazz disclosed ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

108.    The application giving rise to the '488 patent was filed and characterized as a continuation of the Jazz '369 application.  Notably, Jazz canceled all 10 original claims that generally recited the four components described *supra*—namely a "compressed tablet" controlled release dosage form, comprising at least one polymer comprising ethylcellulose, at least one polymeric "pore former," and reciting "providing a time dependent release" measuring release of the drug from time of administration.  In stark contrast to its prior set of claims, Jazz deleted each of those four attributes, and replaced them with claims directed to a generic formulation (rather than a compressed tablet) comprising specifically methacrylic acid-methyl methacrylate co-polymers (rather than one polymer comprising ethylcellulose and at least one polymeric "pore former"), and recited a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm" (rather than reciting attributes following administration).

31

109.    On information and belief, Jazz drafted the claims that ultimately issued as the '488 patent based not on any commensurate disclosure of its underlying application, but solely in view of the disclosures set forth in the '062 application and Avadel's confidential disclosures.  The '488 patent specification does not disclose dissolution testing or the release profile resulting from such testing of formulations containing methacrylic acid-methyl methacrylate co-polymers in deionized water using apparatus 2 at a temperature of 37°C and a paddle speed of 50 rpm.  Further, the '488 patent specification does not disclose the full range of sustained release dosage forms as Jazz appears to assert, but is instead limited to two specific solid dosage forms: tablets and capsules. Further, the '488 patent specification fails to disclose that the inventors were in possession of sustained release formulations possessing a "functional coating" containing methacrylic acid-methylmethacrylate co-polymers, let alone in the percentages recited in the asserted claims.  As such, the '488 patent claims as filed and issued are neither described nor supported by its specification as, on information and belief, the claims were instead solely based on Avadel's inventive work disclosed in at least the '062 Application and confidential information.

110.    Jazz filed the application that ultimately issued as the '885 patent on June 30, 2020 as a continuation of at least the '488 patent.  Like with the '488 patent, on information and belief, the claims of the '885 patent were written based on the disclosures in the '062 application and Avadel's confidential information.  The '885 patent was filed and has issued with claims to formulations comprising methacrylic acid-methyl methacrylate co-polymers and a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm."  For the same reasons as above, the '885 patent claims are neither described nor supported by its patent specification, as the claims were

written based solely on Avadel's inventive work disclosed in at least the '062 application and the confidential information furnished to Jazz described above.

111.     Jazz filed the application that ultimately issued as the '956 patent on September 4, 2020 as a continuation of at least the '885 patent.  As with the '885 patent, the '956 patent was filed and has issued with claims to formulations comprising methacrylic acid-methyl methacrylate co-polymers and a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm."  For the same reasons as above, the '956 patent claims are neither described nor supported by its patent specification, as the claims were written solely based on Avadel's inventive work disclosed in at least the '062 application and the confidential information furnished to Jazz described above.

112.     Jazz filed the application that ultimately issued as the '931 patent on September 4, 2020 as a continuation of at least the '885 patent.  As with the '885 patent, the '931 patent was filed and issued with claims to formulations comprising methacrylic acid-methyl methacrylate co-polymers and a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm."  For the same reasons as above, the '931 patent claims are neither described nor supported by its patent specification, as the claims were written solely based on Avadel's inventive work disclosed in at least the '062 application and the confidential information furnished to Jazz described above.

113.     As a result, none of the Sustained Release Patents have written description support in their specification for any of their claims and thus do not have a priority date earlier than the filing date of those claims in which the new matter was added.

114.     ██████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████.

115.    Jazz's bad faith use of Avadel's confidential information is further reflected in its decision to file a patent infringement suit against Avadel on the Sustained Release Patents knowing that their subject matter does not apply to FT218.   During prosecution, Jazz repeatedly distinguished the claimed "sustained release" composition from a "delayed release" composition specifically to avoid rejections over a reference to Liang.  *See, e.g.*, Ex. 48, Jazz '488 Patent File History, 2020-03-06 Allphin Declaration at ¶¶ 6, 10-11. ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

**The Resinate Patents**

116.    As another example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that Avadel's '062 patent publication was published on January 25, 2018, Jazz had not filed the patent application that gave rise to the patent asserted in Jazz's second-filed Complaint (C.A. No. 21-1138-MN)—Jazz's Patent No. 11,077,079 (the "'079 patent").  Nor did Jazz file the application that ultimately led to the issuance of the '079 patent at the time Avadel's '986 patent publication published on September 12, 2019.

117.    Indeed, Jazz did not file the application that ultimately led to the issuance of the '079 patent until December 10, 2020—more than a year *after* Avadel's '986 patent publication was published.

118.    On information and belief, Jazz drafted the claims that gave rise to the '079 patent based not on any commensurate disclosure of its underlying application or any formulations

invented by the named inventors as of the purported priority date, but solely in view of the disclosures set forth in Avadel's confidential information, trade secrets, and/or '986 patent publication. The '079 patent specification only discloses embodiments of a formulation for purported once-daily dosing that utilize one or more ion-exchange resins and, indeed, criticizes strategies other than ion-exchange resins. And yet, Jazz has asserted that one or more claims of the '079 patent would be infringed through the use of Avadel's FT218, which does not include any such ion-exchange resin. Given Jazz's view of the claim scope of the '079 patent, the '079 patent claims as filed and issued are neither described nor supported by its specification as, on information and belief, the claims were instead solely based on Avadel's confidential information, trade secrets, and/or inventive work disclosed in at least Avadel's '986 patent publication.

119.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

120.   As yet another example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that the '062 patent publication was published on January 25, 2018, Jazz had not filed the patent application that gave rise to the patent asserted in Jazz's Complaint in C.A. No. 21-1594-MN —Jazz's Patent No. 11,147,782 (the "'782 patent"). Nor did Jazz file the application that ultimately led to the issuance of the '782 patent at the time Avadel's '866 patent publication was published on June 20, 2019. The '782 patent was a child patent of the '079 patent.

121.    Indeed, Jazz did not file the application that ultimately led to the issuance of the '782 patent until March 23, 2021—almost two years *after* Avadel's '866 patent publication was published.

122.    On information and belief, Jazz drafted the claims that gave rise to the '782 patent based not on any commensurate disclosure of its underlying application, but solely in view of the disclosures set forth in Avadel's confidential information, trade secrets, and/or '866 patent publication.  The '782 patent specification only discloses embodiments of a formulation for purported once-daily dosing that utilize one or more ion-exchange resins and, indeed, criticizes strategies other than ion-exchange resins.  And yet, Jazz has asserted that one or more claims of the '782 patent would be infringed by Avadel's FT218, which does not include any such ion-exchange resin.  Given Jazz's view of the claim scope of the '782 patent, the '782 patent claims as filed and issued are neither described nor supported by its specification as, on information and belief, the claims were instead solely based on Avadel's inventive work disclosed in at least Avadel's confidential information, trade secrets, and/or '866 patent publication.

123.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

124.    Thus, on information and belief, after the publication of Avadel's '062 patent publication on January 25, 2018, Jazz began a pattern and practice of drafting claims that were

directed to the inventions disclosed in Avadel's published applications rather than the formulations that Jazz had been working on and had been disclosed in its applications.

125.    Additional facts confirm that Jazz's asserted patents constitute a brazen effort to pass off Avadel's work as its own.  Pharmaceutical companies seek intellectual property protection for their own products.  Jazz's own public statements echo that precept, explaining that it seeks intellectual property to "protect *our products* and product candidates and related inventions and improvements that we consider important to our business."  *See* Ex. 1 at 17.  Jazz further represented that "[o]ur owned and licensed patents and patent applications cover or relate to *our products and product candidates*, including certain formulations."  *Id*. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████    Jazz's about-face makes no sense in terms of protecting any Jazz potential product—that about-face is only explained by Jazz's improper effort to pass off Avadel's innovative work as its own and block Avadel from introducing FT218 to the market.

### Count I: Breach of Contract (2010 CDA)

126.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

127.    On information and belief, the 2010 CDA is a valid and enforceable contract between Jazz and Avadel.

128.    On information and belief, Avadel has performed its obligations under the 2010 CDA.

129.    On information and belief, Jazz agreed to maintain the confidential information provided by Avadel in confidence and not to use the confidential information in any capacity other than to evaluate and to negotiate the potential business relationship with Avadel.

130.    On or around May 26, 2010, Avadel disclosed confidential information describing Avadel's drug delivery technology to Jazz. *See supra* ¶¶ 23-38.

131.    Upon information and belief, Jazz breached its duty of confidentiality and non-use by using such information to develop its own once-nightly formulation and file patent applications based upon Avadel's Confidential Information.

132.    At a direct result of Jazz's action, Avadel suffered harm in an amount to be proven at trial.

### Count II: Breach of Contract (2015 CDA)

133.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

134.    The 2015 CDA is a valid and enforceable contract between Jazz and Avadel.

135.    Avadel has performed its obligation under the 2015 CDA.

136.    In Paragraph 1 of the 2015 CDA, Jazz agreed that information described in Exhibit A attached to the 2015 CDA constituted confidential information.

137.    In Paragraph 3 of the 2015 CDA, Jazz agreed to maintain the confidential information in confidence and not use the confidential information in any capacity other than to evaluate and to negotiate the potential business relationship with Avadel.

138.    On or around April 1, 2015, Avadel disclosed the 2015 Study Report in diligence, which contained confidential information as defined under Paragraph 1 of the 2015 CDA. *See supra* ¶¶ 39-49.

139.    Upon information and belief, Jazz breached its duty of confidentiality and non-use by using such information to develop its own once-nightly formulation and file patent applications based upon Avadel's Confidential Information.

140.    At a direct result of Jazz's action, Avadel suffered harm in an amount to be proven at trial.

**Count III: Breach of Contract** 

141.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

142.    ███████████████████████████████████████████

143.    ████████████████████████████████

144.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

145.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

147.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

148.    At a direct result of Jazz's action, Avadel suffered harm in an amount to be proven at trial.

**Count IV:  Misappropriation of Trade Secrets (18 U.S.C. § 1836 *et seq.*)**

149.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

150.    Avadel is in the business of developing and selling pharmaceutical products. Avadel's FT218 product is a once-nightly sodium oxybate formulation.

151.    ███████████████████████████████████████████████████████

███████████████████████ are Avadel trade secrets.

152.    Avadel derives independent economic value from these trade secrets not being generally known to, and not being readily ascertainable through proper means by, Avadel's competitors or any other persons who can obtain economic value from the disclosure or use of the information, such as by directing resources into research and development of an efficacious once-nightly sodium oxybate formulation, as well as the economic value derived from the sale of such a formulation.

153.    Avadel's trade secrets ███████████████████████████████████

█████████████████████████████████ are contained within its confidential 2010 Micropump® Deck and other diligence disclosures.

154.    Avadel took reasonable steps to protect, and did protect, these trade secrets including by at least, on information and belief, having a 2010 CDA in place before sharing the trade secret, and prominently displaying the legend "CONFIDENTIAL" on materials containing the trade secrets that were disclosed to Jazz, including the 2010 Micropump® Deck. ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ Further,

the materials were shared using a cloud service that provides encryption at-rest and in-transit, and implements access controls to limit access to specific recipients.

155.    This information has great value both monetarily and intrinsically to pharmaceutical companies, ███████████████████████████████████████████ ████████████████████████████████████████

156.    This information is not easily duplicated by others with similar knowledge and requires expertise to develop, again as evidenced by ████████████████████████████ ████████████████ and the significant time, effort, and resources that Avadel invested in order to develop FT218.

157.    On information and belief, Avadel initially disclosed these trade secrets to Jazz no later than May 26, 2010, after entering into a CDA with Jazz and/or after securing assurances from Jazz that it would not use information disclosed by Avadel, including in its 2010 Micropump® Deck.

158.    █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

159.    Jazz knew or had reason to know that the information in the 2010 Micropump® Deck and other diligence disclosures were Avadel trade secrets based upon the CDA and/or the CONFIDENTIAL labeling.

160.    Jazz knew or had reason to know that, at the time and under the circumstances through which it acquired Avadel's trade secrets, Jazz had an obligation and duty to not use or misappropriate Avadel's trade secrets.

161. Jazz knew that these materials were "confidential" and referred to them as such.

162. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

163. As a direct and proximate result of Jazz's actions, Avadel has and will continue to suffer harm in an amount to be proven at trial.

**Count V: Misappropriation of Trade Secrets (California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*)**

164. Avadel incorporates by reference the allegations made in the preceding paragraphs above.

165. Avadel is the owner of trade secret and confidential information ████████

███████████████████████████████████████████

████████ that as described above, constitute "trade secrets" within the meaning of Cal. Civil Code § 3426.1.

166. Avadel derives independent economic value from these trade secrets not being generally known to, and not being readily ascertainable through proper means by, Avadel's competitors or any other persons who can obtain economic value from the disclosure or use of the information, such as by directing resources into research and development of an efficacious once-

nightly sodium oxybate formulation, as well as the economic value derived from the sale of such a formulation.

167.    Avadel's trade secrets regarding ███████████████████████████████ ███████████████████████████████████████ are contained within its confidential 2010 Micropump® Deck and other diligence disclosures.

168.    Avadel took reasonable steps to protect, and did protect, these trade secrets including by at least, on information and belief, having a 2010 CDA in place before sharing the trade secret, and prominently displaying the legend "CONFIDENTIAL" on materials containing the trade secrets that were disclosed to Jazz, including the 2010 Micropump® Deck. ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ Further, the materials were shared using a cloud service that provides encryption at-rest and in-transit, and implements access controls to limit access to specific recipients.

169.    This information has great value both monetarily and intrinsically to pharmaceutical companies, ██████████████████████████████████ ██████████████████████████████

170.    This information is not easily duplicated by others with similar knowledge and requires expertise to develop, again as evidenced by ████████████████████████ ██████████████ and the significant time, effort, and resources that Avadel invested in order to develop FT218.

171.    On information and belief, Avadel initially disclosed these trade secrets to Jazz no later than May 26, 2010, after entering into a CDA with Jazz and/or after securing assurances from Jazz that it would not use information disclosed by Avadel, including in its 2010 Micropump® Deck.

172.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

173.    Jazz knew or had reason to know that the information in the 2010 Micropump® Deck and other diligence disclosures were Avadel trade secrets based upon the CDA and/or the CONFIDENTIAL labeling.

174.    Jazz knew or had reason to know that, at the time and under the circumstances through which it acquired Avadel's trade secrets, Jazz had an obligation and duty to not use or misappropriate Avadel's trade secrets.

175.    Jazz knew that these materials were "confidential" and referred to them as such.

176.    Jazz's actions, as set forth herein, constitute "misappropriation" within the meaning of Cal. Civil Code § 3426.1.

177.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

178.    As a direct and proximate result of Jazz's actions, Avadel has and will continue to suffer harm in an amount to be proven at trial.

179.    Jazz has been unjustly enriched as a further proximate result of its misappropriation of Avadel's trade secrets and confidential information.

180.    Jazz's actions in misappropriating Avadel's trade secret and confidential information was willful, fraudulent, malicious, and was done with the intent to injure and oppress Avadel and improve Jazz's own economic opportunities, thereby justifying an award of punitive damages against Jazz pursuant to Cal. Civil Code section 3426.3(c) and attorneys' fees pursuant to Cal. Civil Code § 3426.4.

**Count VI: Correction of Inventorship under 35 U.S.C. § 256 of the '488 Patent**

181.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

182.    One or more of the Avadel Inventors conceived of the subject matter claimed in the '488 patent.

183.    The '488 patent does not have written description support in its specification for any of its claims and thus does not have a priority date earlier than the filing date of those claims in which the new matter was added.

184.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '488 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

185.    One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

186.    One or more of the Avadel Inventors each made significant contributions to the reduction to practice of the subject matter claimed in the '488 patent.

187.    One or more of the Avadel Inventors contributed more to the subject matter claimed in the '488 patent  than the mere explanation of well-known concepts and/or the current state of the art.

188.    One or more of the Avadel Inventors are inventors of the '488 patent.

**Count V: Correction of Inventorship under 35 U.S.C. § 256 of the '885 Patent**

189.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

190.     One or more of the Avadel Inventors conceived of the subject matter claimed in the '885 patent.

191.    The '885 patent does not have written description support in its specification for any of its claims and thus does not have a priority date earlier than the filing date of those claims in which the new matter was added.

192.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '885 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

193.     One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

194.    One or more of the Avadel Inventors each made significant contributions to the reduction to practice of the subject matter claimed in the '885 patent.

195.    One or more of the Avadel Inventors contributed more to the subject matter claimed in the '885 patent  than the mere explanation of well-known concepts and/or the current state of the art.

196.    One or more of the Avadel Inventors are inventors of the '885 patent.

**Count VII: Correction of Inventorship under 35 U.S.C. § 256 of the '956 Patent**

197.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

198.    One or more of the Avadel Inventors conceived of the subject matter claimed in the '956 patent.

199.    The '956 patent does not have written description support in its specification for any of its claims and thus does not have a priority date earlier than the filing date of those claims in which the new matter was added.

200.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '956 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

201.    One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

202.    One or more of the Avadel Inventors each made significant contributions to the reduction to practice of the subject matter claimed in the '956 patent.

203.    One or more of the Avadel Inventors contributed more to the subject matter claimed in the '956 patent  than the mere explanation of well-known concepts and/or the current state of the art.

204.    One or more of the Avadel Inventors are inventors of the '956 patent.

**Count VIII: Correction of Inventorship under 35 U.S.C. § 256 of the '931 Patent**

205.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

206.     One or more of the Avadel Inventors conceived of the subject matter claimed in the '931 patent.

207.     The '931 patent does not have written description support in its specification for any of its claims and thus does not have a priority date earlier than the filing date of those claims in which the new matter was added.

208.     One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '931 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

209.     One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

210.     One or more of the Avadel Inventors each made significant contributions to the reduction to practice of the subject matter claimed in the '931 patent.

211.     One or more of the Avadel Inventors contributed more to the subject matter claimed in the '931 patent  than the mere explanation of well-known concepts and/or the current state of the art.

212.     One or more of the Avadel Inventors are inventors of the '931 patent.

**Count IX: Correction of Inventorship under 35 U.S.C. § 256 of the '079 patent**

213.     Avadel incorporates by reference the allegations made in the preceding paragraphs above.

214.     One or more of the Avadel Inventors conceived of ideas claimed in the '079 patent.

215.     One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '079 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

48

216.    One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

217.    One or more of the Avadel Inventors each made significant contributions to the conception of the subject matter claimed in the '079 patent.

218.    One or more of the Avadel Inventors led to the conception and the reduction to practice of the Invention.

219.    One or more of the Avadel Inventors contributed more to the Invention than the mere explanation of well-known concepts and/or the current state of the art.

220.    One or more of the Avadel Inventors are inventors of the '079 patent.

**Count X: Correction of Inventorship under 35 U.S.C. § 256 of the '782 patent**

221.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

222.    One or more of the Avadel Inventors conceived of ideas claimed in the '782 patent.

223.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '782 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

224.     One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

225.    One or more of the Avadel Inventors each made significant contributions to the conception of the subject matter claimed in the '782 patent.

226.    One or more of the Avadel Inventors led to the conception and the reduction to practice of the Invention.

227.    One or more of the Avadel Inventors contributed more to the Invention than the mere explanation of well-known concepts and/or the current state of the art.

228.     One or more of the Avadel Inventors are inventors of the '782 patent.

## PRAYER FOR RELIEF

WHEREFORE, Avadel requests the following relief:

A.     That the Court declare that Jazz breached its 2010 CDA with Avadel;

B.     That the Court declare that Jazz breached its 2015 CDA with Avadel;

C.     That the Court declare that Jazz breached ██████████████████

D.     That the Court award Avadel damages as a result of Jazz's breach of the 2010 CDA, 2015 CDA, ████████████

E.     That the Court enjoin Jazz from using Avadel's confidential information in breach of the 2010 CDA, 2015 CDA, ██████████

F.     That the Court find Jazz liable for all damages caused by its misappropriation of Avadel's trade secrets and order Jazz to pay such damages, including the disgorgement of all profits, benefits and other compensation and exemplary damages for the willful and malicious nature of the misappropriation, with pre- and post-judgment interest on all such damages;

G.     That the Court enjoin Jazz from further misappropriation and use of Avadel's trade secrets.

H.     That the Court determine and declare that one or more of the Avadel Inventors are inventors of the '488 patent;

I.     That the Court order the United States Patent and Trademark Office to correct inventorship of the '488 patent to reflect the contributions of one or more of the Avadel Inventors;

J.     That the Court determine and declare that one or more of the Avadel Inventors are inventors of the '885 patent;

K.     That the Court order the United States Patent and Trademark Office to correct inventorship of the '885 patent to reflect the contributions of one or more of the Avadel Inventors;

L.      That the Court determine and declare that one or more of the Avadel Inventors are inventors of the '956 patent;

M.      That the Court order the United States Patent and Trademark Office to correct inventorship of the '956 patent to reflect the contributions of one or more of the Avadel Inventors;

N.      That the Court determine and declare that one or more of the Avadel Inventors are inventors of the '931 patent;

O.      That the Court order the United States Patent and Trademark Office to correct inventorship of the '931 patent to reflect the contributions of one or more of the Avadel Inventors;

P.      That the Court determine and declare that one or more of the Avadel Inventors are inventors of the '079 patent;

Q.      That the Court order the United States Patent and Trademark Office to correct inventorship of the '079 patent to reflect the contributions of one or more of the Avadel Inventors;

R.      That the Court determine and declare that one or more of the Avadel Inventors are inventors of the '782 patent;

S.      That the Court order the United States Patent and Trademark Office to correct inventorship of the '782 patent to reflect the contributions of one or more of the Avadel Inventors;

T.      That the Court award Avadel its attorneys' fees, costs and expenses of the litigation;

U.      That the Court grant Avadel such other and further relief, in law or equity, as the Court deems just and proper.

Dated:  April 14, 2022

*Of Counsel*:

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Sarah W. Wang
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
sarah.wang@lw.com

Herman Yue
Bornali Rashmi Borah
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Herman.Yue@lw.com
Rashmi.Borah@lw.com

Yi Ning
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 470-2153
Sunnie.ning@lw.com

Daralyn J. Durie
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 365-6666
ddurie@durietangri.com

Kira A. Davis
Katherine E. McNutt
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013

McCARTER & ENGLISH, LLP

/s/ *Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Counsel for Plaintiffs Avadel CNS*
*Pharmaceuticals, LLC, and Avadel*
*Pharmaceuticals PLC*

(213) 992-4499
kdavis@durietangri.com
kmcnutt@durietangri.com