IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AVADEL CNS PHARMACEUTICALS LLC and AVADEL PHARMACEUTICALS PLC,<br><br>Plaintiff,<br><br>v.<br><br>JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED,<br><br>Defendants. | C.A. No. 22-487-GBW |

## MEMORANDUM ORDER

Before the Court is Defendants Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (together, "Jazz") motion for judgment on the pleadings (the "Motion") on Plaintiffs Avadel CNS Pharmaceuticals LLC and Avadel Pharmaceuticals PLC's (together, "Avadel") Complaint. D.I. 24. The Motion has been fully briefed (D.I. 25, 28, 30) and the Court has heard oral argument. For the following reasons, the Motion is denied.

I.  **BACKGROUND**

In this breach of contract, trade secret misappropriation, and correction of inventorship action, Avadel alleges that, after Avadel and Jazz explored a potential collaboration to jointly develop a once-nightly formulation of sodium oxybate (used for the treatment of excessive daytime sleepiness and cataplexy in adults with narcolepsy), Jazz instead misused Avadel's confidential information in violation of three confidential disclosure agreements ("CDA(s)") between Jazz and Avadel executed in 2010, 2015, and 2018, stole Avadel's trade secrets to develop its own oxybate products, and obtained patents using contributions of Avadel's inventors. *See generally* D.I. 2.

Avadel asserts breach of contract claims related to the parties' purported 2010 CDA (Count I), 2015 CDA (Count II), and 2018 CDA (Count III); misappropriation of trade secret claims arising under 18 U.S.C. § 1836, *et seq*, (Count IV) and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq*, (Count V); and to correct the inventorship of U.S. Patent No. 10,758,488 (the "'488 patent") (Count VI), U.S. Patent No. 10,813,885 (the "'885 patent") (Count V[sic]), U.S. Patent No. 10,959,956 (the "'956 patent") (Count VII), U.S. Patent No. 10,966,931 (the "'931 patent") (Count VIII), U.S. Patent No. 11,077,079 (the "'079 patent") (Count IX), and U.S. Patent No. 11,147,782 (the "'782 patent") (Count X). *Id.* at 37-50.

Jazz answered, D.I. 18, and filed the instant Motion seeking entry of judgment on the pleadings on all counts of Avadel's Complaint, D.I. 24.

## II. LEGAL STANDARD

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter pleadings are closed – but early enough not to delay trial." FED. R. CIV. P. 12(c). When evaluating a motion for judgment on the pleadings, the Court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988)).

"The purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F.Supp.2d 612, 617 (D. Del. 2008); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining that any documents integral to pleadings may be considered in connection with Rule 12(c) motion). "The issue is not whether a plaintiff will ultimately prevail but whether

2

the claimant is entitled to offer evidence to support the claims." *Burlington Coat Factory*, 114 F.3d at 1420. Ultimately, a motion for judgment on the pleadings can be granted "only if no relief could be afforded under any set of facts that could be proved." *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

## III.   DISCUSSION

### A. Avadel States Breach of Contract Claims

With respect to Count I, Jazz argues that Avadel failed to plead the existence of a 2010 CDA. D.I. 25 at 6-11. With respect to Counts II and III, Jazz argues that Avadel has not plead breach of the 2015 and 2018 CDAs. *Id.* at 11-15.

#### 1. Avadel Pleads the Existence of a Written 2010 CDA

Under both Delaware and New York law,[1] a breach of contract claim requires "(1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach." *GEICO Gen. Ins. Co. v. Green*, 276 A.3d 462 (Del. 2022) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)); *accord Dee v. Rakower*, 976 N.Y.S.2d 470, 474 (N.Y. App. Div. 2013) (requiring a breach of contract claim to plead "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach").

Here, Avadel pleads the existence of the 2010 CDA as an express, written agreement. Avadel alleges that, in 2010, Avadel and Jazz discussed a potential partnership to develop a once-

---

[1] Jazz and Avadel point to Delaware and New York law when arguing the sufficiency of Avadel's breach of contract claim based on the 2010 CDA without urging the Court to apply one jurisdiction over the other. *See, e.g.*, D.I. 25 at 6 n. 6; D.I. 28 at 8-9. For purposes of the instant Motion, the Court applies both Delaware and New York law without prejudice to either party later raising choice of law as this action proceeds.

nightly formulation of sodium oxybate. D.I. 2 ¶ 25. Avadel pleads that Jazz's Executive Director of Process and Product Science characterized these discussions as confidential, *id.* ¶ 28, and "[o]n information and belief . . . undertaken under the protection of such a CDA and/or an oral agreement . . . prohibiting the disclosure or use of Avadel's confidential information." *Id.* ¶ 27. Avadel states that entering into such "written, executed CDAs" was consistent with Avadel's business practice and course of conduct at the time. *Id.* ¶ 26. Avadel also pleads that, pursuant to this 2010 CDA, "Avadel prepared two slide decks for Jazz describing Avadel's proprietary drug delivery technologies," at least one of which was "prominently marked 'CONFIDENTIAL' on every slide to indicate to Jazz that its contents contained 'confidential' Avadel information that had not been publicly disclosed at the time." *Id.* ¶¶ 30-31. After reviewing Avadel's confidential slide deck, Avadel alleges that Jazz "concluded that Avadel's technology would not provide the desired release characteristics and declined to partner with Avadel in 2010 to develop a drug product." *Id.* ¶ 38. At this stage, these allegations are sufficient to infer the existence of a written CDA between Jazz and Avadel.[2]

Jazz's contrary arguments do not win the day. First, Jazz argues that "the transmission of allegedly confidential documents . . . does not demonstrate the recipient's intent to be bound by a CDA," citing to *Matter of GEC Indus., Inc.*, 123 B.R. 714, 717 (Bankr. D. Del. 1991) and *Abramo v. Ploener*, 394 A.2d 758, 760 (Del. Super. Ct. 1978). But *GEC* and *Abramo* were decided after the parties developed a full factual record—not in the pre-discovery Rule 12 context where

---

[2] Avadel's representations at oral argument, however, confine Avadel's breach of contract claim to that of an express, written agreement. Avadel disclaimed the existence of an implied contract, explaining that it believed a written agreement exists, but that Avadel had not "been able to locate it yet." Tr. 30:12-25. Avadel also represented that it was not asserting the existence of an implied contract. Tr. 30:21-31:4 ("[N]o, we believe there was a written CDA executed by the parties."). Accordingly, Avadel will not be able to prevail on its breach of contract action on a theory of an oral or implied agreement.

4

inferences are drawn in Avadel's favor. *See Bibbs v. Trans Union LLC*, 43 F.4th 331, 339 (3d Cir. 2022) ("We analyze a motion for judgment on the pleadings under Federal Rule of Civil Procedure Rule 12(c) under the same standards that apply to a Rule 12(b)(6) motion. Under Rule 12(c), a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party."). Accordingly, neither *GEC* nor *Abramo* compel judgment on the pleadings in Jazz's favor.

Next, Jazz argues that Avadel failed to plead the existence of a 2010 CDA because Avadel does not plead Jazz's "intention to be bound" nor the 2010 CDA's "sufficiently definite terms," D.I. 30 at 1, 6, relying on *Ameritel Mobile LLC v. Wireless Connection*, No. 4898/11, 2013 WL 5411705 (N.Y. Sup. Ct. Sept. 24, 2013) and *Frye v. Raphaelson*, C.A. No. 2020-0325-SEM, 2021 WL 4073425 (Del. Ch. May 3, 2021), *adopted*, (Del. Ch. 2021). But *Ameritel* was decided on a motion for summary judgment and does not address Avadel's burden at the pleading stage. 2013 WL 5411705, at *1. In *Frye*, the agreement at issue was attached to plaintiff's complaint, and the court found that plaintiff's pleading, stating that the parties "entered into a written agreement," could not "override the text of the Agreement, which is defective in several ways." *Frye*, 2021 WL 4073425, at *1 ("Initially, the Agreement is not signed by any parties. More importantly, it is not signed by Defendants, the parties to be charged. The Agreement is also missing the settlement date and the terms and conditions that must be in an agreement for sale of real property."). Accordingly, *Frye* does not compel judgment in Jazz's favor as this Court does not have evidence of any other agreement or terms contained therein that would contravene Avadel's assertion that a written 2010 CDA exists.

Accordingly, Jazz's Motion is denied with respect to the existence of the 2010 CDA as a written agreement.

### 2. Avadel Pleads Jazz' Breach of the 2015 CDA

Avadel has adequately plead that Jazz breached the 2015 CDA.[3] Paragraph 3 of the 2015 CDA states:

> The Designated Recipient and Jazz Pharmaceuticals agree to maintain the Confidential Information in confidence. Without the prior written consent of Flamel, except as set forth herein, the Designated Recipient and Jazz Pharmaceuticals shall not disclose Confidential Information to any third party or use Confidential Information for any purpose other than to evaluate and, if a decision is made to proceed, to negotiate such business relationship (the "Purpose").

D.I. 2 ¶ 43 (citing D.I. 2-11, Ex. 11 ¶ 3). Avadel pleads that, "[o]n April 1, 2015, Avadel sent Jazz a summary report of its pilot clinical study in humans ('2015 Study Report')" that "disclosed information that covered all categories of confidential information as defined in the 2015 CDA, including information critical to the development of Avadel's FT218 product that was not previously disclosed to the public" such as various pK data. D.I. 2 ¶ 46. Avadel pleads that the 2015 Study Report was marked confidential, *id.* ¶ 47, that it contained "Avadel's confidential information regarding the clinical trial as well as the unique attributes and profile of a sachet, liquid-suspension system for sodium oxybate once-nightly dosing" and "confidential, trade secret pharmacokinetic data indicating that such a sachet, liquid-suspension system would be effective for sodium oxybate once-nightly dosing," *id.* ¶ 48. Avadel pleads that Jazz, after reviewing Avadel's confidential information in the 2015 Study Report, declined to partner with Avadel. *Id.* ¶ 49. Avadel also pleads that, "[i]nstead of using Avadel's confidential information solely for the evaluation and negotiation of a future business relationship with Avadel (as required by the CDAs), Jazz used information from its 'diligence' with Avadel, including the critical pK data, to redirect

---

[3] Jazz contends and Avadel does not dispute that the 2015 CDA is governed by New York law. D.I. 25 at 11; *see also* D.I. 2-11, Ex. 11 ¶ 9.

the focus of its own development efforts" in breach of the 2015 CDA. *Id.* ¶ 89; *see also id.* ¶¶ 66-91. These allegations are sufficient to plead Jazz's breach. *See, e.g., Opternative, Inc. v. Jand, Inc.*, C.A. No. 17 Civ. 6936 (JFK), 2018 WL 3747171, at *5 (S.D.N.Y. Aug. 7, 2018) ("allegations are sufficient to establish circumstantial evidence from which the factfinder could infer that [defendant] used [plaintiff's] Confidential Information for purposes other than evaluating a business relationship with [plaintiff], in breach of the NDAs").

Jazz argues that Avadel does not plead that Jazz "possessed" any of Avadel's confidential information. D.I. 30 at 6; D.I. 25 at 12-13. Specifically, Jazz contends that "Avadel sent the [confidential] information to Benet, not Jazz." D.I. 30 at 6. But at oral argument, Jazz conceded that Benet was Jazz's agent. Tr. 22:5-8. Thus, construing inferences in Avadel's favor, Avadel has sufficiently plead that Avadel furnished confidential information to Jazz via Benet, which Jazz later misused in violation of the 2015 CDA. At this stage, such allegations are sufficient because Jazz has not "clearly establishe[d] that no material issue of fact remains to be resolved" on this issue and would therefore be "entitled to judgment as a matter of law." *Rosenau*, 539 F.3d at 221.

Accordingly, Jazz's Motion is denied with respect to Avadel's breach of contract claim arising under the 2015 CDA.

### 3. Avadel Pleads Breach of the 2018 CDA

Avadel has adequately plead that Jazz breached the 2018 CDA.[4] Paragraph 2(a) of the 2018 CDA states:

> Except as otherwise expressly permitted herein, without the prior written consent of the Disclosing Party, the Receiving Party will not use Confidential Information of the Disclosing Party for any purpose other than the Purpose or disclose Confidential Information of the Disclosing Party to any third party; provided that the

---

[4] Jazz contends and Avadel does not dispute that the 2018 CDA is governed by New York law. D.I. 25 at 13; *see also* D.I. 2-14, Ex. 14 ¶ 6(c).

7

> Receiving Party may disclose Confidential Information of the Disclosing Party to its Affiliates and their respective officers, directors, employees, consultants, attorneys, financial or other advisors/providers, accountants, agents or representatives (the "Representatives") who are required to use such Confidential Information for the Purpose and who are bound by obligations of confidentiality at least as stringent as those set forth herein. Upon disclosing Confidential Information to any such Representatives, the Receiving Party will advise them of the confidential nature of the information. Without limiting the generality of the foregoing, the Receiving Party will take all reasonable precautions to prevent the disclosure of Confidential Information of the Disclosing Party to any unauthorized third parties (and in any event consistent with the precautions it ordinarily takes to safeguard its own confidential documents) and will be liable for any breach of the confidentiality and non-use obligations under this Agreement by any of the Representatives of the Receiving Party.

D.I. 2 ¶ 51 (citing D.I. 2-14, Ex. 14, ¶ 2(a)). Paragraph 1 of the 2018 CDA defined "confidential information" as:

> (i) all information (whether in written, electronic, or graphic form or disclosed orally) that is provided by or on behalf of one Party (the "Disclosing Party") to the other Party (the "Receiving Party"), directly or indirectly, in connection with the Purpose and relating to the Disclosing Party and its Affiliates (as defined below) and their respective products, product candidates, technologies and businesses, and those of any third party from whom the Disclosing Party or its Affiliates has received information on a confidential basis, (ii) any memorandum, analysis, compilation, summary, interpretation, study, report or other document, record or material that is or has been prepared by, for or on behalf of the Receiving Party or any of its Representatives (as defined below) and that contains, reflects, interprets or is based directly or indirectly upon any information of the type referred to in clause (i) of this sentence.

D.I. 2 ¶ 53 (citing D.I. 2-14, Ex. 14, ¶ 1).

Avadel pleads that "by July 2018," Avadel provided Jazz with "confidential, trade secret data indicating that such a sachet, liquid-suspension system would be effective to achieve ▮ ▮once-nightly dosing of a sodium oxybate product." D.I. 2 ¶¶ 58-63. Avadel alleges that, "[a]fter Avadel's disclosure of the foregoing

8

confidential information pursuant to explicit confidentiality agreements, Jazz once again declined to partner with Avadel." *Id.* ¶ 63. Thus, drawing inferences in Avadel's favor, the Complaint plausibly alleges that Jazz declined to partner with Avadel after it obtained its confidential information—a breach of the 2018 CDA.

Jazz argues that Avadel disclosed its confidential information *on* July 13, 2018 and that any allegations concerning Jazz's activities prior to that date are not actionable under the 2018 CDA. D.I. 25 at 13-14. But Avadel pleads that "by July 2018" it had transmitted confidential information to Jazz. D.I. 2 ¶ 58. Adopting Jazz's view that Avadel's transmissions occurred no earlier than July 13, 2018 when Avadel pleads they occurred "by July 2018" would amount to construing inferences in Jazz's favor rather than Avadel's, an outcome flouting the standard governing Rule 12(c) motions. *See Rosenau*, 539 F.3d at 221 (explaining that the Court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party"). That is, the timing of Avadel's transmission is a factual dispute not amenable to resolution at the Rule 12(c) stage. *See, e.g., Noramco LLC v. Dishman USA, Inc.*, C.A. No. 21-1696-WCB, 2022 WL 2817876, at *6 (D. Del. July 19, 2022) (denying motion for judgment on the pleadings because "based on the pleadings, it appears that there are significant factual disputes to be resolved in this case").

Accordingly, Jazz's Motion is denied with respect to Avadel's breach of contract claim arising under the 2018 CDA.

### B. Avadel States Plausible Trade Secrets Misappropriation Claim

With respect to Counts IV and V, Jazz argues that Avadel has not pled that the slide decks Avadel provided to Jazz in 2010 contained trade secrets. Jazz also argues that Avadel does not plead that Jazz misappropriated Avadel's trade secrets. D.I. 25 at 15; 19.

9

To state a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*, ("DTSA"), a plaintiff must allege facts demonstrating "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]"and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (internal quotations omitted). "[T]he DTSA and the [California Uniform Trade Secrets Act] share the same pleading requirements for the identification of trade secrets." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018); *see also* Cal. Civ. Code. § 3426, *et seq*.

### 1. Avadel Pleads Its 2010 Slide Decks Contained Trade Secrets

"A 'trade secret' is defined as information that: (1) derives independent economic value from not being generally known to the public; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Gatan, Inc. v. Nion Company*, C.A. No. 15-1862-PJH, 2017 WL 1196819, at * 6 (N.D. Cal. Mar. 31, 2017) (citing Cal. Civ. Code § 3426.1); *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) ("The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business."). "Whether a trade secret owner has taken reasonable efforts to maintain secrecy is a question of fact." *Automotive Data Sols., Inc. v. Directed Elecs. Canada, Inc.*, C.A. No. 18-1560-GW(EX), 2018 WL 4742288, at *5 (C.D. Cal. July 16, 2018) (citing *Mattel, Inc. v. MGA Entm't, Inc.*, C.A. No. 04-9049 DOC (RNBx), 2011 WL 3420571, at *2 (C.D. Cal. Aug. 4, 2011)).

As detailed *supra*, Avadel pleads that, to protect its trade secrets, Avadel executed a written 2010 CDA with Jazz, disclosed information pursuant to contractual restrictions therein, had a

10

"confidential discussion" with Jazz, and stamped at least one of the slide decks Avadel transmitted to Jazz as "confidential." D.I. 2 ¶¶ 25-36. Avadel also pleads that, "[a]t the time [of the 2010 discussions], Avadel's business practice and course of conduct when engaging in discussions with potential commercial partners was to disclose confidential information pursuant to a written, executed CDAs [sic] prohibiting the disclosure or use of Avadel's confidential information." *Id.* ¶ 26. Avadel also pleads its confidential materials were shared with Jazz "using a cloud service that provides encryption at-rest and in-transit, and implements access controls to limit access to specific recipients." *Id.* ¶¶ 154, 168. Thus, Avadel's sufficiently pleads that Avadel took reasonable measures to maintain the secrecy of its confidential information.[5] *See Citcon USA, LLC v. RiverPay Inc.*, C.A. No. 18-02585-NC, 2018 WL 6813211, at *5 (N.D. Cal. Dec. 27, 2018), *aff'd in part, rev'd in part and remanded*, No. 20-16929, 2022 WL 287563 (9th Cir. Jan. 31, 2022); *VBS Distribution, Inc. v. Nutrivita Lab'ys, Inc.*, 811 F. App'x 1005, 1008 (9th Cir. 2020).

In response, Jazz raises factual disputes, arguing (for example) that Avadel transmitted the slide decks to a third-party who allegedly had no obligation to maintain their confidentiality, that Avadel did not send the decks in an encrypted format, and that at least one of the two slide decks transmitted to Jazz was not confidential. D.I. 25 at 18-19. These factual disputes are not appropriate for resolution on a Rule 12(c) motion and do not defeat Avadel's claims. *See, e.g., Noramco*, 2022 WL 2817876, at *6.

Jazz also faults Avadel for "not address[ing] two cases that Jazz cited, both of which . . . granted motions to dismiss on facts mirroring those here." D.I. 30 at 8. But *Hospitality Mktg. Concepts v. Six Continents Hotels*, C.A. No. 15-1791, 2016 WL 9045853 (C.D. Cal. May 2, 2016)

---

[5] Jazz does not argue that Avadel does not "derives independent economic value from [its information] not being generally known to the public." *Gatan*, 2017 WL 1196819, at * 6.

11

and *Profit Point Tax Techs. v. DPAD Grp.*, C.A. No. 19-698, 2020 WL 759952 (W.D. Pa. Jan. 29, 2020) do not save Jazz. In *Hospitality*, the court held that, "[plaintiff's] failure to enter a confidentiality or non-disclosure agreement before voluntarily disclosing its alleged trade secrets to [defendant], its Australian subsidiary, or its third-party consultants extinguished their secrecy." 2016 WL 9045853, at *5. Here, Avadel pleads that "[a]t the time [of the 2010 discussions], Avadel's business practice and course of conduct when engaging in discussions with potential commercial partners was to disclose confidential information pursuant to a written, executed CDAs [sic] prohibiting the disclosure or use of Avadel's confidential information." D.I. 2 at ¶ 26. Thus, unlike the plaintiff in *Hospitality*, Avadel at this stage adequately pleads that any commercial partner in possession of Avadel's technology must be presumed to have been subject to confidentiality restrictions. In *Profit*, the court dismissed plaintiff's misappropriation of trade secrets claims because the plaintiff did not "specify with whom [plaintiff] did (or did not) share information" while also "affirmatively disclos[ing] its [alleged confidential information] to third parties." 2020 WL 759952, at *6 (W.D. Pa. Jan. 29, 2020). Here, Avadel identifies the specific measures it took to maintain the secrecy of its trade secrets when that information was shared outside of Avadel.[6]

---

[6] The *Point* court actually distinguishes a case, *Teva Pharmaceuticals USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 680 (E.D. Pa. 2018), which the Court finds more analogous to the circumstances at bar, rendering Jazz's reliance on *Point* further strained. The *Point* court explained: "To the extent [plaintiff] relies on *Teva* . . . , this case is distinguishable. The plaintiff in *Teva* alleged that the defendant, its former employee: (1) signed a confidentiality agreement that prohibited her from improperly disclosing trade secrets or confidential information; and (2) documents she shared were marked 'confidential.' The court noted that, because the information was classified as confidential and Teva took measures to restrict access, it was not available outside Teva." *Profit*, 2020 WL 759952, at *6 (citations omitted). Avadel pleads that it both signed a confidentiality agreement with Jazz prohibiting Jazz from disclosing Avadel's confidential information, and that Avadel shared decks marked "confidential" with Jazz. *See, e.g.*, D.I. 2 ¶¶ 31, 37, 38, 154.

12

Accordingly, because Avadel has pled that its slide decks contained trade secrets, Jazz's Motion is denied on this ground.

### 2. Avadel Pleads Jazz Misappropriated Avadel's Trade Secrets

The parties agree that Jazz's argument with respect to whether Jazz misappropriated Avadel's trade secrets "rises and falls with the 2015 and 2018 CDA breach arguments." D.I. 30 at 9 (citing D.I. 25 at 19; D.I. 28 at 17). Because the Court has concluded that Avadel has adequately pled its 2015 and 2018 breach of contract claims, Jazz's Motion is denied on this ground.

### C. Avadel States Plausible Correction-of-Inventorship Claims

With respect to Counts VI-XI, Jazz argues that Avadel has not sufficiently pled its correction-of-inventorship claims because those counts "recite legal standards in conclusory fashion." D.I. 25 at 20; *see also* D.I. 30 at 9-10.

35 U.S.C. § 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997). A party may correct an inventorship error via misjoinder and nonjoinder. *Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1553 (Fed. Cir. 1997). "Misjoinder is the error of naming a person as an inventor who is not an inventor; nonjoinder is the error of omitting an inventor." *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358 (Fed. Cir. 2019). To state a correction-of-inventorship claim, Avadel must allege facts that would allow the Court to infer that Avadel contributed to the conception and reduction to practice of the inventions. *Intercept Pharms., Inc. v. Fiorucci*, C.A. No. 14-1313-RGA, 2017 WL 253966, at *2 (D. Del. Jan. 20, 2017).

Accepting Avadel's well-pleaded factual allegations as true and drawing all reasonable inferences in its favor, Avadel's claims for correction of inventorship are plausible. The Complaint describes ███████████████████████████████████████████, *see, e.g.*, D.I. 2 ¶¶ 18-22, 64-65, and pleads that Avadel shared with Jazz confidential information related to Avadel's products, clinical trials, and proprietary drug delivery technologies, *see, e.g., id.* ¶¶ 30, 46, 58, 60-62. After Jazz obtained Avadel's data, Avadel pleads Jazz never collaborated with Avadel. *Id.* ¶ 7, 38, 49, 63. According to Avadel, Mr. Michael Desjardin (Jazz's Vice President of Manufacturing and Technical Development) forwarded one of Avadel's slide decks to Mr. Clark Allphin ("a named inventor on many of the patents Jazz has asserted against Avadel" who also served as Jazz's Executive Director of Process and Product Science). *Id.* ¶¶ 28, 73-75. Avadel alleges Mr. Desjardin's email encouraged Mr. Allphin to revisit another confidential slide deck Jazz had received from Avadel ███████████████████████████████████████ ███████████████. *Id.* ¶¶ 74-77. Avadel claims that the slide deck allegedly reviewed by Mr. Allphin described "Avadel's confidential conclusion that microparticles could be utilized as an alternative to solid oral dosing, including by way of 'sachet or oral suspension, which allow large dose formulations that are completely tasteless'" and "proposed a dosage form of 'one sachet of powder (controlled release microparticles) and one bottle of oral solution.'" *Id.* ¶ 82 (internal citations omitted). Avadel's deck also purportedly disclosed that one could use a "'combination of immediate release AND delayed release in a single administration' in order 'to obtain the desired PK profile,' and that the dosage form may contain 50% sodium oxybate in solution and 50% controlled release microparticles." *Id.* ¶ 84 (internal citations omitted).

Then, Avadel contends that, less than three weeks after Mr. Desjardin emailed Mr. Allphin, "Mr. Allphin and named co-inventor Scott Bura filed a provisional application 62/117,889 which

ultimately matured into the '782 patent. One year later (and six years after the 2010 interaction with Avadel), Messrs. Allphin and Bura filed utility Application No. 15/047,586, Collectively, those comprise the '899 Applications.'" *Id.* ¶ 78. Avadel pleads that, while Jazz's applications "were filed under the guise of describing ion-exchange resinate technology, the '899 Applications track the confidential disclosures of [Avadel's confidential slide deck]." *Id.* ¶ 79. According to Avadel, "the '899 Applications state that 'it would be desirable to provide oxybate . . . in extended release, oral liquid dosage form (including suspensions of oxybate-containing particles as described herein, which in some embodiments can be supplied as a sachet . . . .).'" *Id.* ¶ 82. Avadel also pleads that the '899 Applications state "controlled release and immediate release formulations can be dosed together to a subject to provide quick onset of action, followed by maintenance of therapeutic levels of the drug substance over a sustained period of time" and "contain multiple other references to a combination of immediate and controlled release formulations"—ideas that Avadel claims were conceived by Avadel's inventors and not anyone at Jazz. *Id.* ¶¶ 83, 85.

Construing the Complaint in the light most favorable to Avadel and taking these and other highly specific facts together—including, but not limited to, ████████████████████ ████████, its eagerness to meet with Avadel and explore a possible collaboration, allegations surrounding Jazz's internal use of Avadel's confidential information, the timing of Jazz's distancing itself from Avadel, and Jazz's filing of the '899 Applications which matured into the '782 patent—Avadel's correction-of-inventorship claim as to the '782 patent is plausible. These facts allow the reasonable inference that certain of Avadel's inventors conceived the invention of the '782 patent and that individuals at Jazz did not.

Avadel's Complaint also support the reasonable inference that inventors at Avadel "made a more-than-insignificant contribution to the conception of at least one claim" of the '782 patent.

*CODA*, 916 F.3d at 1359 (citing *Fina Oil*, 123 F.3d at 1473 ("The determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case.")). Indeed, Avadel's correspondence with Jazz and "as well as the parties' signing [multiple] nondisclosure agreement[s] going to cooperation between the parties in developing [sodium oxybate] technology . . . allow the reasonable inference that the collaboration requirement was satisfied." *CODA*, 916 F.3d at 1359. In view of Avadel's extensive and highly specific allegations, Jazz's argument that Avadel does not "attempt to match up [its inventors'] alleged 'contribut[ions]' to Jazz's patent claims," D.I. 30 at 10, is not persuasive.

In fact, the allegations pled by Avadel are strikingly similar to those which the Federal Circuit found sufficient to state a correction-of-inventorship claim in *CODA*. *See generally* 916 F.3d 1350 (Fed. Cir. 2019). Avadel cites *CODA*, D.I. 28 at 18-19, but Jazz does not distinguish it. Instead, Jazz points to *Opternative*. But there, the court concluded that the plaintiff failed to state a claim for "sole inventorship" because "the complaint does not include any specific allegations that [the alleged inventor] conceived of the total patented invention and that any contribution by the named inventors in the . . . [patent] was insignificant." *Opternative*, 2018 WL 3747171, at *9. Here, as described *supra*, Avadel has made specific allegations with respect to its contributions, rendering *Opternative* inapposite on this issue.

With respect to Avadel's correction-of-inventorship claims on the '488, '885, '956, '931, and the '079 patents, Avadel alleges that, "[o]n information and belief, Jazz engaged in a pattern and practice of copying Avadel's inventive work by drafting claims based on the disclosures in Avadel's patent publications and guided by its improper use of the confidential information disclosed by Avadel during the diligence process, rather than any commensurate disclosure of

16

Jazz's underlying applications," D.I. 2 ¶ 101. As a result, Avadel contends that Jazz' patents reflect Avadel's work, *id.* ¶¶ 102-125.

Jazz does not attempt to dismantle Avadel's correction-of-inventorship claims patent-by-patent.[7] Instead, Jazz appears to characterize Avadel's allegations as nonactionable by citing to *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867 (Fed. Cir. 1988), contending that the "Federal Circuit has expressly authorized such conduct absent other inappropriate conduct." D.I. 25 at 20. However, Avadel's Complaint is replete with allegations concerning Jazz's allegedly inappropriate conduct, including allegations that Jazz monitored Avadel's activities and later misused Avadel's confidential information to obtain patents for itself. *See generally* D.I. 2. Moreover, *Kingsdown* is inapposite to the instant action because, in *Kingsdown*, the Federal Circuit analyzed the "deceitful intent" element of inequitable conduct when explaining that "there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market." *Kingsdown*, 863 F.2d at 874. Here, Avadel seeks relief under a theory of correction-of-inventorship; not inequitable conduct. Thus, this Court agrees with Avadel that "[n]othing in the text of 35 U.S.C. § 256 . . . suggests that Congress made 'filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market' an exception from its scope." D.I. 28 at 19-20. Jazz provides no contrary authority. Thus, *Kingsdown* does not compel entry of judgment in Jazz's favor.

---

[7] Indeed, in view of Jazz's cursory arguments addressing these claims, *see* D.I. 25 at 19-20; D.I. 30 at 9-10, the Court's discretion is best utilized in denying the Motion because Jazz has not met its burden to compel judgment in its favor. *cf. Almirall, LLC v. Torrent Pharms., Ltd.*, 548 F. Supp. 3d 443, 451 (D. Del. 2021) ("[T]he Court has discretion to deny a Rule 12(c) motion," *citing* Wright & Miller, 5C *Federal Practice and Procedure* § 1367 (3d ed. Apr. 2021)); *see also Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991) (explaining that a Rule 12(c) motion should be granted "only if no relief could be afforded under any set of facts that could be proved").

17

Accordingly, Jazz is not entitled to judgment on the pleadings on Avadel's correction-of-inventorship claims.

## IV. CONCLUSION

For the foregoing reasons, the Motion is denied.

\* \* \*

**WHEREFORE**, this 18th day of July, 2023, **IT IS HEREBY ORDERED** that:

1. Defendants Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) (D.I. 24) is **DENIED**.

2. Consistent with the parties' Stipulated Order (D.I. 47), the parties shall meet and confer and submit a Proposed Scheduling Order no later than fourteen (14) days from the date of this Memorandum Order.

3. Because this Memorandum Order is filed under seal, the parties shall meet and confer and submit a joint proposed redacted version no later than seven (7) days from the date of this Memorandum Order. In the absence of a timely request compliant with applicable standards, the Court will unseal the entire Memorandum Order.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE