IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AVADEL CNS PHARMACEUTICALS LLC and AVADEL PHARMACEUTICALS PLC, | ) ) ) | |
| Plaintiffs, | ) ) | **PUBLIC VERSION** |
| v. | ) ) ) | C.A. No. 22-487 (GBW) |
| JAZZ PHARMACEUTICALS, INC. and JAZZ PHARMACEUTICALS IRELAND LIMITED, | ) ) ) ) ) | ███████████████ ████████████████████████ |
| Defendants. | ) | |

## FIRST AMENDED ANSWER TO COMPLAINT

### Preliminary Statement

Plaintiffs Avadel CNS Pharmaceuticals, LLC and Avadel Pharmaceuticals PLC (together "Plaintiffs" or "Avadel")[1] allege that Defendants Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited (together "Defendants" or "Jazz") purportedly misappropriated Avadel's alleged trade secrets and purportedly breached related confidential disclosure agreements for the past decade-plus. As shown throughout this Answer, however, documentary evidence spanning back to 2009 demonstrates that Avadel's baseless allegations were not properly investigated before the Complaint was filed. Indeed, Avadel is or should be in possession of documents that directly contradict what it has pled.

Notably, Avadel/Flamel never accused Jazz of misusing information during their discussions, which spanned more than a decade. Nor did Avadel/Flamel ever believe that Jazz

---

[1]   Avadel states that "[r]eferences to Avadel include certain predecessors in interest to Avadel Pharmaceuticals plc that operated under the name Flamel in some cited documents." D.I. 2 at 1, n.1. Jazz uses "Flamel" where appropriate to refer to the entity that is at issue in the allegation. To the extent necessary, and based on the time period and Flamel's relationship to Avadel, "Flamel" should also be understood to refer to Avadel where appropriate.

was not seriously considering a proposed deal.  For example, in 2018, Avadel's CEO bought 3,000 shares of stock in his own company on the day the companies met in New York City to discuss a proposed partnership.  *See* Ex. 1 at JPION00457494; Ex. 2 (5/24/18 SEC Form 4 for Michael Anderson).  He then bought an additional 2,500 shares several weeks later.  *See* Ex. 3 (6/27/18 SEC Form 4 for Anderson).  And despite the public availability of Jazz's patents allegedly incorporating Avadel's confidential information relating to once-nightly formulations of sodium oxybate, Avadel continued to reach out to Jazz to partner in the development of such formulations and the parties continued to meet until at least January 2020 without any allegations of any purported wrongdoing.  *See, e.g*., Ex. 4 at JPION00457658; Ex. 5 at JPION00457670.  Only through this litigation, after Jazz had sued Avadel for patent infringement, and with no U.S. Food and Drug Administration ("FDA") approval of its once-nightly sodium oxybate product, did Avadel for the first time baselessly accuse Jazz of purported wrongdoing.

### Response to Allegations

1.     Plaintiffs Avadel CNS Pharmaceuticals, LLC and Avadel Pharmaceuticals PLC (collectively "Plaintiffs" or "Avadel") seek redress for Defendants Jazz Pharmaceuticals, Inc. and Jazz Pharmaceuticals Ireland Limited's (collectively "Defendants" or "Jazz") misappropriation of Avadel's trade secrets and related breach of confidential disclosure agreements ("CDAs").  Jazz's trade secret misappropriation and breach of its confidentiality obligations are part of Jazz's continuing efforts to keep Avadel's revolutionary *once*-nightly formulation of sodium oxybate ("FT218") for the treatment of excessive daytime sleepiness ("EDS") and cataplexy in adults with narcolepsy off the market.

**ANSWER:**  Jazz admits that the Complaint purports to allege an action for the misappropriation of Avadel's trade secrets and the breach of alleged related confidential disclosure agreements.  Jazz denies that the Complaint states a claim for which relief can be granted, denies that Avadel is entitled to any relief, and, except as expressly admitted, Jazz denies the allegations of Paragraph 1.

2.     For almost two decades, Jazz has marketed and sold immediate-release, *twice*-nightly sodium oxybate formulations, first under the trade name Xyrem® and more recently under

the trade name Xywav™. Both of Jazz's sodium oxybate products require narcolepsy patients to take a first dose right before bedtime, and to then wake up in the middle of the night and take a second dose. Because narcolepsy is a sleep disorder, waking up in the middle of the night for treatment is counterintuitive and represents a major problem for these patients.

**ANSWER:** Jazz admits that it holds an approved New Drug Application ("NDA") under Section 505(a) of the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 355(a), for sodium oxybate oral solution (NDA No. 21-196), which it sells under the trade name XYREM®. Jazz admits that the FDA first approved Xyrem® in 2002. Jazz also admits that it holds an approved NDA under Section 505(a) of the FFDCA, 21 U.S.C. § 355(a), for calcium, magnesium, potassium, and sodium oxybates oral solution (NDA No. 212690), which it sells under the trade name XYWAV®. Jazz admits that the FDA first approved Xywav® in 2020. Jazz refers to the FDA-approved labeling for Xyrem® and Xywav® (available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process when searches for "Xyrem" and "Xywav" are conducted (last visited June 2, 2022)) for the administration instructions contained therein (*see, e.g.*, Exs. 6-10 (Xyrem® and Xywav® labels)), and, except as expressly admitted, Jazz denies, or otherwise lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 2.

3.     Accordingly, there is a significant need for a once-nightly sodium oxybate drug product. Jazz informed the marketplace of this unmet need at least as early as 2016, but had been struggling in vain for years prior to that to formulate a product with the requisite bioavailability for once-nightly dosing, *See* Ex. 1, Jazz Pharmaceuticals plc, Annual Report (Form 10-K) (Feb. 23, 2016), *available at* https://investor.jazzpharma.com/node/14886/html (Jazz is "also pursuing other activities related to the potential development of options for narcolepsy patients that would provide clinically meaningful improvements compared to Xyrem, including once-nightly dosing."). Despite over two decades of effort, Jazz has failed to develop such a product.

**ANSWER:** Jazz admits that D.I. 2-1 states, among other things, "[w]e are also pursuing other activities related to the potential development of options for narcolepsy patients that would provide clinically meaningful improvements compared to Xyrem, including once-nightly dosing."

D.I. 2-1 at 9.  Jazz otherwise refers to D.I. 2-1 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 3.

4.      Avadel ultimately succeeded where Jazz failed.  Avadel developed FT218 and has submitted a New Drug Application ("NDA") to the FDA seeking approval to provide its revolutionary narcolepsy treatment to patients.  Recognizing its potential superiority over Jazz's existing twice-nightly formulations, the FDA has granted FT218 Orphan Drug Designation for the treatment of narcolepsy.  With approval and a grant of Orphan Drug Exclusivity, FT218 would be awarded a seven-year period of market exclusivity in the United States.

**ANSWER:**  Paragraph 4 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz admits that, pursuant to Section 505(b)(2) of the FFDCA, Avadel filed an NDA ("Avadel's NDA") seeking approval to engage in the commercial manufacture, use, sale, offer for sale, or importation of a sodium oxybate product, which Avadel has designated as FT218.  Jazz admits that FT218 has received Orphan Drug Designation, admits that 21 U.S.C. § 301 *et seq.* contains statutory provisions relating to food and drugs, including provisions concerning Orphan Drugs, admits that 21 C.F.R. contains regulations relating to food and drugs, including provisions concerning Orphan Drugs, and refers to the statutes and regulations for the terms thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 4.

5.      When Avadel filed its NDA, Jazz faced a choice: either allow Avadel to provide a narcolepsy treatment that met patient needs unmet by Jazz's products; or file frivolous patent infringement lawsuits in an effort to prevent Avadel's once-nightly treatment from reaching the patients who need it in an attempt to preserve its market share.

**ANSWER:**  Jazz denies the allegations of Paragraph 5.

6.      Jazz chose the latter approach, filing three patent infringement lawsuits seeking to keep Avadel's once-nightly product off the market. (C.A. No. 21-691-MN, C.A. No. 21-1138-MN and C.A. No. 21-1594-MN) (collectively "Jazz's Suits").  Together, Jazz's Suits allege that Avadel's FT218 infringes U.S. Patent Nos. 10,758,488 (the "'488 patent"), 10,813,885 (the "'885 patent"), 10,959,956 (the "'956 patent"), 10,966,931 (the "'931 patent"), 8,731,963 (the '963 patent) 11,077,079 (the "'079 patent"), and 11,147,782 (the "'782 patent").  As Avadel has

explained in its responsive pleadings, Jazz's lawsuits are meritless and seek to enforce patent claims covering work that Avadel, not Jazz, invented.[2]

**ANSWER:** Jazz admits that it filed actions for patent infringement and for declaratory judgments of patent infringement under the patent laws of the United States, 35 U.S.C. §100, et seq. and 28 U.S.C. §§ 2201 and 2202, arising from Avadel's filing of its NDA with the FDA seeking approval to commercially market a sodium oxybate drug product prior to the expiration of United States Patent Nos. 8,731,963 (the "'963 patent"), 10,758,488 (the "'488 patent"), 10,813,885 (the "'885 patent"), 10,959,956 (the "'956 patent"), 10,966,931 (the "'931 patent"), 11,077,079 (the "'079 patent"), and 11,147,782 (the "'782 patent") (collectively, the "Jazz Patents"). Jazz further admits that those actions were subsequently assigned the case numbers C.A. No. 21-691-MN, C.A. No. 21-1138-MN, and C.A. No. 21-1594-MN, and, except as expressly admitted, Jazz denies the allegations of Paragraph 6.

7. Jazz's inability to develop a once-nightly product on its own led it to track Avadel's successes, including closely monitoring Avadel's patent filings. But Jazz did more than just engage in legal monitoring of Avadel's public disclosures of its work; Jazz also improperly accessed and used Avadel's confidential information regarding its successful clinical studies and the proprietary technology that ultimately allowed Avadel to develop FT218. To secure such access, Jazz repeatedly entered into agreements with Avadel—ostensibly for purposes of assessing a possible collaboration between the companies. But Jazz never collaborated with Avadel. And instead of honoring its obligations not to misuse Avadel's confidential information obtained under these agreements, Jazz distributed that information internally at Jazz and did precisely what it had agreed not to do, pretending that Jazz scientists invented subject matter associated with that confidential information and trade secrets, and using it to guide its patent prosecution efforts as well as its own drug development efforts. In addition to rendering Jazz's copycat patent claims invalid, Jazz's conduct violated confidentiality agreements and misappropriated Avadel's trade secrets.

---

[2] Avadel purports to incorporate all responsive pleadings in Jazz's Suits by reference. Such incorporation by reference is improper. *See, e.g.*, *Kohler v. Pa.*, 2011 U.S. Dist. LEXIS 162744 at *3 (E.D Pa. January 28, 2011). To the extent that the Court deems such incorporation by reference to be proper, however, then Jazz incorporates all of its pleadings from Jazz's Suits.

**ANSWER:** Jazz admits that, as part of its ordinary course of business, it legally and in accordance with normal industry practices, monitored certain of Avadel's patent filings. Indeed, consistent with the above-referenced normal industry practices, Avadel likewise monitored Jazz's patent filings. *See, e.g.*, Ex. 11 at AVDL_00758152; Ex. 12 at AVDL_00758154; Ex. 13 at AVDL_01138069-070. Jazz further admits that it entered into certain CDAs with Avadel, but denies that all of the CDAs (or other confidentiality agreements) referred to in the Complaint existed, denies that any of the CDAs (or any other confidentiality obligations) were violated, denies that any alleged trade secrets were misappropriated, and except as expressly admitted, Jazz denies the allegations of Paragraph 7.

8.      Through this action, Avadel now seeks: (1) to recover the damages it has suffered as a result of Jazz's breaches of its collaboration agreements; (2) to recover the damages and other available remedies as a consequence of Jazz's willful and malicious misappropriation of Avadel's trade secrets; and (3) to obtain certain equitable remedies to address the threats imposed by Jazz's misappropriation of those trade secrets.

**ANSWER:** Jazz admits that the Complaint purports to seek the relief referenced in Paragraph 8, but Jazz denies that the Complaint states a claim for which relief can be granted, denies that Avadel is entitled to any relief, and except as expressly admitted, Jazz denies the allegations of Paragraph 8.

### Response to Avadel's Allegations Regarding "The Parties"

9.      Plaintiff Avadel CNS Pharmaceuticals, LLC is a limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.

**ANSWER:** Jazz admits, on information and belief, the allegations of Paragraph 9.

10.     Plaintiff Avadel Pharmaceuticals plc is a public limited company organized and existing under the laws of the Republic of Ireland and has its principal place of business at Ten Earlsfort Terrace, Dublin 2, D02 T380 Ireland.

**ANSWER:** Jazz admits, on information and belief, the allegations of Paragraph 10.

11.     On information and belief, Defendant Jazz Pharmaceuticals Ireland Limited is a corporation organized and existing under the laws of Ireland, having a principal place of business at Waterloo Exchange, Waterloo Road, Dublin, Ireland 4.

**ANSWER:** Jazz admits the allegations of Paragraph 11.

12.     On information and belief, Defendant Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 3170 Porter Drive, Palo Alto, California 94304.

**ANSWER:** Jazz admits the allegations of Paragraph 12.

**Response to Avadel's Allegations Regarding "Jurisdiction and Venue"**

13.     This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1.

**ANSWER:** Paragraph 13 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz refers to the Complaint for the contents thereof, but Jazz denies that the Complaint states a claim for which relief can be granted, denies that Avadel is entitled to any relief, and otherwise denies the allegations of Paragraph 13.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

**ANSWER:** Paragraph 14 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies that the Complaint states a claim for which relief can be granted and denies that Avadel is entitled to any relief.

15.     This Court has personal jurisdiction over Defendant Jazz Pharmaceuticals Inc. because Jazz Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware.

**ANSWER:** Paragraph 15 states a legal conclusion for which no response is required.  To the extent that a response is required, Jazz does not dispute personal jurisdiction for purposes of this action only.

16.     This Court also has personal jurisdiction over Defendant Jazz Pharmaceuticals Ireland Limited because it has purposely availed itself of the benefits and protections of Delaware's

laws such that it should reasonably anticipate being haled into court in Delaware, at least by filing Jazz's Suits.  On information and belief, Jazz Pharmaceuticals Ireland Limited is in the business of, *inter alia*, developing, manufacturing, marketing, offering for sale, and selling pharmaceutical products throughout the United States, including within this District, either on its own or through its affiliates.  Therefore, Defendant Jazz Pharmaceuticals Ireland Limited transacts business within the State of Delaware related to Plaintiff's claims, and/or has engaged in systematic and continuous business contacts within the State of Delaware.

**ANSWER:**  Paragraph 16 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz does not dispute personal jurisdiction for purposes of this action only.

17.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1391 and/or pursuant to Jazz's consent.

**ANSWER:**  Paragraph 17 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz does not dispute venue for purposes of this action only.

### Response to Avadel's Allegations Regarding "Jazz's Early Failure to Develop Once-Nightly Sodium Oxybate"

18.    Sodium oxybate is the sodium salt of gamma hydroxybutyric acid ("GHB"), a central nervous system depressant that is capable of providing individuals suffering from interrupted nighttime sleep with normal, physiologic sleep.  This improvement in nocturnal sleep can lead to significant clinical improvements in symptoms of narcolepsy, such as cataplexy attacks and excessive daytime sleepiness.

**ANSWER:**  Jazz admits the allegations of Paragraph 18.

19.    Jazz currently markets the twice-nightly sodium oxybate product Xyrem®, which it obtained when it acquired Orphan Medical in 2004.  In 2002, Xyrem® was approved for use by the FDA to treat cataplexy in patients with narcolepsy.

**ANSWER:**  Jazz admits that it currently markets Xyrem® (sodium oxybate), admits that it acquired Orphan Medical in 2004, and admits that the FDA first approved Xyrem® in 2002.  Jazz otherwise refers to the FDA-approved labeling for Xyrem® (available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process when search for "Xyrem" is conducted (last visited June 2, 2022)) for the contents thereof (*see, e.g.*, Exs.

6-8 (Xyrem® labels)), and except as expressly admitted, Jazz denies the allegations of Paragraph 19.

20.     Because of the high dosage required for sodium oxybate's therapeutic efficacy and its short half-life in humans, Xyrem® must be taken twice during the night—once at bedtime and again 2.5 to 4 hours later.  This means that narcolepsy patients already suffering from a sleep disorder sleep [sic] have to wake up in the middle of the night to take the second dose of Xyrem®, which is a major source of reduced quality of life, raises patient safety concerns, and often leads to non-compliance or discontinuation of the drug.

**ANSWER:**  Jazz refers to the FDA-approved labeling for Xyrem® (available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process when search for "Xyrem" is conducted (last visited June 2, 2022)) for the content thereof. *See, e.g.*, Exs. 6-8 (Xyrem® labels).  Jazz otherwise denies, or lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 20.

21.     As a result of the problems associated with the use of Xyrem®, Jazz has long recognized the need for a once-nightly sodium oxybate formulation.  Since at least as early as 2002, Orphan Medical, Jazz, and/or their third-party collaborators have been attempting to develop a once-nightly sodium oxybate formulation.  *See. e.g.*, Ex. 2; Ex. 3.

**ANSWER:**  Jazz admits that it has discovered and patented once-nightly GHB formulations, including once-nightly sodium oxybate formulations, admits that there was a long-felt need for the inventions claimed in the Jazz Patents, admits that Jazz continues research and development work with respect to once-nightly GHB formulations, refers to D.I. 2-2 and D.I. 2-3 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 21.

22.



███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████

**ANSWER:**  Jazz admits that it does not currently have FDA approval for a once-nightly sodium oxybate formulation, refers to D.I. 2-2 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 22.

**Response to Avadel's Allegations that,**
**"In 2010, The Parties Discuss Using Avadel's Micropump® Platform With Oxybate"**

23.    Avadel, through its subsidiary Flamel Ireland Limited, owns numerous United States patents that cover Avadel's FT218 product, an innovative once-nightly formulation of sodium oxybate for the treatment of excessive daytime sleepiness and cataplexy in adults with narcolepsy.

**ANSWER:**  Jazz admits, on information and belief, that Avadel (on its own or through its subsidiaries) owns certain United States patents that purport to cover Avadel's FT218 product and, except as expressly admitted, Jazz denies the allegations of Paragraph 23.

24.    FT218 was developed by Avadel based on certain aspects of Avadel's patented Micropump® platform, which Avadel had used successfully to develop other modified release formulations using microparticulate beads to provide controlled release of drug products.  Avadel ultimately directed its efforts to develop a once-nightly formulation of GHB.  Avadel's Micropump® drug delivery platform has been and remains important to Avadel, and Avadel has taken steps to protect this technology, including by keeping aspects of it confidential and by patenting certain aspects and implementations of it.  And even with regard to the latter category, Avadel maintained confidential and/or trade secret status of those aspects until the patent process mandated public disclosure.

**ANSWER:**  Jazz admits that aspects of Avadel's Micropump® were patented as early as 2002, and that Avadel collaborated with certain third parties to develop modified/controlled release formulations using microparticulate beads (including in sachet formulations), but Jazz denies that Avadel took steps to "protect" such technology and/or collaborations, and denies that Avadel "maintained confidential and/or trade secret status" over such information at the relevant time periods discussed herein.  Jazz also notes that none of the inventors on Avadel's Micropump®

technology patent (Ex. 14, JPION00466128-143 (the "'209 Patent")) are inventors on the Avadel

patents referenced in the Complaint.  Jazz otherwise refers to the '209 Patent for the contents

thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 24.

25.    In 2010, Avadel contacted Jazz to discuss a potential partnership that would take
advantage of Avadel's experience with the Micropump® platform to develop a once-nightly
formulation of sodium oxybate.  Ex. 4.

**ANSWER:** Jazz admits that, on or about February 16, 2010, Jeffery Vick—who was then,

on information and belief, Chief Business Officer of Flamel—emailed Bruce Cozadd—co-founder

of Jazz.    In that email, Vick lauded Jazz's (and, specifically, Cozadd's) "substantial

accomplishments . . . over the last 12 months" and stated that he had "been watching [Cozadd's

and Jazz's] progress over time and [was] impressed."  D.I. 2-4 at JPION00077862; *see also id.* at

JPION00077863 ("Once again, congratulations on Jazz' [sic] continuing progress and

evolution.").  Vick, with no confidentiality restrictions or other limitations on use, and without any

solicitation from Jazz, then went on to describe Flamel's "two main technology platforms," one of

which was Flamel's "Micropump® Technology."  *Id.* at JPION00077862.  Vick, without any

confidentiality restrictions or limitations on use, disclosed to Cozadd and Jazz, among other things,

that Avadel's "Micropump® Technology" purportedly:  "provide[d] controlled oral release of

small molecules;" was the "basis of GSK's marketed product Coreg CR®"; provided for a

"[d]elayed release profile of 5 or more hours if desired"; provided the "[a]bility to combine

multiple release profiles . . . but keep them physically separate"; and could be used in "multiple

dose strengths." *Id*.  Vick further expressed his "hope" that Flamel and Jazz "have the opportunity

to work together on a mutually beneficial project at some point."  *Id*. at JPION00077863.  On

information and belief, at the time of the email, Vick and Flamel knew that Jazz was marketing a

sodium oxybate product and were specifically promoting to Jazz the "Micropump® Technology"

for use with sodium oxybate.  Jazz otherwise refers to D.I. 2-4 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 25.

26.     At the time, Avadel's business practice and course of conduct when engaging in discussions with potential commercial partners was to disclose confidential information pursuant to a written, executed CDAs prohibiting the disclosure or use of Avadel's confidential information.

**ANSWER:**  Based on information and belief, including Flamel's interactions with Jazz discussed throughout this Answer and the lack of any documents produced by Avadel showing any such actions in the 2010 timeframe, Jazz denies the allegations of Paragraph 26.

27.     On information and belief, at least some of Avadel's discussions with Jazz, including the disclosures detailed herein, were undertaken under the protection of such a CDA and/or an oral agreement ("2010 CDA") prohibiting the disclosure or use of Avadel's confidential information.

**ANSWER:**  Jazz denies the allegations of Paragraph 27.

28.     Indeed, Mr. Clark Allphin, Jazz's Executive Director of Process and Product Science at the time and named inventor on many of the patents Jazz has asserted against Avadel, later described the 2010 discussion with Avadel in an e-mail as a "confidential discussion."  Ex. 5.

**ANSWER:**  Jazz admits that D.I. 2-5 is an email from on or about September 30, 2020— a decade after 2010—wherein Allphin wrote, among other things, "I was not involved in the confidential discussion."  Jazz denies that it had any confidentiality obligations to Flamel in 2010, denies that Allphin had any knowledge or information in 2020 concerning whether there were any obligations of confidentiality between Jazz and Flamel in 2010, and notes that Allphin expressly stated on or about January 31, 2019 that "I wasn't involved in the 2010 pitch [Avadel] made to [Jazz]."  D.I. 2-18 at JPION00073713.  Jazz otherwise refers to D.I. 2-5 and D.I. 2-18 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 28.

29.     On information and belief, the 2010 CDA prohibited the use of Avadel's confidential information for any purpose other than to evaluate a potential partnership between Avadel and Jazz.

**ANSWER:** Jazz denies that Flamel disclosed any confidential information to Jazz in 2010, denies that Jazz and Flamel entered into "the 2010 CDA" or that "the 2010 CDA" existed, and, otherwise denies the allegations of Paragraph 29.

30.     As part of its "confidential discussion[s]" in 2010, Avadel prepared two slide decks for Jazz describing Avadel's proprietary drug delivery technologies.  One slide deck described the use of Avadel's Trigger Lock™ technology to deter abuse of pharmaceuticals (the "2010 Trigger Lock™ Deck").  Ex. 6.  The other slide deck described Avadel's Micropump® platform technology and the applicability of certain aspects of it to a potential once-nightly sodium oxybate formulation (the "2010 Micropump® Deck").  Ex. 7.

**ANSWER:** Jazz admits that D.I. 2-6 and D.I. 2-7 purport to contain two slide decks, one concerning "Trigger Lock™" (the "2010 Trigger Lock™ Deck") and the other concerning "Micropump® for Controlled-Release Sodium Oxybate" (the "2010 Micropump® Deck"), and that both the 2010 Trigger Lock Deck and the 2010 Micropump® Deck bear dates of March 2010.

Both the 2010 Trigger Lock™ Deck and the 2010 Micropump® Deck were sent from an individual named Brent Clough at InnerVation LLC to individuals at Jazz.  Neither deck was sent from Flamel to Jazz.  Clough was not an employee of Flamel at that time and, on information and belief, has never been an employee of Flamel (or Avadel). ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████     ████████████████████████████████

████████████████████████████████████████████     ████████████

████████████████     ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████     *See, e.g.*, Ex. 16, AVDL_01110648-658

(January 15, 2015 agreement regarding exenatide).

Clough sent the 2010 Trigger Lock™ Deck and the 2010 Micropump® Deck to Jazz without Jazz's solicitation.  Instead, Clough solicited Jazz.  Clough emailed Cozadd on or about

April 5, 2010, stating, "I am following up on behalf of Steve Lisi who suggested that we speak at your convenience," and introducing InnerVation as "an extensive global healthcare expert network that provides a multitude of services to institutional and corporate clients."   Ex. 17 at JPION00455452.  On information and belief, Lisi was not an employee of Flamel at this time. Instead, on information and belief, Lisi was not employed by Flamel until 2012 and then departed Flamel in 2015 for purported "personal reasons."  Ex. 18 (4/7/15 Flamel Press Release, available at https://investors.avadel.com/static-files/47581202-a471-4aa9-99cc-d9c6e09743ed (last visited June 2, 2022)).  Instead of continuing communications with Clough, Cozadd "suggest[ed]" that Clough "contact Mike Desardin, [Jazz's] SVP of Product Development."   Ex. 17 at JPION00455452.

Clough then emailed Desjardin on or about April 21, 2010, provided the Trigger Lock™ Deck in that email, and stated to Desjardin that the 2010 Trigger Lock™ Deck was "non-confidential."  D.I. 2-6 at JPION00030652.  Clough then, based on Desjardin's "experience and background," asked for Desjardin's "feedback on [Flamel's] technology."  *Id.*  With respect to the 2010 Micropump® Deck, Clough stated in an email on or about June 2, 2010 to Desjardin and Diane Guinta of Jazz that he "asked Flamel to follow-up with a summary presentation" of Micropump® for sodium oxybate.  D.I. 2-7 at JPION00030009.  Clough further stated that "Steve [Willard, CEO of Flamel] [was] available for a call to answer any follow-up questions [Jazz] may have on [Flamel's] technology."  *Id.*

Clough's emails to Jazz did not reference any confidentiality agreements or otherwise indicate any expectation of confidentiality.  In addition, Clough stated that he "had several independent consultant and experts evaluate and sign-off on [Flamel's] technology prior to [Innervation LLC's] involvement with [Flamel]."  D.I. 2-6 at JPION00030652.  On information

and belief, Flamel did not have CDAs in place with either Innervation LLC or the "several independent consultants and experts" that "evaluat[ed] and sign[ed]-off" on Flamel's technology prior to Clough sending it to Jazz.

On information and belief, Jazz was also independently familiar, based on publicly available sources, with information in the 2010 Trigger Lock™ Deck and the 2010 Micropump® Deck before Clough sent those decks to Jazz. When Vick first approached Cozadd in February 2010, Cozadd forwarded Vick's email to Desjardin and James Pfeiffer (now deceased) of Jazz. *See* Ex. 19 at JPION00455370-371. ██████████████████████

██████████████████████████████████████████████████

██████████████████

Information regarding Flamel's technologies (including allegedly confidential and trade secret information in the 2010 Trigger Lock™ Deck and the 2010 Micropump® Deck) was publicly available well before June 2010 and/or any other time relevant to Avadel's pleadings in the Complaint, at least in the form of information published on Flamel's website and the '209 Patent. *See, e.g.*, Ex. 20 at JPION00466079-081, 104-117, 121-124, 126-127, 144-148, 155-160, 186-201, 236-238, 305-314, 367-369, 406-407, 427-433, 447-477 (collection of Wayback screen captures of Flamel's website); Ex. 14, JPION00466128-143 ('209 Patent). Such information includes (without limitation): solutions to "problems" of large dosage amounts, including formulations of "suspensions/syrups . . . and sachets" using Micropump®; examples of sachet formulations using Micropump®; release profile information using Micropump®; a description and depiction of the multiparticulate Micropump® formulations; and polymers for use in the coating systems for Micropump®. *See id.*; *see also, e.g.*, Ex. 21 at JPION00466202 (March 30, 2003 news article reporting a deal between GSK and Flamel and noting, "This is not the first time that GSK

and Flamel have worked together.  Last year, the French firm started to develop a sachet formulation of GSK's blockbuster antibiotic Augmentin . . . which made use of the micropump technology to create a product that is easier to swallow."); Ex. 22 at JPION00466125 (October 20, 2003 news article reporting, "GSK had signed up Flamel to apply its Micropump controlled-release and taste-masking technology to a sachet formulation of Augmentin. . . .").

In addition, on or about September 14, 2009, Louise Chen, who on information and belief was a Senior Analyst, Specialty Pharmaceuticals at Collins Stewart LLC, emailed Cozadd with what, on information and belief, was a widely-distributed email, and invited Cozadd to "meet with Steve Willard, CEO and Charles Marlio, Director of Strategic Planning" "to discuss Flamel Technologies" on Thursday, September 24, 2009 at Collins Stewart LLC's New York City office. *See* Ex. 23 at JPION00455420.  The email stated that "Micropump® is a controlled release and taste-masking technology for the oral administration of small molecule drugs," and further stated that a "*[p]resentation is attached for your review*."  *Id.* (emphasis in original).  Chen's email was unsolicited and did not reference any confidentiality agreements or otherwise indicate any expectation of confidentiality.

The presentation attached to Chen's email (Ex. 24, JPION00455421-448) contains Avadel's allegedly confidential and trade secret information, including (without limitation): a description and depiction of the Micropump® microparticulate oral delivery system for small molecules.  *See id.* at JPION00455439.  Flamel continued to publicly disclose its allegedly confidential and trade secret information in the 2010 Micropump® Deck long before any alleged misuse by Jazz.  *See, e.g.*, Ex. 25, JPION00466365-366 (2011 Flamel publication on www.ondrugdelivery.com); Ex. 26, JPION00466203-235 (March 2012 Flamel public presentation); Ex. 27, JPION00044544-589 (email from third party to Jazz attaching July 2014

Flamel public presentation); Ex. 28, JPION00025323-349 (email attaching August 2014 Flamel public presentation); Ex. 29, JPION00187209-210 (December 2014 Flamel press release and internal Jazz discussion of same); Ex. 30, JPION00025199-252 (email attaching March 2015 Flamel public presentation); Ex. 31, JPION00466239-304 (September 2016 Flamel public presentation).

Jazz also incorporates its answer to Paragraph 25, including the discussion of Coreg CR. The publicly available information about the use of Micropump® in Coreg CR would also have been publicly known and Flamel could not have had any expectations of confidentiality with respect to that publicly known information. *See, e.g.*, Ex. 32 at JPION00455449; Ex. 14, the '209 Patent; Ex. 33, JPION00466315-337 (2006 COREG CR FDA-approved Package Insert); Ex. 34, JPION00466370-405 (2009 COREG CR FDA-approved Package Insert).[3]

Jazz otherwise refers to the documents discussed in this Paragraph for the contents thereof and, except as expressly admitted, Jazz denies the allegations of paragraph 30.

31.    The 2010 Micropump® Deck was prominently marked "CONFIDENTIAL" on every slide to indicate to Jazz that its contents contained "confidential" Avadel information that had not been publicly disclosed at the time.  Ex. 7 at JPION00030010.

**ANSWER:**  Jazz admits that certain of the slides in the 2010 Micropump® Deck state "CONFIDENTIAL," but denies that the 2010 Micropump® Deck actually contained confidential information that "had not been publicly disclosed at the time" and/or at any time relevant to the allegations in the Complaint, denies that there were any confidentiality obligations or restrictions of use upon Jazz with respect to the 2010 Micropump® Deck, and except as expressly admitted, Jazz denies the allegations of Paragraph 31.

---

[3]    The Coreg CR labels are available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process (last visited June 2, 2022) when a search for "Coreg CR" is conducted.

32.     The 2010 Micropump® Deck contained confidential information detailing Avadel's technology and its development that had not been disclosed to the public.  The 2010 Micropump® Deck explained that "[d]oses of sodium oxybate administered are large, 4.5 g and 6 g" and highlighted the "[i]ncompatibility with pill or tablet forms" of these high sodium oxybate dosages.  *Id.* at 2.

**ANSWER:**  Jazz admits that the fact that doses of sodium oxybate administered are large and incompatible with pill or tablet forms was discovered and patented by Jazz (not Avadel) (*see, e.g.*, Ex. 35, U.S. Patent No. 7,262,219 at cols. 9-10 and Example 1; Ex. 36, U.S. Patent No. 7,851,506 at cols. 8-9, Example 1, and Claims), and denies Avadel's assertions of confidentiality. As a further example, the FDA-approved labeling for Xyrem® in 2002 disclosed that sodium oxybate was marketed in the form of an oral solution and in dosages of 4.5 g, 6 g, 7.5 g, and 9 g, as did subsequent versions of the FDA-approved labeling for Xyrem®.  *See, e.g.*, Exs. 6-8.

Jazz otherwise refers to the documents referenced in this Paragraph and the 2010 Micropump® Deck for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 32.

33.     The 2010 Micropump® Deck further disclosed the solution to this problem that Avadel had kept confidential: a new liquid suspension system for sodium oxybate once-nightly dosing in the form of microparticulate beads provided in a sachet.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 30 and 32, refers to the 2010 Micropump® Deck for the contents thereof, denies Avadel's assertions of confidentiality, and otherwise denies the allegations of Paragraph 33.

34.     The 2010 Micropump® Deck further disclosed the idea of using a combination of controlled release and immediate release microparticles to create a pulsatile PK profile.  *Id.* at 16.

**ANSWER:**  Jazz incorporates its answer to Paragraph 30 and notes, on information and belief, that the "simulated" pulsatile PK profile (*see* D.I. 2-7 at 16) was not proprietary to Flamel, but instead, mimicked what was known for Xyrem®.  *See, e.g.*, Exs. 6-8.  Jazz otherwise refers to

the documents referenced in this Paragraph for the contents thereof, denies Avadel's assertions of confidentiality, and otherwise denies the allegations of Paragraph 34.

35.     The 2010 Micropump® Deck further described the usefulness and unique attributes of this system and disclosed simulated pK modeling of a once-nightly sodium oxybate formulation using such a combination of microparticles.

**ANSWER:** Jazz incorporates its answers to Paragraphs 30 and 34, refers to the 2010 Micropump® Deck for the contents thereof, denies Avadel's assertions of confidentiality, and otherwise denies the allegations of Paragraph 35.

36.     In addition, the 2010 Micropump® Deck recommended a proposed sachet-based dosage form using sodium oxybate microparticles. *Id.* at 17.

**ANSWER:** Jazz incorporates its answer to Paragraph 30, refers to the 2010 Micropump® Deck for the contents thereof, denies Avadel's assertions of confidentiality, and otherwise denies the allegations of Paragraph 36.

37.     As early as June 4, 2010, this 2010 Micropump® Deck was forwarded internally within Jazz to Mr. Allphin.  Ex 7 at JPION00030009.

**ANSWER:** Jazz admits that D.I. 2-7 at JPION00030009 includes an email on or about June 4, 2010 from Desjardin to Pfeiffer and Allphin purporting to forward the 2010 Micropump® Deck, but Jazz denies that there were any confidentiality restrictions or limitations on use in place that prevented the purported forwarding and, except as expressly admitted, Jazz denies the allegations of Paragraph 37.

38.     After reviewing Avadel's confidential information in the 2010 Micropump® Deck, Jazz eventually concluded that Avadel's technology would not provide the desired release characteristics and declined to partner with Avadel in 2010 to develop a drug product. █████████
████████████████

**ANSWER:** ████████████████████████████
████████████████████████████████
████████████████████████████████

Jazz

otherwise refers to D.I. 2-8 for the contents thereof and, except as expressly admitted, Jazz denies

the allegations of Paragraph 38.

### Response to Avadel's Allegations that, "In 2014, Jazz Contacted Avadel
### For Further Discussions Regarding Another Potential Partnership

39.    On October 30, 2014, Jazz's Senior Vice President of Corporate Development, Craig Parker, contacted Steve Lisi, the Senior Vice President of Business and Corporate Development at Avadel, via email and invited Mr. Lisi to an in-person meeting to "have a conversation about our shared interest in sodium oxybate." Ex. 9 at AVDL_00738819.  In January 2015, Mr. Parker and Mr. Lisi met in San Francisco to discuss a potential opportunity for collaboration. *Id.*; Ex. 10.

**ANSWER:**  Jazz admits that, on or about October 30, 2014, Parker emailed Lisi about,

among other things, "hav[ing] a conversation about our shared interest in sodium oxybate," and

that Parker and Lisi exchanged several emails between October 30 and November 25, 2014

attempting to set up such a conversation.  *See* D.I. 2-9 at AVDL_00738818-820.  Jazz further

admits, on information and belief, that a conversation between Parker and Lisi subsequently

occurred, but that Parker did not further initiate contact with Lisi.  Instead, on or about January 8,

2015, Lisi contacted Parker by email, stating: "I know when we spoke we said we would catch up

in San Fran.  I thought you were going to send an email. . . ."  *Id.* at AVDL_00738818.  Jazz

admits, on information and belief, that Parker and Lisi then met in San Francisco.  *See, e.g.*, *id.* at

AVDL_00738817.  Lisi then followed up with Parker after that in-person meeting, Flamel and

Jazz discussed preparation of a CDA, and Jazz noted "[o]ur standard CDA needed some

modifications for the uniqueness of the situation." *Id.* As explained below, the "uniqueness of the

situation" was that no Flamel allegedly confidential information was actually disclosed to Jazz

under the 2015 CDA. Instead, an external consultant was the only one to receive such information.

On information and belief, Flamel does not possess any similar communications evidencing any

alleged CDA between Flamel and Jazz in the 2010 timeframe, nor do any such communications

exist.

Jazz otherwise refers to D.I. 2-9 and D.I. 2-10 for the contents thereof and, except as

expressly admitted, Jazz denies the allegations of Paragraph 39,

40.     Upon information and belief, and as described in further detail below, Jazz's
renewed interest in a meeting with Avadel was the result of reports in 2014 that Avadel was
successfully advancing its efforts to develop a once-nightly oxybate product.

**ANSWER:** Jazz denies the allegations of Paragraph 40.

41.     Upon information and belief, this meeting was proposed by Jazz not due to a
genuine interest in establishing a collaboration with Avadel, but as a pretense to obtain confidential
information regarding Avadel's sodium oxybate product after Jazz became aware of reports of
Avadel's success in developing a once-nightly product.

**ANSWER:** Jazz denies the allegations of Paragraph 41.

42.     On March 18, 2015, Jazz, Avadel, and Jazz's Designated Recipient, Dr. Leslie Z.
Benet, entered into another confidential disclosure agreement in advance of the diligence for a
potential deal, preventing either party from disclosing or misusing any confidential information
obtained from the other party (the "2015 CDA"). Ex. 11, 2015 CDA; *see also e.g.*, Ex. 9
(discussing a non-disclosure agreement); Ex. 12 (discussing a non-disclosure agreement).

**ANSWER:** Jazz admits that, on or about March 18, 2015, and by no later than March 27,

2015, Jazz Pharmaceuticals plc, Flamel, and an external consultant, Dr. Leslie Z. Benet or the

"Designated Recipient," entered into the 2015 CDA. *See* D.I. 2-11; ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

Jazz further admits that the 2015 CDA states:

> In order to facilitate discussions regarding a possible business relationship, Jazz Pharmaceuticals wishes to have the Designated Recipient evaluate certain Confidential Information (as defined below), which Flamel considers to be confidential and proprietary. Flamel agrees to disclose to the Designated Recipient, or allow the Designated Recipient to have access to, the Confidential Information, and the Designated Recipient agrees to receive such Confidential Information, only upon the following terms and conditions, which Jazz Pharmaceuticals also agrees to. . . .

D.I. 2-11 at 1.  Jazz otherwise refers to the documents referenced in this Paragraph for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 42.

43.     In Paragraph 3, the 2015 CDA states:

> The Designated Recipient and Jazz Pharmaceuticals agree to maintain the Confidential Information in confidence.  Without the prior written consent of Flamel, except as set forth herein, the Designated Recipient and Jazz Pharmaceuticals shall not disclose Confidential Information to any third party or use Confidential Information for any purpose other than to evaluate and, if a decision is made to proceed, to negotiate such business relationship (the "Purpose").  Ex. 11, ¶ 3.

**ANSWER:**  Jazz admits that the above-recited language appears in the 2015 CDA as a portion of paragraph 3 of that document.  The 2015 CDA, however, makes clear that no allegedly confidential information was to be disclosed from Flamel to Jazz.  Instead, Flamel would disclose allegedly confidential information only to Benet:

> Flamel shall only disclose Confidential Information by providing the information solely to the Designated Recipient unless otherwise authorized in a writing signed by authorized representatives of each Party in accordance with Section 11 below amending this Agreement.

*Id.* at ¶ 2; ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████     ██████████████████████



Ex. 40 at AVDL_738585-586

On information and belief, the 2015 CDA was never amended to authorize Flamel to disclose allegedly confidential information to Jazz.

And the 2015 CDA did not permit Benet to disclose any allegedly confidential information to Jazz.  Instead, Benet was permitted under the 2015 CDA to provide his opinion/evaluation to Jazz, based on Flamel's allegedly confidential information.  Notably, Benet's opinion/evaluation was expressly defined in the 2015 CDA as "not includ[ing] the specific Confidential Information" that Flamel was to disclose to Benet under the 2015 CDA:

> Upon review and evaluation of the Confidential Information, the Designated Recipient may only provide to Jazz Pharmaceuticals his general professional opinion or evaluation of Flamel's Confidential Information as it relates to certain pre-specified criteria previously provided to Designated Recipient by Jazz Pharmaceuticals in order for Jazz Pharmaceuticals to evaluate the possibility of a business relationship with Flamel.  For the avoidance of doubt, the

Designated Recipient's opinion or evaluation will not include the specific Confidential Information described on Exhibit A.

D.I. 2-11 at ¶ 2.

The 2015 CDA further defined other information as *not* being confidential:

For the avoidance of doubt, any unauthorized disclosure of Confidential Information by Flamel to any individual other than the Designated Recipient shall result in such disclosure (a) not being considered Confidential Information and (b) not having the safeguards afforded under this Agreement.

*Id.*

Notwithstanding the foregoing, Jazz Pharmaceuticals shall be free to use for any purpose the Residuals resulting from the Designated Recipient's evaluation of the Confidential Information, provided that the Designated Recipient and Jazz Pharmaceuticals shall meet all the obligations under this Agreement. "Residuals" means information in non-tangible form, including ideas, concepts, know-how or techniques contained therein, that, without further reference to any materials that are written, stored in electronic or physical form or are otherwise fixed, is unintentionally retained in the unaided memory of persons who were permitted access to Flamel's Confidential Information under the terms of this Agreement to carry out the Purpose hereof. A person's memory will be considered to be unaided if the person has not intentionally memorized Flamel's Confidential Information for the purpose of retaining and subsequently using or disclosing it. In furtherance and not in limitation of the foregoing, the Parties agree that the use of general information relating to the Field, including without limitation desirable profiles and product characteristics of current and potential future products that involve a form or formulation of the drug sodium oxybate, will not under any circumstances be considered a breach or this Agreement.

*Id.* at ¶ 3.

Jazz otherwise refers to the documents referenced in this Paragraph for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 43.

44.    Specifically, the 2015 CDA defines "confidential information" to include:

•       Number of subjects

- Population (healthy subjects / or patients), demographics
- Fluid and Food intake
- Dosing/titration schedules
- Time of day of dosing
- Study design (e.g. complete crossover vs parallel groups)
- PK sampling times relative to dose
- Concomitant therapy allowances, if any
- Key statistical analysis considerations, if any
- Brief description of bioanalytical methodology (e.g. LC- MS-MS) lower limit of quantification
- Tables and graphs should identify the dose properly
- PK curves showing plasma concentration over time
- Mean and standard deviation should be included
- Statistical difference (p<0.05) should be identified
- Spaghetti plots by treatment
- PK parameters (90% confidence intervals, means, standard deviation, median, min, max, or individual subject values by treatment)
- Cmax
- Tmax
- Apparent elimination rate constant (λ)
- Terminal half life
- AUC (t)
- AUC (inf)

Ex. 11, at 6.

**ANSWER:** Jazz admits that paragraph 1(a) of the 2015 CDA states:

"Confidential Information" means solely the information described on Exhibit A, attached hereto, which is provided to the Designated Recipient by Flamel in written, electronic or graphic form in accordance with the provisions of Section 2, and expressly excludes information identified as excluded on Exhibit A. Flamel agrees not to provide to the Designated Recipient any information that is, or that it considers to be, confidential or proprietary other than the specific information described on Exhibit A and that, if Flamel nonetheless provides to the Designated Recipient or Jazz

Pharmaceuticals or its representatives any information other than the specific information described on Exhibit A, such additional information will not be "Confidential Information" and will not be afforded any of the protections afforded to Confidential Information under this Agreement.

D.I. 2-11 at ¶ 1.  Jazz also admits that paragraph 1(b) and Exhibit A of the 2015 CDA further explain what is **_not_** confidential information.

Jazz otherwise refers to the 2015 CDA, including Exhibit A, for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 44.

45.    Once the 2015 CDA was in place, Jazz acquired additional Avadel information that was confidential at the time regarding the success of Avadel's clinical study of FT218 and information critical to the success of Avadel's once-nightly program.

**ANSWER:**  Jazz denies the allegations of Paragraph 45.

46.    On April 1, 2015, Avadel sent Jazz a summary report of its pilot clinical study in humans ("2015 Study Report").  Ex. 13, 2015 Study Report. ███████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████

**ANSWER:**  Jazz admits that, on or about April 1, 2015, Flamel sent internal emails stating that certain information ████████████████████████████████████ D.I. 2-13 at AVDL_01111376.  On information and belief, "the Jazz representative" referred to was Benet. Avadel has provided no documents showing what was actually "released" to Benet, let alone that it was the document provided at D.I. 2-13.  Jazz otherwise incorporates its answers to Paragraphs 43, 45, 48, and 49, refers to D.I. 2-13 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 46.

47.    The 2015 Study Report was prominently marked confidential.

**ANSWER:**  Jazz admits that a portion of D.I. 2-13 purports to be a document entitled "SODIUM OXYBATE CR SUMMARY REPORT Pilot Clinical study FT218-1301 PART I & PART II," admits that portion of D.I. 2-13 states "CONFIDENTIAL INFORMATION" at the bottom of the pages, refers to D.I. 2-13 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 47.

48.     The 2015 Study Report contained Avadel's confidential information regarding ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████

**ANSWER:**  Jazz incorporates its answer to Paragraph 30, and otherwise denies the allegations of Paragraph 48.

49.     After reviewing Avadel's confidential information in the 2015 Study Report, Jazz once again declined to partner with Avadel.

**ANSWER:**  As stated above, Jazz never received any confidential information from Flamel or Avadel under the 2015 CDA.  Instead, any alleged confidential information was sent to Benet, although Avadel has not included exhibits with its Complaint showing what exactly was sent to Benet.  On information and belief, whatever it was that was sent to Benet, was minimal.

███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████    ██████████████ ████████████████████

Consistent with the 2015 CDA, Benet did not disclose any Flamel allegedly confidential information to Jazz.  ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████

Jazz denies that it "declined to partner with Avadel" in 2015.  Instead, Avadel knows or should know that Flamel refused to engage in discussions with Jazz and also decided not to send any confidential information to Jazz (as opposed to Benet).  ████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████

Jazz and Flamel, however, never progressed to ████████████████████  Instead, when Jazz requested that the ██████ disclosures be sent to the external consultants, Flamel ████████ ██████ walked away.  In an email on or about July 27, 2015, Jakobowski explained:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████

 Again, Avadel knows or should know all of this, but alleged otherwise.

Jazz otherwise refers to documents referenced in this Paragraph for the contents thereof, and denies the allegations of Paragraph 49.

**Response to Allegations that, "In 2018, Jazz Received Further Confidential Information From Avadel During Additional Diligence Discussions"**

50.     In 2018, Jazz again approached Avadel to purportedly discuss a potential collaboration regarding Avadel's once-nightly oxybate formulation.

**ANSWER:** Jazz admits that, in 2018, Avadel approached Jazz (not the other way around) to discuss a potential partnership regarding Avadel's once-nightly sodium oxybate product. ███

███████████████████████████████████████████████████

███████████. Jazz otherwise refers to D.I. 2-16 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 50.

51.     The parties again entered into a confidential disclosure agreement on May 3, 2018 to protect "all information" provided to the other party in connection with this potential collaboration ("2018 CDA").  Ex. 14, 2018 CDA.  In Paragraph 2(a), the 2018 CDA states:

> Except as otherwise expressly permitted herein, without the prior written consent of the Disclosing Party, the Receiving Party will not use Confidential Information of the Disclosing Party for any purpose other than the Purpose or disclose Confidential Information of the Disclosing Party to any third party; provided that the Receiving Party may disclose Confidential Information of the Disclosing Party to its Affiliates and their respective officers, directors, employees, consultants, attorneys, financial or other advisors/providers, accountants, agents or representatives (the "Representatives") who are required to use such Confidential Information for the Purpose and who are bound by obligations of confidentiality at least as stringent as those set forth herein.  Upon disclosing Confidential Information to any such Representatives, the Receiving Party will advise them of the confidential nature of the information.  Without limiting the generality of the foregoing, the Receiving Party will take all reasonable precautions to prevent the disclosure of Confidential Information of the Disclosing Party to any unauthorized third parties (and in any event consistent with the precautions it ordinarily takes to safeguard its own confidential documents) and will be liable for any breach of the confidentiality and non-use obligations under this Agreement by any of the Representatives of the Receiving Party.

Ex. 14, ¶ 2(a).

**ANSWER:**  Jazz admits that, on or about May 3, 2018, Jazz Pharmaceuticals plc and Avadel entered into the 2018 CDA.  *See* D.I. 2-14.  Jazz also admits that the above-recited language appears in D.I. 2-14 at paragraph 2(a) of that document.  The 2018 CDA also states:

> Notwithstanding the foregoing, it will not a breach of this Agreement for the Receiving Party and its Representatives to use for any purpose the Residuals resulting from the evaluation of the Disclosing Party's Confidential Information or negotiation or pursuit of a potential business relationship, provided that the Receiving Party and its Representatives shall meet all of their obligations under this Agreement.  "Residuals" means information in nontangible form that, without further reference to any materials that are written, stored in electronic or physical form or are otherwise fixed, is unintentionally retained in the unaided memory of persons who were permitted access to the Disclosing Party's Confidential Information under Section 2(a) hereof.  A person's

30

memory will be considered unaided if the person has not intentionally memorized the Disclosing Party's Confidential Information for the purpose of retaining and subsequently using or disclosing it.  In furtherance and not in limitation of the foregoing, the Parties agree that the use of general information relating to the research, development, commercialization and manufacturing of products for the treatment of the symptoms of narcolepsy and/or other sleep disorders, including products that involve a form or formulation of oxybate (the "Field"), including without limitation desirable profiles and product characteristics of current and potential future products that involve a form or formulation of oxybate, will not under any circumstances be considered a breach of this Agreement.

*Id.* at ¶ 2(b).  Jazz otherwise refers to the 2018 CDA for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 51.

52.    The 2018 CDA defines confidential information to include, *inter alia*:

(i)  all information (whether in written, electronic, or graphic form or disclosed orally) that is provided by or on behalf of one Party (the "Disclosing Party") to the other Party (the "Receiving Party"), directly or indirectly, in connection with the Purpose and relating to the Disclosing Party and its Affiliates (as defined below) and their respective products, product candidates, technologies and businesses, and those of any third party from whom the Disclosing Party or its Affiliates has received information on a confidential basis,

(ii)  any memorandum, analysis, compilation, summary, interpretation, study, report or other document, record or material that is or has been prepared by, for or on behalf of the Receiving Party or any of its Representatives (as defined below) and that contains, reflects, interprets or is based directly or indirectly upon any information of the type referred to in clause (i) of this sentence.

Ex. 14, ¶ 1.

**ANSWER:**  Jazz admits that the above-recited language appears in D.I. 2-14 as a portion of paragraph 1 of that document.  Jazz also admits that paragraph 1(a)-(d) of the 2018 CDA further explains what is ***not*** confidential information (in addition to the "Residuals" referenced in the

answer to Paragraph 51).  Jazz otherwise refers to the 2018 CDA for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 52.

53.     The 2018 CDA also recognizes that a breach of these obligations could cause irreparable harm to the other Party that could not be adequately compensated with damages.

**ANSWER:**  Jazz admits that paragraph 5 of the 2018 CDA states, among other things, that "[e]ach Party acknowledges that any breach of its obligations under this Agreement may cause irreparable harm to the other Party, which cannot be reasonably or adequately compensated in damages in an action at law."  Jazz otherwise refers to the 2018 CDA for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 53.

54.     Paragraph 5 of the 2018 CDA allows the parties to "seek preliminary and permanent injunctive and other equitable relief without having to prove the inadequacy of any other remedy it may have at law or in equity and without being required to post bond or other security."  Ex. 14, ¶ 5.

**ANSWER:**  Jazz admits that the above-quoted language appears in the 2018 CDA as a portion of paragraph 5 of that document, refers to the 2018 CDA for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 54.

55.     █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

**ANSWER:**  █████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

    Jazz otherwise refers to the documents referenced in this Paragraph for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 55.

    56.   ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████ ███████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████

    **ANSWER:**  ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Jazz otherwise incorporates its answers to Paragraphs 24-38, 43, 45, 46, 48, 49, and 55, refers to D.I. 2-18 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 56.

57.     Jazz's diligence list included more than 30 items that touched on key areas of Avadel's once-nightly oxybate program.

**ANSWER:**  Jazz admits that it sent Avadel certain diligence lists and/or questions.  *See, e.g.*, Ex. 53 at JPION00455475-477; Ex. 54 at JPION00456975-977.  Jazz otherwise refers to the documents referenced in this Paragraph for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 57.

58.     Under the 2018 CDA, Jazz obtained access to information regarding Avadel's clinical trials as well as the key confidential features of Avadel's once-nightly formulation, including ████████████████████████████████.  By July 2018, Avadel provided Jazz with at least the following confidential information:

- ███████████████████████████████████████
  ████████████████████

**ANSWER:**  Jazz admits that a limited number of Jazz employees—none of whom were

Allphin—received certain allegedly confidential information from Avadel no earlier than July 13,

2018. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

Jazz otherwise incorporates its answer to Paragraph 30, refers to the documents referenced

in this Paragraph for the contents thereof, and, except as expressly admitted, Jazz denies the

allegations of Paragraph 58.

59.    As part of the diligence process, Jazz received a confidential summary table of all
pK studies Avadel had completed and ████████████████████████████████.  The
summary table disclosed ████████████████████████████████████  Ex.
19.

**ANSWER:**  Jazz admits that a limited number of Jazz employees—none of whom were

Allphin—received certain allegedly confidential information from Avadel no earlier than July 13,

2018. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

Jazz otherwise incorporates its answers to Paragraphs 30 and 32, refers to the documents referenced in this Paragraph and D.I. 2-19 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 59.

    60.  ████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████

**ANSWER:**  Jazz admits that a limited number of Jazz employees—none of whom were Allphin—received certain allegedly confidential information from Avadel no earlier than July 13, 2018. ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

Jazz otherwise incorporates its answer to Paragraph 30, refers to the documents referenced in this Paragraph and D.I. 2-20, D.I. 2-21, D.I. 2-22, and D.I. 2-23 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 60.

61.  ███████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████

**ANSWER:**  Jazz admits that a limited number of Jazz employees—none of whom were Allphin—received certain allegedly confidential information from Avadel no earlier than July 13, 2018. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

Jazz otherwise incorporates its answer to Paragraph 30, refers to the documents referenced in this Paragraph and D.I. 2-24 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 61.

62.     The materials disclosed during the 2018 diligence process contained Avadel's trade secret information ██████████████████████████████████ █████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████  Avadel protected these trade secrets from disclosure, and derived economic value from the secrecy of this information.

**ANSWER:** Jazz admits that a limited number of Jazz employees—none of whom were Allphin—received certain allegedly confidential information from Avadel no earlier than July 13, 2018. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ Jazz also admits that Avadel alleges that those documents contained confidential and trade secret information, but Jazz denies that all such information was confidential and/or trade secrets and denies Avadel's allegations of misuse.

Jazz otherwise incorporates its answers to Paragraphs 30 and 107, refers to the documents referenced in this Paragraph for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 62.

63.     After Avadel's disclosure of the foregoing confidential information pursuant to explicit confidentiality agreements, Jazz once again declined to partner with Avadel.

**ANSWER:** Jazz incorporates its answer to Paragraph 62, admits that Jazz and Avadel did not come to terms on a partnership and, except as expressly admitted, denies the allegations of Paragraph 63.

### Response to "Jazz's Contemporaneous Misappropriation"

64.     ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████



**ANSWER:** Jazz ███████████████████████████████████████████████████████████████████ refers to D.I. 2-2 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 64.

65. ██████████████████████████████████████████████
████████████████████████████████████████

**ANSWER:** ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ D.I. 2-25 at

JPION00045907.   Jazz otherwise refers to D.I. 2-25 for the contents thereof and, except as

expressly admitted, Jazz denies the allegations of Paragraph 65.

66.     Meanwhile, certain public information in 2014 indicated that Avadel was
successfully advancing its efforts to develop a once-nightly sodium oxybate product.  In light of
this information, Jazz began reconsidering whether the microparticulate beads used by Avadel
(and described in its confidential diligence materials provided to Jazz) would be a suitable platform
for a once-nightly sodium oxybate formulation.

**ANSWER:**   Jazz admits that D.I. 2-2 states, among other things, "[i]n 2014 Flamel

announced acceptable PK results with a multiparticulate approach. ██████████████████

████████████████████████████████████████████████████████

██████ D.I. 2-2 at JPIOON00070099.  Jazz also admits that D.I. 2-2 states, among other things,

that ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ a multiparticulate approach may be viable for once nightly." *Id.* at JPION00070100.

Jazz, therefore, revisited its previous development and innovative work on bead

formulations. *See, e.g*, *id.* at JPION00070101-111.  D.I. 2-25 demonstrates that Jazz "evaluated a

host of approaches back in early to mid 2009." D.I. 2-25 at JPION00045907.  Among those

approaches was sachet and bead formulations. *See, e.g*., Ex. 60 at JPION00031085-086.  Jazz

otherwise refers to the documents referenced in this Paragraph for the contents thereof and, except

as expressly admitted, Jazz denies the allegations of Paragraph 66.

67.     On March 28, 2014, Jazz's business development team forwarded a market research
report on Avadel to Mr. Allphin and informed him of a "rumor" that Avadel was developing a
"Xyrem like candidate" using its Micropump® technology.  Ex. 26.  In replying to this "rumor,"
Mr. Allphin stated that other companies were "very good at developing bead formulations" and
"I'd think that one [of those companies] would have taken a bite at [sodium oxybate with beads]
if they thought it even had a remote chance of being feasible."  Ex. 27.

**ANSWER:** Jazz admits that D.I. 2-26 contains, among other things, a publicly available SunTrust document concerning Flamel and Micropump®. D.I. 2-26 at JPION00026031-066. Jazz also admits that D.I. 2-26 contains, among other things, an email on or about March 19, 2014 from Katherine Littrell of Jazz to Cozadd, Matt Young, and Honkeramp of Jazz stating, among other things, "Laurie Bertner called this morning to call out to us the rumor again that Flamel Tech has a Xyrem like candidate. She says that they are talking about an orphan drug that is over $500 M in sales and of the drugs on the list (see page 13) in the SunTrust report, Xyrem is the obvious CNS candidate." *Id.* at JPION00026029; *see also, e.g.*, Ex. 61 at JPION00455379 (March 19, 2014 email stating, among other things, "[r]ecently, an analyst at SunTrust initiated coverage of Flamel and his report highlighted the potential of one of their development programs in CNS using their Micropump technology that targets an orphan condition. . . . The report contains a list of possible candidates, including Xyrem, and several investors have focused on Xyrem as the most likely candidate.").

Jazz further admits that D.I. 2-27 contains an email on or about March 28, 2014 from Allphin to Desjardin and Finbar Larkin of Jazz that states, among other things, "One thing to keep in mind - both Impax and Supernus are very good at developing bead formulations and keen on 505b(2), both have heritage in drug delivery. And both would certainly be aware of the formidable challenges with SXB. I'd think that one would have taken a bite at this if they thought it even had a remote chance of being feasible." D.I. 2-27 at JPION00033839.

Jazz otherwise refers to the documents referenced in this Paragraph for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 67.

68.     In April 2014, however, Avadel announced in a press release that it had completed a proof-of-concept study of sodium oxybate using its microparticle technology. Ex. 28 at 5.

**ANSWER:** Jazz admits that, on or about April 7 2014, Flamel publicly announced in a press release pharmacokinetic data related to a proof-of-concept study of sodium oxybate using Micropump®. *See, e.g.*, D.I. 2-28 at 5; Ex. 62 at JPION00466118-120. Jazz further admits that Flamel subsequently held a conference call on or about July 29, 2014 in which it also publicly announced further information regarding its sodium oxybate project. *See, e.g.*, D.I. 2-28 at 5. Jazz otherwise refers to the documents referenced in this Paragraph for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 68.

69.     Less than two weeks later, Mr. Allphin drafted a slide deck entitled "sodium oxybate pitch" to discuss the current status of the once-nightly program with a focus on a multiparticulate bead formulation.  Mr. Allphin speculated that Avadel was using a sustained release bead, and erroneously surmised that it was "based on micropump patent, using film similar to PLE-2…."  Ex. 29 at 5.



**Flamel**

- Beads, most likely sustained release rather than delayed release
  - Based on micropump patent, using film similar to PLE-2 █████████
- Sodium oxybate has some challenges
  - High sodium load for patient
  - Hygroscopic/deliquescent
    - Processing challenges
    - Formulation challenges
    - Packaging – limited to anhydrous environment (foil sachet)
    - Dosing – limited ability for variable dosing (as with current Xyrem)

CONFIDENTIAL                                    - 5 -                    Jazz Pharmaceuticals

*Id.*

**ANSWER:** Jazz admits that D.I. 2-29 contains, among other things, the slide shown in Paragraph 69. Jazz further states that when asked internally what formulation approach Flamel had taken in response to the press release that Flamel issued on or about April 7, 2014, Allphin responded: "I don't know what Flamel is using," but speculated (based on publicly available information) that, "if it's similar to what's used in their Coreg-CR, then it's an enteric polymer and oil (consistent with the '209 patent)." Ex. 63 at JPION00024591. Jazz otherwise refers to the documents referenced in this Paragraph for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 69.

70. Based on that surmise, Mr. Allphin proposed an approach for GHB delivery using sustained release beads possessing a "film similar to PLE-2" as a main path "for competitive timing" with Avadel. *Id.* at 6.

**ANSWER:** Jazz incorporates its answers to Paragraph 66 and 69 and otherwise denies the allegations of Paragraph 70.

71. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ ██████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████



**ANSWER:** ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

72.     Two months later, in October 2014, Jazz reached out to Avadel to initiate additional discussions regarding the use of Avadel's technology for a sodium oxybate product.

**ANSWER:** Jazz incorporates its answer to Paragraph 39 and otherwise denies the allegations of Paragraph 72.

73.  

**ANSWER:**

Jazz further admits that, on or about December 19, 2014, Flamel publicly announced in a press release "positive results of a second clinical trial with Micropump Sodium Oxybate."  *Id.*  Jazz otherwise incorporates its answers to Paragraphs 39, 42, 66, and 69, refers to D.I. 2-2 and D.I. 2-31 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 73.

74.

**ANSWER:**  Jazz denies the allegations of Paragraph 74.

75.     On January 29, 2015, five years after Jazz and Avadel's interactions in 2010, Michael Desjardin forwarded to Mr. Allphin and Bill Jakobowski the 2010 Trigger Lock™ Deck, which contained information regarding Avadel's Micropump® technology.  *See, e.g.*, Ex. 6 at 5.

**ANSWER:**  Jazz admits that D.I. 2-6 contains, among other things, an email on or about January 29, 2015 from Desjardin to Allphin and Jakobowski, which forwarded the 2010 Trigger Lock™ Deck and that the 2010 Trigger Lock™ Deck includes information regarding Micropump®.  Jazz otherwise incorporates its answer to Paragraph 30, refers to D.I. 2-6 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 75.

76.     On information and belief, receipt of the Trigger Lock Deck™ from Mr. Desjardin on January 29, 2015 led Mr. Allphin to review and reassess the confidential 2010 Micropump® Deck Jazz had previously received from Avadel.

**ANSWER:** Jazz denies the allegations of Paragraph 76.

77.     The 2010 Micropump® Deck disclosed what was at the time Avadel's confidential proposed dosage form of "1 pack containing one sachet of powder (controlled release microparticles) and one bottle of oral solution." Ex. 7 at 17.

**ANSWER:** Jazz incorporates its answers to Paragraphs 24-38, refers to D.I. 2-7 for the contents thereof, and otherwise denies the allegations of Paragraph 77.

78.     Less than three weeks after the email from Mr. Desjardin, on February 18, 2015, Mr. Allphin and named co-inventor Scott Bura filed a provisional application 62/117,889 which ultimately matured into the '782 patent. One year later (and six years after the 2010 interaction with Avadel), Messrs. Allphin and Bura filed utility Application No. 15/047,586. Collectively, those comprise the "'899 Applications."

**ANSWER:** Jazz admits that the '782 patent issued from an application that claims priority to provisional application number 62/117,889 filed on February 18, 2015 and U.S. Patent Application 15/047,586 filed on February 18, 2016, and, except as expressly admitted, Jazz denies the allegations of paragraph 78.

79.     While the applications were filed under the guise of describing ion-exchange resinate technology, the '899 Applications track the confidential disclosures of the 2010 Micropump® Deck, particularly when viewed from the perspective that its claimed subject matter is not limited to resinate technology, but encompasses microparticulate technology, as Jazz now surprisingly claims in Claim Construction disclosures in C.A. No. 21-1138-MN, Dkt. 45, dated March 4, 2022. For example, the initial slide of the Micropump® Deck notes that because "[d]oses of sodium oxybate administered are large, 4.5 g and 6 g" they were "incompatib[le] with pill or tablet forms." Ex. 7 at 2. The '899 Applications, in turn, recite that "while extended release oxybate dosage forms are known, such extended release dosage forms are provided as solids, *e.g.*, as tablets," but "[b]ecause the required dose of oxybate is high, such tablets can be quite large," which "can be problematic." Ex. 42, '899 Applications, 2016-02-18 Specification at ¶ 23.

**ANSWER:** Jazz admits that D.I. 2-42 states, among other things:

> Furthermore, while extended release oxybate dosage forms are known, such extended release dosage forms are provided as solids, *e.g.* as tablets. Because the required dose of oxybate is high, such tablets can be quite large, and/or require the administration of multiple tablets. This can be problematic because some patient populations have difficulty swallowing solid dosage forms, or the need to swallow multiple tablets may reduce patient compliance. In addition, the sustained release matrix or coating compositions used to provide extended release are complex and expensive to produce.

46

> Accordingly, it would be desirable to provide oxybate ( or analogous drugs which require administration in high doses) in an extended release, oral liquid dosage form (including suspensions of oxybate-containing particles as described herein, which in some embodiments can be supplied as a sachet which can be suspended in e.g., tap water by the end user), using simply, readily controlled processing methods.

D.I. 2-42 at ¶ 23.  Jazz otherwise incorporates its answers to Paragraphs 24-38, refers to D.I. 2-7 and D.I. 2-42 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 79.

80.  ███████████████████████████████████████████ ███████████████████████████████  Indeed, Jazz's notion that its patents encompass the FT218 formulation is belied by the fact that Jazz did not believe at the time that a bead delivery platform would work with sodium oxybate.  *See e.g.*, Ex. 30 at 10 ("Flamel appears to be naïve about the challenges of SXB [sodium oxybate]").

**ANSWER:**  Jazz incorporates its answers to Paragraphs 66, 69, and 71, refers to D.I. 2-30 for the contents thereof, and otherwise denies the allegations of Paragraph 80.

81.  ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████

**ANSWER:**  ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████  Jazz otherwise incorporates its answers to Paragraphs 66 and 69, refers to D.I. 2-32 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 81.

82.  The very next part of the 2010 Micropump® Deck contains Avadel's confidential conclusion that microparticles could be utilized as an alternative to solid oral dosing, including by way of "sachet or oral suspension, which allow large dose formulations that are completely tasteless." Ex. 7 at 2.  It also proposed a dosage form of "one sachet of powder (controlled release

microparticles) and one bottle of oral solution." *Id*. at 17.  Similarly, immediately after explaining the limitations of solid oral dosage forms for sodium oxybate extended release, the '899 Applications state that "it would be desirable to provide oxybate . . . in extended release, oral liquid dosage form (including suspensions of oxybate-containing particles as described herein, which in some embodiments can be supplied as a sachet . . . .)."  Ex. 42 at ¶ 23.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-38 and 79, refers to D.I. 2-7

and D.I. 2-42 for the contents thereof, and otherwise denies the allegations of Paragraph 82.

83.     On information and belief, as of that time, Jazz had not dedicated any time or effort to developing a sachet formulation of oxybate for purposes of once-nightly dosing.  On information and belief, that idea, among others, came directly from Avadel's 2010 Micropump® Deck and not from anyone at Jazz.

**ANSWER:**  Jazz incorporates its answers to Paragraph 24-38, 66, and 69, and otherwise

denies the allegations of Paragraph 83.

84.     The 2010 Micropump® Deck also disclosed that one could use a "combination of immediate release AND delayed release in a single administration" in order "to obtain the desired PK profile," and that the dosage form may contain 50% sodium oxybate in solution and 50% controlled release microparticles.  Ex. 7 at 2.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-38, refers to D.I. 2-7 for the

contents thereof, and otherwise denies the allegations of Paragraph 84.

85.     Notably, Jazz's '889 Applications state "controlled release and immediate release formulations can be dosed together to a subject to provide quick onset of action, followed by maintenance of therapeutic levels of the drug substance over a sustained period of time."  Ex. 43, '889 Applications, 2015-02-18 Specification ¶ 18.  The '899 Applications contain multiple other references to a combination of immediate and controlled release formulations.  *See e.g.*, *id.* at ¶ 14 ("[T]here can be an immediate release GHB formulation that is present in or accompanies the controlled release formulation"); *id.* at ¶ 17 ("The immediate release component can form part of a controlled release unit or liquid dosage form or may be a separate immediate release composition.").  On information and belief, these ideas, among others, came from the 2010 Micropump® Deck and not from anyone at Jazz.

**ANSWER:**  Jazz admits that the D.I. 2-43 states, among other things:

> In specific embodiments, controlled release and immediate release formulations can be dosed together to a subject to provide  quick onset of action, followed by maintenance of therapeutic levels of the drug substance over a sustained period of time.  However, because the controlled release component and immediate release component described herein need not be present in a single dosage form, as it is

used herein, the phrase "dosed together" refers to substantially simultaneous dosing of the controlled release and immediate release components, but not necessarily administration in the same dosage form. Dosing the controlled release and immediate release components together offers increased convenience, allowing patients to quickly achieve and maintain therapeutic levels of a drug over a sustained period of time, while reducing the frequency with which the drug must be dosed. Furthermore, dosing the controlled release and immediate release components together may avoid the disadvantages of dosing regimens and formulations that result in highly pulsatile plasma concentrations.

D.I. 2-43 at ¶ 18. Jazz also admits that D.I. 2-43 contains multiple other references to a combination of immediate and controlled release formulations, including (without limitation) in paragraphs 14 and 17 of that document. Jazz otherwise refers to D.I. 2-43 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 85.

86.     On information and belief, Jazz's desperation to develop or at least patent a once-nightly sodium oxybate product led it to improperly rely on confidential information previously disclosed by Avadel to Jazz during the 2010 diligence process.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 86.

87.     On information and belief, Jazz misused the confidential information from the 2010 Micropump® Deck by including that information in the '899 Applications, but hid that misuse by means of (a) including it in a disclosure that exclusively related to ion-exchange resinate technology, and then later (b) when Jazz attempted to pretend that the subject matter of the specification was not so confined, file a nonpublication request with the PTO to conceal that effort from public view and maintain submarine applications that were never published until issuance.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 87.

88.     By October 2015, based on confidential Avadel information, Mr. Allphin and others at Jazz understood that Avadel's microparticulate formulation in a sachet dosage form "has a good chance of success" at arriving at a once-nightly formulation, and Avadel was on the fast track to finding the ███████████ while Jazz was wasting time exploring other approaches such as ████████████████████████████████████████ Ex. 33.

**ANSWER:** Jazz admits that D.I. 2-33 contains, among other emails, an email on or about October 23, 2015 from Allphin to others at Jazz that, among other things, makes reference to a publicly available Leerink report on Flamel and states, "As you look through the report, the analyst did a reasonably good job.  Rightly, they indicate a SR bead approach (Flamel) has good chance of success, ███████████████████████████████████████."  D.I. 2-33 at JPION0049394.  Jazz otherwise refers to D.I. 2-33 for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 88.

89.     In addition to providing Jazz with motivation to steal Avadel's intellectual property, Jazz's access to Avadel's trade secret information regarding Avadel's clinical trials and other information demonstrating the unique attributes and profile of a sachet, liquid-suspension system for sodium oxybate once-nightly dosing led Jazz to adjust its development strategy to focus on a similar system.  Instead of using Avadel's confidential information solely for the evaluation and negotiation of a future business relationship with Avadel (as required by the CDAs), Jazz used information from its "diligence" with Avadel, ████████████████████ to redirect the focus of its own development efforts.  And rather than continuing to flounder about with varying, failed initiatives, that misappropriation afforded Jazz a valuable head start on attempting to develop its own, potentially viable, once-nightly oxybate formulation.

**ANSWER:**  As explained herein, Avadel's claims are baseless and Jazz denies the allegations of Paragraph 89.

90.     Specifically, in response to the confidential information ████████████████ for Avadel's microparticulate formulation, Jazz quickly shifted its internal focus on developing a once-nightly oxybate to mirror Avadel's formulation and dosage form.  Before Avadel's confidential disclosures in 2015, Jazz was focused on a wide range of dosage forms and presentations; however, after seeing the positive results of Avadel's pellet-based approach through its confidential disclosures, Jazz focused nearly exclusively on "sustained release pellets". ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████ Ex. 35 (indicating that Jazz's once-nightly formulation program had shifted to focus on "sustained release pellets," by March 2016).

**ANSWER:** Jazz admits that D.I. 2-34 states, among other things, that ██████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████ (D.I. 2-34 at JPION00032343), and that D.I. 2-34 then goes on to provide information about, among other things, such a multiparticulate formulation (*id.* at

JPION00032344).   Jazz also admits that D.I. 2-35 states, among other things, that "Jazz is

developing a once nightly oxybate (JZP-324) formulation that presently is in the form of sustained

release pellets targeted to roughly match the in-vitro dissolution of the former PLE-2 ███████

███████████   D.I. 2-35 at JPION00032113.   Jazz otherwise incorporates its answers to

Paragraphs 39-49, 66, and 69, notes that Avadel's pleading in this Paragraph is inconsistent with

Avadel's pleading in Paragraph 66, refers to D.I. 2-34 and D.I. 2-35 for the contents thereof and,

except as expressly admitted, Jazz denies the allegations of Paragraph 90.

91.     And as described above, Jazz's pattern of misappropriating Avadel's confidential information to guide its own internal development effort did not end there.  Based on its access to confidential information demonstrating the promise of Avadel's approach, Jazz continued to obtain access to Avadel's trade secret and confidential information through the 2018 diligence process.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-63 and otherwise denies the

allegations of Paragraph 91.

### Response to Allegations that "Jazz Also Resorted to Monitoring and Copying Avadel's Patents and Confidential Information"

92.     Despite Jazz's continued search for the ████████████ in Avadel's confidential information, it still has not been able to develop a viable once-nightly sodium oxybate formulation. Such inability may stem from Jazz's lack of experience with Avadel's innovative technology.

**ANSWER:**  Jazz denies the allegations of Paragraph 92.

93.     Through its "diligence" with Avadel, and its review of Avadel's confidential information describing its clinical trial successes, Jazz eventually realized that Avadel would beat Jazz to the market with a once-nightly sodium oxybate product.

**ANSWER:**  Jazz denies the allegations of Paragraph 93.

94.     Upon information and belief, based on the knowledge that Avadel had been able to develop a clinically successful once-nightly sodium oxybate project, Jazz recognized that it would be unable to introduce its own product implementing Avadel's technology in time to compete on the market.  On information and belief, Jazz responded by improperly using Avadel's confidential information and trade secrets as detailed above, and further embarking on a strategy of copying Avadel's patent applications, and filing claims covering Avadel's once-nightly sodium oxybate product in hopes of illicitly and illegitimately preventing FT218 from ever reaching market.  In doing so, Jazz not only committed fraud on the U.S. Patent and Trademark office ("PTO"), but

intentionally sought to deprive patients of a life changing therapeutic that it recognized was superior to its twice-nightly Xyrem® product.

**ANSWER:** Paragraph 94 states legal conclusions for which no response is required. To the extent that a response is required, Jazz refers to the Jazz Patents for the contents thereof and otherwise denies the allegations of Paragraph 94.

95. One of those patents, U.S. Patent No. 10,272,062 (the "'062 patent"), entitled "Modified Release Gamma-Hydroxybutyrate Formulations Having Improved Pharmacokinetics," was filed on July 21, 2017 and issued to Avadel. The '062 patent lists as its inventors Claire Megret, Herve Guillard, and Jean-Francois Dubuisson (collectively the "Avadel Inventors"). Avadel's '062 patent claims priority to several provisional applications with the earliest provisional application No. 62/365,812 filed on July 22, 2016. The application that ultimately issued as Avadel's '062 patent was first published on January 25, 2018 as U.S. Publication No. 2018/0021284 (the "'062 patent publication").

**ANSWER:** Jazz admits that U.S. Patent No. 10,272,062 (the "'062 patent") is titled "Modified release gamma-hydroxyburyrate formulations having improved pharmacokinetics," lists July 21, 2017 as the filing date of the underlying application number 15/655,924 (the "'924 application"), lists Flamel Ireland Limited as the assignee, and lists Claire Megret, Herve Guillard, and Jean-Francois Dubuisson as inventors. Jazz further admits that the '062 patent claims priority to three provisional applications, the earliest of which is provisional application number 62/365,812, for which the '062 patent lists July 22, 2016 as the filing date. Jazz further admits that the '062 patent lists a publication date for the '924 application as January 25, 2018 as US 2018/0021284, and, except as expressly admitted, Jazz denies the allegations of Paragraph 95.

96. Thus, by January 25, 2018, Avadel's '062 patent publication disclosed modified release formulations of GHB containing methacrylic acid-methyl methacrylate co-polymers, with certain dissolution profiles when tested in deionized water using USP apparatus 2 and where the dissolution medium was maintained at 37°C ± 0.5°C with the rotating paddle speed fixed at 50 rpm.

**ANSWER:** Jazz admits that the '062 patent lists January 25, 2018 as the publication date of the underlying '924 application, refers to the text of the '062 patent publication for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 96.

97.     U.S. Patent No. 10,736,866 (the "'866 patent") is a continuation of Avadel's '062 patent and was filed on February 21, 2019 and issued on August 11, 2020.  The application that gave rise to the '866 patent was first published on June 20, 2019 (the "'866 patent publication").

**ANSWER:**  Jazz admits that U.S. Patent No. 10,736,866 (the "'866 patent") states that it

is a continuation of the application that issued as the '062 patent and was filed on February 21,

2019.  Jazz further admits that the '866 patent states that it issued on August 11, 2020 and that it

states that the underlying application published on June 20, 2019, and, except as expressly

admitted, Jazz denies the allegations of Paragraph 97.

98.     Thus, by June 20, 2019, Avadel's '866 patent publication disclosed claims relating to a sachet formulation of GHB comprising an immediate release component and a controlled release component.

**ANSWER:**  Jazz admits that the '866 patent states that the underlying application

published on June 20, 2019, refers to the text of the '866 patent publication for the contents thereof,

and, except as expressly admitted, Jazz denies the allegations of Paragraph 98.

99.     U.S. Patent No. 10,952,986 (the "'986 patent") is a continuation of the '866 patent and was filed on May 23, 2019 and issued on March 23, 2021.  The application that ultimately issued as the '986 patent was first published on September 12, 2019 (the "'986 patent publication").

**ANSWER:**  Jazz admits that U.S. Patent No. 10,952,986 (the "'986 patent") states that it

is a continuation of the application that issued as the '866 patent.  Jazz further admits that the '986

patent states that it was filed on May 23, 2019 and states that it issued on March 23, 2021.  Jazz

further admits that the '986 patent states that the underlying application was published on

September 12, 2019, and, except as expressly admitted, Jazz denies the allegations of paragraph

99.

100.    Thus, by September 12, 2019, Avadel's '986 patent publication disclosed claims relating to formulations of GHB comprising an immediate release portion and a modified release portion, as a skilled artisan would understand the plain meaning of those terms, with a suspending or viscosifying agent separate and distinct from the immediate release and modified release portions.

**ANSWER:**   Jazz admits that the '986 patent states that the underlying application published on September 12, 2019, refers to the text of the '986 patent publication for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 100.

101.   On information and belief, Jazz engaged in a pattern and practice of copying Avadel's inventive work by drafting claims based on the disclosures in Avadel's patent publications and guided by its improper use of the confidential information disclosed by Avadel during the diligence process, rather than any commensurate disclosure of Jazz's underlying applications. Jazz, and the named inventors on the asserted patents, along with others responsible for the prosecution of same, misled the PTO by concealing that they had copied the disclosures set forth in Avadel's patent publications.

**ANSWER:**   Paragraph 101 states legal conclusions for which no response is required.   To the extent that a response is required, Jazz refers to the Jazz Patents for the contents thereof and otherwise denies the allegations of Paragraph 101.

### Response to Allegations Concerning "The Sustained Release Patents"

102.   As one example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that Avadel's '062 patent publication was published on January 25, 2018, Jazz had not filed any patent applications that gave rise to the patents asserted in Jazz's initially-filed Complaint (C.A. No. 21-691-MN), *i.e.*, Jazz's Patent Nos. 10,758,488 (the "'488 patent"), 10,813,885 (the "'885 patent"), 10,959,956 (the "'956 patent"), and 10,966,931 (the "'931 patent") (collectively, the "Sustained Release Patents"). Instead, Jazz was prosecuting the parent application to the Sustained Release Patents, U.S. Application No. 13/071369 (the "Jazz '369 Application"). The then-pending claims of the Jazz '369 application were directed to a "controlled release dosage form for oral administration" including "a compressed tablet controlled release core," comprising at least one polymer comprising ethylcellulose, at least one polymeric "pore former," and also recited "providing a time dependent release" measuring release of the drug from time of administration. *See, e.g.*, Ex. 44, Jazz '369 Application File History, 2017-10-04 Response to Final Office Action at claim 1. One dependent claim recited that "at least one polymeric pore-former is at least one of a polyethylene glycol, poloxamer, polyvinyl alcohol, copovidone, povidone, a water soluble sugar, a water soluble organic acid, such as carboxylic acids and their salts, and a hydroxyalkyl cellulose selected from hydroxyethyl cellulose, hydroxypropyl methylcellulose, and hydroxypropyl cellulose." *See id.* at claim 16. The Jazz '369 Application claims therefore corresponded to the substance of the specification, which disclosed controlled release dosage forms containing a compressed tablet controlled release core, ethylcellulose, and hydroxypropyl cellulose or poloxamer. *See, e.g.*, Ex. 45, Jazz '369 Application at Examples 1-13. While claim 1 of the Jazz '369 Application was originally directed to "a controlled release dosage form for oral administration," the applicant narrowed claim 1 first to a "compressed tablet" and later to include a "compressed tablet controlled release core," in response to rejections finding that claim 1 was obvious over a prior art patent application to Liang *et al.*, U.S. Patent Publication No. 2006/0210630 ("Liang"). *See* Ex. 46, Jazz '369 Application File History, 2013-05-28 Response

to Office Action at claim 1; Ex. 47, January 27, 2014 Response to Office Action at claim 1.  These narrowing amendments conformed the claims to the disclosure of the Jazz '369 Application, which was limited to a compressed tablet dosage form.  Further, the Jazz '369 Application had no claims or teachings of dissolution testing or the release profiles resulting from such testing of formulations containing methacrylic acid-methyl methacrylate co-polymers in deionized water using apparatus 2 at a temperature of 37°C and a paddle speed of 50 rpm, as described in Avadel's '062 patent publication.

**ANSWER:**  Jazz admits that it filed U.S. Patent Application No. 13/071,369 (the "'369

application") on March 24, 2011 which claimed priority to a provisional application filed on March

24, 2010 (prior to any purported disclosure of allegedly confidential information from Flamel or

Avadel to Jazz), that the '369 application published as U.S. Publication No. 2012/0076865 on

March 29, 2012 (*see* Ex. 67 (the "'369 application publication")), refers to the text, claims, and

file histories of the '369 application, the '488 patent, the '885 patent, the '956 patent, and the '931

patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of

Paragraph 102.

103.    On information and belief, by July 2018, Jazz had received additional information from Avadel during its 2018 diligence that further informed Jazz's patent prosecution strategy. *Supra* ¶¶ 50-63.  In particular, Jazz learned that Avadel's FT218 is ███████████████████ ████████████████████████████████████████████  Ex. 24 at AVDL_00121424; *see e.g.*  Ex. 33 at AVDL_00034188 at 31.  Jazz was also aware that Avadel was testing FT218 in ███████████ ████████████████.  Ex. 24 at AVDL_00121424.

**ANSWER:**  Jazz admits that a limited number of Jazz employees—none of whom were

Allphin—received D.I. 2-24 no earlier than July 13, 2018 (after Jazz had filed U.S. Patent

Application No. 16/025,487 (the "'487 application") on July 2, 2018, which later issued as the

'488 patent).[4]  Jazz otherwise incorporates its answers to Paragraphs 30, 32, and 50-63, refers to

D.I. 2-24 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of

Paragraph 103.

---

[4]  The claims filed with the '487 application published on November 8, 2018 as U.S. Publication No. 2018/0318222.  *See* Ex. 68.

104.    Jazz also learned from the 2018 diligence process that Avadel's FT218 consists of ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████ Jazz further learned from the 2018 diligence process that the ███████████████████ consists of ██████████████████████ ████████████████████████████████████████████ Ex. 24 at AVDL_0012142426, 428. *Supra* ¶¶ 50-63.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 30, 50-63, 66, 69, 90, and 103, and otherwise denies the allegations of Paragraph 104.

105.    After Avadel's '062 patent publication was published, however, Jazz let its '369 application become abandoned on November 2, 2018.  Jazz did not file the application that ultimately led to the issuance of the first of the Sustained Release Patent, the '488 patent, until July 2, 2018—approximately six months *after* Avadel's '062 patent publication was published.

**ANSWER:**  Jazz admits that it filed the '487 application on July 2, 2018 (before a limited number of Jazz employees—none of whom were Allphin—received any allegedly Avadel confidential information under the 2018 CDA on July 13, 2018) as a continuation of the '369 application, that the '487 application issued as the '488 patent on September 1, 2020, and, except as expressly admitted, Jazz denies the allegations of Paragraph 105.

106.    Jazz was aware of the disclosures in Avadel's patent publications since at least as early as when it was published.



**ANSWER:**  Jazz refers to D.I. 2-36, D.I. 2-37, D.I. 2-38, and D.I. 2-39 for the contents thereof, incorporates its answers to Paragraphs 7 and 50-64, and otherwise denies the allegations of Paragraph 106.

107.    On information and belief, based on its access to Avadel's trade secret and confidential information, Jazz concluded that at least Example 1 and Example 1bis of Avadel's '062 patent publication disclosed the formulation of FT218, Avadel's once-nightly sodium oxybate formulation for the treatment of excessive daytime sleepiness and cataplexy in adults with narcolepsy.  As a result of the confidential disclosures accompanying the 2015 CDA, Jazz uniquely had access to ███████████ For example, the confidential 2015 Study Report provided by Avadel to Jazz disclosed

**ANSWER:** Jazz denies that any Flamel allegedly confidential information was disclosed to Jazz under the 2015 CDA.  Further, the limited number of Jazz employees—none of whom were Allphin—who received allegedly confidential information under the 2018 CDA did not receive that information until at least July 13, 2018, well after March 23, 2018.  As Avadel should know, Jazz's ability to focus on Example 1bis ████████████████ was due to Avadel's public disclosure of pK profiles for FT 218 made no later than March 8, 2018.  *See, e.g.*, Ex. 64, JPION00457309-342; *see also id.* at 327-330; Ex. 65 at JPION00466161, 162, 170-173.  Indeed, Figure 13 from the '062 Patent is set forth in Avadel's March 8, 2018 presentation, as is the overlay of Xyrem® incorporated from Figure 14 of the '062 Patent to Figure 13 of the '062 Patent.  *Compare* '062 Patent at Figs. 13 and 14 *with* Ex. 64 at JPION00457329-330 and Ex. 65 at JPION00466172-173; *see also* '062 Patent at 10:63-11:7 (identifying the information for Figure 13 as coming from "Example 1 bis" and the information from Figure 14 as coming from "Xyrem").

Jazz also incorporates its answers to Paragraphs 39-63, refers to D.I. 2-39, D.I. 2-13, and the '062 Patent, as well as the documents referenced in this Paragraph, for the contents thereof, and otherwise denies the allegations of Paragraph 107.

108.    The application giving rise to the '488 patent was filed and characterized as a continuation of the Jazz '369 application.  Notably, Jazz canceled all 10 original claims that generally recited the four components described *supra*—namely a "compressed tablet" controlled release dosage form, comprising at least one polymer comprising ethylcellulose, at least one polymeric "pore former," and reciting "providing a time dependent release" measuring release of the drug from time of administration.  In stark contrast to its prior set of claims, Jazz deleted each of those four attributes, and replaced them with claims directed to a generic formulation (rather than a compressed tablet) comprising specifically methacrylic acid-methyl methacrylate co-polymers (rather than one polymer comprising ethylcellulose and at least one polymeric "pore former"), and recited a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm" (rather than reciting attributes following administration).

**ANSWER:**  Jazz admits that it filed the '487 application on July 2, 2018 (before a limited number of Jazz employees—none of whom were Allphin—received any allegedly Avadel confidential information under the 2018 CDA on July 13, 2018) as a continuation of the '369 application, that the '487 application issued as the '488 patent on September 1, 2020, refers to the text, claims, and file history of the '488 patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 108.

109.    On information and belief, Jazz drafted the claims that ultimately issued as the '488 patent based not on any commensurate disclosure of its underlying application, but solely in view of the disclosures set forth in the '062 application and Avadel's confidential disclosures.  The '488 patent specification does not disclose dissolution testing or the release profile resulting from such testing of formulations containing methacrylic acid-methyl methacrylate co-polymers in deionized water using apparatus 2 at a temperature of 37°C and a paddle speed of 50 rpm.  Further, the '488 patent specification does not disclose the full range of sustained release dosage forms as Jazz appears to assert, but is instead limited to two specific solid dosage forms: tablets and capsules. Further, the '488 patent specification fails to disclose that the inventors were in possession of sustained release formulations possessing a "functional coating" containing methacrylic acid-methylmethacrylate co-polymers, let alone in the percentages recited in the asserted claims.  As such, the '488 patent claims as filed and issued are neither described nor supported by its specification as, on information and belief, the claims were instead solely based on Avadel's inventive work disclosed in at least the '062 Application and confidential information.

**ANSWER:**  Jazz admits that it filed the claims of the '487 application (which later issued as the '488 patent) on July 2, 2018 (before a limited number of Jazz employees—none of whom were Allphin—received any allegedly Avadel confidential information under the 2018 CDA on July 13, 2018).  Jazz further admits that its claims filed on July 2, 2018 concerned GHB

formulations with coatings "comprising one or more methacrylic acid-methyl methacrylate co-polymers" that release "greater than about 40% of its gamma-hydroxybutyrate over about 4 to about 6 hours when tested in a dissolution apparatus 2 in deionized water at a temperature of 37° C and a paddle speed of 50 rpm." Ex. 66 at JPION00000265. Jazz further refers to the text, claims, and file history of the '488 patent for the contents thereof and, except as expressly admitted, Jazz denies the allegations of Paragraph 109.

110.   Jazz filed the application that ultimately issued as the '885 patent on June 30, 2020 as a continuation of at least the '488 patent. Like with the '488 patent, on information and belief, the claims of the '885 patent were written based on the disclosures in the '062 application and Avadel's confidential information. The '885 patent was filed and has issued with claims to formulations comprising methacrylic acid-methyl methacrylate co-polymers and a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm." For the same reasons as above, the '885 patent claims are neither described nor supported by its patent specification, as the claims were written based solely on Avadel's inventive work disclosed in at least the '062 application and the confidential information furnished to Jazz described above.

**ANSWER:**  Jazz admits that it filed U.S. Patent Application No. 16/916,677 (the "'677 application") on June 30, 2020 as a continuation of U.S. Patent Application No. 16/712,260 (the "'260 application"), that the '260 application is a continuation of the '487 application, that the '677 application issued as the '885 patent on October 27, 2020, refers to the text, claims, and file history of the '885 patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 110.

111.   Jazz filed the application that ultimately issued as the '956 patent on September 4, 2020 as a continuation of at least the '885 patent. As with the '885 patent, the '956 patent was filed and has issued with claims to formulations comprising methacrylic acid-methyl methacrylate co-polymers and a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm." For the same reasons as above, the '956 patent claims are neither described nor supported by its patent specification, as the claims were written solely based on Avadel's inventive work disclosed in at least the '062 application and the confidential information furnished to Jazz described above.

**ANSWER:**  Jazz admits that it filed U.S. Patent Application No. 17/012,823 (the "'823 application") on September 4, 2020 as a continuation of the '677 application, that the '823

application issued as the '956 patent on March 30, 2021, refers to the text, claims, and file history of the '956 patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 111.

112.    Jazz filed the application that ultimately issued as the '931 patent on September 4, 2020 as a continuation of at least the '885 patent.  As with the '885 patent, the '931 patent was filed and issued with claims to formulations comprising methacrylic acid-methyl methacrylate co-polymers and a specific dissolution profile defined by tests performed "in a dissolution apparatus 2 in deionized water at a temperature of 37°C and a paddle speed of 50 rpm."  For the same reasons as above, the '931 patent claims are neither described nor supported by its patent specification, as the claims were written solely based on Avadel's inventive work disclosed in at least the '062 application and the confidential information furnished to Jazz described above.

**ANSWER:**  Jazz admits that it filed U.S. Patent Application No. 17/012,831 (the "'831 application") on September 4, 2020 as a continuation of the '677 application, that the '831 application issued as the '931 patent on April 6, 2021, refers to the text, claims, and file history of the '931 patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 112.

113.    As a result, none of the Sustained Release Patents have written description support in their specification for any of their claims and thus do not have a priority date earlier than the filing date of those claims in which the new matter was added.

**ANSWER:**  Paragraph 113 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz refers to the '488 patent, the '885 patent, the '956 patent, and the '931 patent for the contents thereof, and otherwise denies the allegations of Paragraph 113.

114.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

**ANSWER:**  Jazz admits that the '062 patent states that the underlying application was published on January 25, 2018, refers to D.I. 2-40 for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 114.

115.    Jazz's bad faith use of Avadel's confidential information is further reflected in its decision to file a patent infringement suit against Avadel on the Sustained Release Patents knowing that their subject matter does not apply to FT218.   During prosecution, Jazz repeatedly distinguished the claimed "sustained release" composition from a "delayed release" composition specifically to avoid rejections over a reference to Liang.  *See, e.g.*, Ex. 48, Jazz '488 Patent File History, 2020-03-06 Allphin Declaration at ¶¶ 6, 10-11. ██████████████████████████████
████████████████████████████   █████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████

**ANSWER:**  Jazz admits, on information and belief, that Avadel's proposed sodium oxybate product, code named FT218, would infringe one or more claims of the '488 patent, the '885 patent, the '956 patent, and the '931 patent, and refers to the text, claims, and file histories of the '488 patent, the '885 patent, the '956 patent, and the '931 patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 115.

**Response to Allegations Concerning "The Resinate Patents"**

116.    As another example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that Avadel's '062 patent publication was published on January 25, 2018, Jazz had not filed the patent application that gave rise to the patent asserted in Jazz's second-filed Complaint (C.A. No. 21-1138-MN)—Jazz's Patent No. 11,077,079 (the "'079 patent").  Nor did Jazz file the application that ultimately led to the issuance of the '079 patent at the time Avadel's '986 patent publication published on September 12, 2019.

**ANSWER:**  Jazz admits that the '062 patent states that the underlying application was published on January 25, 2018 and that the '986 patent states that the underlying application was published on September 12, 2019.  Jazz further admits that U.S. Patent No. 11,077,079 (the "'079 patent") issued from an application filed on December 10, 2020, which claimed priority to three earlier-filed applications, including an earliest non-provisional application filed on February 18, 2016 and an earliest provisional application filed on February 18, 2015, and that the '079 patent is being asserted in C.A. No. 21-1138, and, except as expressly admitted, Jazz denies the allegations of Paragraph 116.

117.    Indeed, Jazz did not file the application that ultimately led to the issuance of the '079 patent until December 10, 2020—more than a year *after* Avadel's '986 patent publication was published.

**ANSWER:**  Jazz admits that the '079 patent issued from an application filed on December 10, 2020, which claimed priority to three earlier-filed applications, including an earliest non-provisional application filed on February 18, 2016 and an earliest provisional application filed on February 18, 2015.  Jazz further admits that the '986 patent states that the underlying application was published on September 12, 2019, and, except as expressly admitted, Jazz denies the allegations of Paragraph 117.

118.    On information and belief, Jazz drafted the claims that gave rise to the '079 patent based not on any commensurate disclosure of its underlying application or any formulations invented by the named inventors as of the purported priority date, but solely in view of the disclosures set forth in Avadel's confidential information, trade secrets, and/or '986 patent publication.  The '079 patent specification only discloses embodiments of a formulation for purported once-daily dosing that utilize one or more ion-exchange resins and, indeed, criticizes strategies other than ion-exchange resins.  And yet, Jazz has asserted that one or more claims of the '079 patent would be infringed through the use of Avadel's FT218, which does not include any such ion-exchange resin.  Given Jazz's view of the claim scope of the '079 patent, the '079 patent claims as filed and issued are neither described nor supported by its specification as, on information and belief, the claims were instead solely based on Avadel's confidential information, trade secrets, and/or inventive work disclosed in at least Avadel's '986 patent publication.

**ANSWER:**  Jazz admits, on information and belief, that the use of Avadel's proposed sodium oxybate product, code named FT218, would infringe one or more claims of the '079 patent and refers to the text, claims, and file history of the '079 patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 118.

119.    Jazz's internal documents corroborate that at the time that Avadel's '986 patent publication was published on September 12, 2019, Jazz had not developed any sachet formulations of GHB comprising an immediate release component and a controlled release component.  ████

██████████████████████████

**ANSWER:**  Jazz admits that the '986 patent states that the underlying application was published on September 12, 2019, incorporates its answers to Paragraphs 66, 69, and 90, refers to

D.I. 2-41 and the '079 patent for the contents thereof, and except as expressly admitted, Jazz denies the allegations of Paragraph 119.

120.    As yet another example of Jazz's pattern and practice of copying Avadel's work and passing it off as its own, at the time that the '062 patent publication was published on January 25, 2018, Jazz had not filed the patent application that gave rise to the patent asserted in Jazz's Complaint in C.A. No. 21-1594-MN —Jazz's Patent No. 11,147,782 (the "'782 patent"). Nor did Jazz file the application that ultimately led to the issuance of the '782 patent at the time Avadel's '866 patent publication was published on June 20, 2019. The '782 patent was a child patent of the '079 patent.

**ANSWER:** Jazz admits that the '062 patent states that the underlying application was published on January 25, 2018. Jazz further admits that the '866 patent states that the underlying application was published on June 20, 2019. Jazz further admits that the '782 patent issued from an application filed on March 23, 2021 as a continuation of the '079 patent, that the application that issued as the '782 patent claimed priority to three earlier-filed applications, including an earliest non-provisional application filed on February 18, 2016 and an earliest provisional application filed on February 18, 2015, and that the '782 patent is being asserted in C.A. No. 21-1594, and, except as expressly admitted, Jazz denies the allegations of Paragraph 120.

121.    Indeed, Jazz did not file the application that ultimately led to the issuance of the '782 patent until March 23, 2021—almost two years *after* Avadel's '866 patent publication was published.

**ANSWER:** Jazz admits that the '866 patent states that the underlying application was published on June 20, 2019. Jazz further admits that the '782 patent issued from an application filed on March 23, 2021, which claimed priority to an earliest non-provisional application filed on February 18, 2016 and an earliest provisional application filed on February 18, 2015, and, except as expressly admitted, Jazz denies the allegations of Paragraph 121.

122.    On information and belief, Jazz drafted the claims that gave rise to the '782 patent based not on any commensurate disclosure of its underlying application, but solely in view of the disclosures set forth in Avadel's confidential information, trade secrets, and/or '866 patent publication. The '782 patent specification only discloses embodiments of a formulation for purported once-daily dosing that utilize one or more ion-exchange resins and, indeed, criticizes

strategies other than ion-exchange resins. And yet, Jazz has asserted that one or more claims of the '782 patent would be infringed by Avadel's FT218, which does not include any such ion-exchange resin. Given Jazz's view of the claim scope of the '782 patent, the '782 patent claims as filed and issued are neither described nor supported by its specification as, on information and belief, the claims were instead solely based on Avadel's inventive work disclosed in at least Avadel's confidential information, trade secrets, and/or '866 patent publication.

**ANSWER:** Jazz admits, on information and belief, that the use of Avadel's proposed sodium oxybate product, code named FT218, would infringe one or more claims of the '782 patent and refers to the text, claims, and file history of the '782 patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 122.

123. Jazz's internal documents corroborate that at the time that Avadel's '986 patent publication was published on September 12, 2019, Jazz had not developed any formulations containing immediate and modified release particles, with a suspending or viscosifying agent separate from the immediate release and modified release particles. ████████████████████████ ████████████████████████████████████ ████████████████████

**ANSWER:** Jazz admits that the '986 patent states that the underlying application was published on September 12, 2019, incorporates its answers to Paragraph 66, 69, and 90, refers to D.I. 2-41 and the '782 patent for the contents thereof, and, except as expressly admitted, Jazz denies the allegations of Paragraph 123.

124. Thus, on information and belief, after the publication of Avadel's '062 patent publication on January 25, 2018, Jazz began a pattern and practice of drafting claims that were directed to the inventions disclosed in Avadel's published applications rather than the formulations that Jazz had been working on and had been disclosed in its applications.

**ANSWER:** Jazz admits that the '062 patent states that the underlying application was published on January 25, 2018 and, except as expressly admitted, Jazz denies the allegations of Paragraph 124.

125. Additional facts confirm that Jazz's asserted patents constitute a brazen effort to pass off Avadel's work as its own. Pharmaceutical companies seek intellectual property protection for their own products. Jazz's own public statements echo that precept, explaining that it seeks intellectual property to "protect ***our products*** and product candidates and related inventions and improvements that we consider important to our business." *See* Ex. 1 at 17. Jazz further represented that "[o]ur owned and licensed patents and patent applications cover or relate to ***our***

***products and product candidates***, including certain formulations." *Id*.  But Jazz's development documents confirm that, prior to publication of Avadel's '062 patent publication, Jazz's development focus was far removed from the subject matter of any of the claims of the patents it now asserts against Avadel, and corresponded to the subject matter of original claims of Jazz's then-pending applications.  Jazz's about-face makes no sense in terms of protecting any Jazz potential product—that about-face is only explained by Jazz's improper effort to pass off Avadel's innovative work as its own and block Avadel from introducing FT218 to the market.

**ANSWER:**  Jazz refers to D.I. 2-1 for the contents thereof, incorporates its answers to Paragraph 24-63, 66, 69, and 90, and otherwise denies the allegations of Paragraph 125.

### Response to "Count I:  Breach of Contract (2010 CDA)"

126.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:**  Jazz incorporates its answer to the preceding paragraphs.

127.    On information and belief, the 2010 CDA is a valid and enforceable contract between Jazz and Avadel.

**ANSWER:**  Paragraph 127 states a legal conclusion for which no response is required.  To the extent that a response is required, Jazz denies that any "2010 CDA" exists and otherwise denies the allegations of Paragraph 127.

128.    On information and belief, Avadel has performed its obligations under the 2010 CDA.

**ANSWER:**  Paragraph 128 states a legal conclusion for which no response is required.  To the extent that a response is required, Jazz denies that any "2010 CDA" exists and otherwise denies the allegations of Paragraph 128.

129.    On information and belief, Jazz agreed to maintain the confidential information provided by Avadel in confidence and not to use the confidential information in any capacity other than to evaluate and to negotiate the potential business relationship with Avadel.

**ANSWER:**  Jazz denies that any "2010 CDA" exists, denies that Avadel provided Jazz with any information that Jazz was obligated to keep confidential in the 2010 timeframe, and otherwise denies the allegations of Paragraph 129.

130.     On or around May 26, 2010, Avadel disclosed confidential information describing Avadel's drug delivery technology to Jazz.  *See supra* ¶¶ 23-38.

**ANSWER:**  Jazz denies that any "2010 CDA" exists, denies that Avadel provided Jazz with any information that Jazz was obligated to keep confidential in the 2010 timeframe, incorporates its answers to Paragraphs 23-38, and otherwise denies the allegations of Paragraph 130.

131.     Upon information and belief, Jazz breached its duty of confidentiality and non-use by using such information to develop its own once-nightly formulation and file patent applications based upon Avadel's Confidential Information.

**ANSWER:**  Jazz denies that the "2010 CDA" exists, denies that Avadel provided Jazz with any information that Jazz was obligated to keep confidential in the 2010 timeframe, denies that it developed its own once-nightly formulations and filed patent applications based upon any Avadel allegedly confidential information, refers to the Jazz Patents for the content thereof, and otherwise denies the allegations of Paragraph 131.

132.     At a direct result of Jazz's action, Avadel suffered harm in an amount to be proven at trial.

**ANSWER:**  Paragraph 132 states a legal conclusion for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraphs 132.

### Response to "Count II:  Breach of Contract (2015 CDA)"

133.     Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:**  Jazz incorporates its answers to the preceding paragraphs.

134.     The 2015 CDA is a valid and enforceable contract between Jazz and Avadel.

**ANSWER:**  Paragraph 134 states a legal conclusion for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 134.

135.     Avadel has performed its obligation under the 2015 CDA.

**ANSWER:** Paragraph 135 states a legal conclusion for which no response is required. To the extent that a response is required, on information and belief, Jazz denies, otherwise lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 135.

136. In Paragraph 1 of the 2015 CDA, Jazz agreed that information described in Exhibit A attached to the 2015 CDA constituted confidential information.

**ANSWER:** Jazz incorporates its answers to Paragraphs 41-44 and otherwise denies the allegations of Paragraph 136.

137. In Paragraph 3 of the 2015 CDA, Jazz agreed to maintain the confidential information in confidence and not use the confidential information in any capacity other than to evaluate and to negotiate the potential business relationship with Avadel.

**ANSWER:** Jazz incorporates its answers to Paragraphs 41-44 and otherwise denies the allegations of Paragraph 137.

138. On or around April 1, 2015, Avadel disclosed the 2015 Study Report in diligence, which contained confidential information as defined under Paragraph 1 of the 2015 CDA. *See supra* ¶¶ 39-49.

**ANSWER:** Jazz incorporates its answers to Paragraphs 39-49 and otherwise denies the allegations of Paragraph 138.

139. Upon information and belief, Jazz breached its duty of confidentiality and non-use by using such information to develop its own once-nightly formulation and file patent applications based upon Avadel's Confidential Information.

**ANSWER:** Jazz denies the allegations of Paragraph 139.

140. At a direct result of Jazz's action, Avadel suffered harm in an amount to be proven at trial.

**ANSWER:** Paragraph 140 states a legal conclusion for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 140.

### Response to "Count III: Breach of Contract (2018 CDA)"

141.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:** Jazz incorporates its answers to the preceding paragraphs.

142.    The 2018 CDA is a valid and enforceable contract between Jazz and Avadel.

**ANSWER:** Paragraph 142 states a legal conclusion for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 142.

143.    Avadel has performed its obligations under the 2018 CDA.

**ANSWER:** Paragraph 143 states a legal conclusion for which no response is required. To the extent that a response is required, on information and belief, Jazz denies, or otherwise lacks knowledge or information sufficient to form a belief as to the truth, of the allegations of Paragraph 143.

144.    In Paragraph 1 of the 2018 CDA, Jazz agreed that all information provided by Avadel in connection with the purpose of evaluating, negotiating, and pursuing a potential business transaction relating to Avadel's products, product candidates, technologies, and businesses constituted confidential information.

**ANSWER:** Jazz incorporates its answers to Paragraphs 51 and 52, and otherwise denies the allegations of Paragraph 144.

145.    In Paragraph 2 of the 2018 CDA, Jazz agreed to maintain the confidential information in confidence and not use the confidential information in any capacity other than for the purpose of evaluating, negotiating, and pursuing a potential business transaction.

**ANSWER:** Jazz incorporates its answers to Paragraphs 51 and 52, and otherwise denies the allegations of Paragraph 145.

146.    By July 2018, Avadel provided to Jazz a package of confidential information in response to Jazz's diligence questions. *See supra* ¶¶ 50-63.

**ANSWER:** Jazz incorporates its answers to Paragraphs 50-63 and otherwise denies the allegations of Paragraph 146.

147.    Upon information and belief, Jazz breached its duty of nondisclosure and non-use by using such information to develop its own once-nightly formulation and file patent applications based upon Avadel's confidential information.

**ANSWER:**  Jazz denies the allegations of Paragraph 147.

148.    At a direct result of Jazz's action, Avadel suffered harm in an amount to be proven at trial.

**ANSWER:**  Paragraph 148 states a legal conclusion for which no response is required.  To the extent a response is required, Jazz denies the allegations of Paragraph 148.

**Response to "Count IV:  Misappropriation of Trade Secrets (18 U.S.C. § 1836 et seq.)"**

149.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:**  Jazz incorporates its answers to the preceding paragraphs.

150.    Avadel is in the business of developing and selling pharmaceutical products. Avadel's FT218 product is a once-nightly sodium oxybate formulation.

**ANSWER:**  Jazz admits that Avadel is in the business of, among other things, developing pharmaceutical products.  Jazz also admits that Pursuant to Section 505(b)(2) of the FFDCA, Avadel filed Avadel's NDA seeking approval to engage in the commercial manufacture, use, sale, offer for sale, or importation of a sodium oxybate product, which Avadel has identified with the code name FT218.

151.    ███████████████████████████████████████████████ ███████████████████ are Avadel trade secrets.

**ANSWER:**  Paragraph 151 states legal conclusions for which no response is required.  To the extent a response is required, Jazz incorporates its answers to Paragraphs 24-63 and otherwise denies the allegations of Paragraph 151.

152.    Avadel derives independent economic value from these trade secrets not being generally known to, and not being readily ascertainable through proper means by, Avadel's competitors or any other persons who can obtain economic value from the disclosure or use of the information, such as by directing resources into research and development of an efficacious once-

nightly sodium oxybate formulation, as well as the economic value derived from the sale of such a formulation.

**ANSWER:** Jazz denies the allegations of Paragraph 152.

153. Avadel's trade secrets ████████████████████████████ ████████████████████████████████████████ are contained within its confidential 2010 Micropump® Deck and other diligence disclosures.

**ANSWER:** Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 153.

154. Avadel took reasonable steps to protect, and did protect, these trade secrets including by at least, on information and belief, having a 2010 CDA in place before sharing the trade secret, and prominently displaying the legend "CONFIDENTIAL" on materials containing the trade secrets that were disclosed to Jazz, including the 2010 Micropump® Deck. Avadel also took reasonable steps to protect, and did protect, these trade secrets during the 2014-15 and 2018 disclosures, including by at least having a CDA in place before sharing the trade secrets to prohibit their disclosure or use for any improper purpose, and prominently displaying the legend "CONFIDENTIAL" on materials containing the trade secrets that were disclosed to Jazz. Further, the materials were shared using a cloud service that provides encryption at-rest and in-transit, and implements access controls to limit access to specific recipients.

**ANSWER:** Jazz incorporates its answers to Paragraphs 24-63 and otherwise denies the allegations of Paragraph 154.

155. This information has great value both monetarily and intrinsically to pharmaceutical companies, as seen by Jazz's continued failure to develop a once-nightly sodium oxybate formulation over more than a decade of attempts.

**ANSWER:** Jazz denies the allegations of Paragraph 155.

156. This information is not easily duplicated by others with similar knowledge and requires expertise to develop, again as evidenced by Jazz's continued failures in developing a similar formulation and the significant time, effort, and resources that Avadel invested in order to develop FT218.

**ANSWER:** Jazz denies that it "duplicated" anything of Avadel's or that its work resulted in "failures," and otherwise denies the allegations of Paragraph 156.

157. On information and belief, Avadel initially disclosed these trade secrets to Jazz no later than May 26, 2010, after entering into a CDA with Jazz and/or after securing assurances from Jazz that it would not use information disclosed by Avadel, including in its 2010 Micropump® Deck.

**ANSWER:** Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 157.

158. Further, Avadel disclosed this trade secret information, including ███████████ ███████, to Jazz from 2015-2018 throughout various "diligence" exchanges after entering into a CDA with Jazz and/or after securing assurances from Jazz that it would not use information disclosed by Avadel for any purpose beyond evaluating a business relationship between the parties.

**ANSWER:** Jazz admits that it entered into the 2015 CDA and the 2018 CDA, incorporates its answers to Paragraphs 39-63, and except as expressly admitted, Jazz denies the allegations of Paragraph 158.

159. Jazz knew or had reason to know that the information in the 2010 Micropump® Deck and other diligence disclosures were Avadel trade secrets based upon the CDA and/or the CONFIDENTIAL labeling.

**ANSWER:** Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 159.

160. Jazz knew or had reason to know that, at the time and under the circumstances through which it acquired Avadel's trade secrets, Jazz had an obligation and duty to not use or misappropriate Avadel's trade secrets.

**ANSWER:** Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 160.

161. Jazz knew that these materials were "confidential" and referred to them as such.

**ANSWER:** Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 161.

162. Nevertheless, on or about 2014, Jazz began to willfully and maliciously misappropriate Avadel's trade secrets in violation of at least the CDA and/or the confidential business relationship between Jazz and Avadel by at least: (1) forwarding the confidential slide deck to multiple people over a period of at least 10 years, (2) using the information disclosed for purposes other than the evaluation of Avadel's product for potential business partnerships, such as guiding the development of their own once-nightly formulation and which areas of research to focus on, as well as by filing patent applications based upon Avadel's trade secrets. Jazz's misappropriation of Avadel's trade secrets was ongoing and continuous from 2014 to the present.

**ANSWER:**  Paragraph 162 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 162.

163.    As a direct and proximate result of Jazz's actions, Avadel has and will continue to suffer harm in an amount to be proven at trial.

**ANSWER:**  Paragraph 163 states a legal conclusion for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 163.

**Response to "Count V:  Misappropriation of Trade Secrets
(California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*)"**

164.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:**  Jazz incorporates its answers to the preceding paragraphs.

165.    Avadel is the owner of trade secret and confidential information ████████ ███████ that as described above, constitute "trade secrets" within the meaning of Cal. Civil Code 3426.1.

**ANSWER:**  Paragraph 165 states legal conclusions for which no response is required.  To the extent a response is required, Jazz denies the allegations of Paragraph 165.

166.    Avadel derives independent economic value from these trade secrets not being generally known to, and not being readily ascertainable through proper means by, Avadel's competitors or any other persons who can obtain economic value from the disclosure or use of the information, such as by directing resources into research and development of an efficacious once-nightly sodium oxybate formulation, as well as the economic value derived from the sale of such a formulation.

**ANSWER:**  Jazz denies the allegations of Paragraph 166.

167.    Avadel's trade secrets regarding ████████████████████████████████ ████████████████████████████ are contained within its confidential 2010 Micropump® Deck and other diligence disclosures.

**ANSWER:**   Jazz incorporates its answer Paragraphs 24-63 and otherwise denies the allegations of Paragraph 167.

168.    Avadel took reasonable steps to protect, and did protect, these trade secrets including by at least, on information and belief, having a 2010 CDA in place before sharing the

trade secret, and prominently displaying the legend "CONFIDENTIAL" on materials containing the trade secrets that were disclosed to Jazz, including the 2010 Micropump® Deck.  Avadel also took reasonable steps to protect, and did protect, these trade secrets during the 2014-15 and 2018 disclosures, including by at least having a CDA in place before sharing the trade secrets to prohibit their disclosure or use for any improper purpose, and prominently displaying the legend "CONFIDENTIAL" on materials containing the trade secrets that were disclosed to Jazz.  Further, the materials were shared using a cloud service that provides encryption at-rest and in-transit, and implements access controls to limit access to specific recipients.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-63 and otherwise denies the

allegations of Paragraph 168.

169.    This information has great value both monetarily and intrinsically to pharmaceutical companies, as seen by Jazz's continued failure to develop a once-nightly sodium oxybate formulation over more than a decade of attempts.

**ANSWER:**  Jazz denies the allegations of Paragraph 169.

170.    This information is not easily duplicated by others with similar knowledge and requires expertise to develop, again as evidenced by Jazz's continued failures in developing a similar formulation and the significant time, effort, and resources that Avadel invested in order to develop FT218.

**ANSWER:**  Jazz denies that it "duplicated" anything of Avadel's or that its work resulted

in "failures," and otherwise denies the allegations of Paragraph 170.

171.    On information and belief, Avadel initially disclosed these trade secrets to Jazz no later than May 26, 2010, after entering into a CDA with Jazz and/or after securing assurances from Jazz that it would not use information disclosed by Avadel, including in its 2010 Micropump® Deck.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the

allegations of Paragraph 171.

172.    Further, Avadel disclosed this trade secret information, including ███████ ████████ to Jazz from 2015-2018 throughout various "diligence" exchanges after entering into a CDA with Jazz and/or after securing assurances from Jazz that it would not use information disclosed by Avadel for any purpose beyond evaluating a business relationship between the parties.

**ANSWER:**  Jazz admits that it entered into the 2015 CDA and the 2018 CDA, incorporates

its answers to Paragraphs 39-63, and except as expressly admitted, Jazz denies the allegations of

Paragraph 172.

173.    Jazz knew or had reason to know that the information in the 2010 Micropump® Deck and other diligence disclosures were Avadel trade secrets based upon the CDA and/or the CONFIDENTIAL labeling.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 173.

174.    Jazz knew or had reason to know that, at the time and under the circumstances through which it acquired Avadel's trade secrets, Jazz had an obligation and duty to not use or misappropriate Avadel's trade secrets.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 174.

175.    Jazz knew that these materials were "confidential" and referred to them as such.

**ANSWER:**  Jazz incorporates its answers to Paragraphs 24-38 and otherwise denies the allegations of Paragraph 175.

176.    Jazz's actions, as set forth herein, constitute "misappropriation" within the meaning of Cal. Civil Code § 3426.1.

**ANSWER:**  Paragraph 176 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 176.

177.    Nevertheless, on or about 2014, Jazz began to willfully and maliciously misappropriate Avadel's trade secrets in violation of at least the CDA and/or the confidential business relationship between Jazz and Avadel by at least: (1) forwarding the confidential slide deck to multiple people over a period of at least 10 years, and (2) using the information disclosed for purposes other than the evaluation of Avadel's product for potential business partnerships, such as guiding the development of their own once-nightly formulation and which areas of research to focus on, as well as by filing patent applications based upon Avadel's trade secrets.  Jazz's misappropriation of Avadel's trade secrets was ongoing and continuous from 2014 to the present.

**ANSWER:**  Paragraph 177 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 177.

178.    As a direct and proximate result of Jazz's actions, Avadel has and will continue to suffer harm in an amount to be proven at trial.

**ANSWER:**  Paragraph 178 states a legal conclusion for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 178.

179.    Jazz has been unjustly enriched as a further proximate result of its misappropriation of Avadel's trade secrets and confidential information.

**ANSWER:**  Paragraph 179 states a legal conclusion for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 179.

180.    Jazz's actions in misappropriating Avadel's trade secret and confidential information was willful, fraudulent, malicious, and was done with the intent to injure and oppress Avadel and improve Jazz's own economic opportunities, thereby justifying an award of punitive damages against Jazz pursuant to Cal. Civil Code section 3426.3(c) and attorneys' fees pursuant to Cal. Civil Code § 3426.4.

**ANSWER:**  Paragraph 180 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 180.

### Response to "Count VI:  Correction of Inventorship under 35 U.S.C. § 256 of the '488 Patent"

181.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:**  Jazz incorporates its answers to the preceding paragraphs.

182.    One or more of the Avadel Inventors conceived of the subject matter claimed in the '488 patent.

**ANSWER:**  Paragraph 182 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 182.

183.    The '488 patent does not have written description support in its specification for any of its claims and thus does not have a priority date earlier than the filing date of those claims in which the new matter was added.

**ANSWER:**  Paragraph 183 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz refers to the '488 patent and its file history for the contents thereof and otherwise denies the allegations of Paragraph 183.

184.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '488 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

**ANSWER:**  Paragraph 184 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 184.

185.    One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

**ANSWER:**  Jazz denies, or otherwise lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 185.

186.    One or more of the Avadel Inventors each made significant contributions to the reduction to practice of the subject matter claimed in the '488 patent.

**ANSWER:**  Paragraph 186 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 186.

187.    One or more of the Avadel Inventors contributed more to the subject matter claimed in the '488 patent than the mere explanation of well-known concepts and/or the current state of the art.

**ANSWER:**  Paragraph 187 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 187.

188.    One or more of the Avadel Inventors are inventors of the '488 patent.

**ANSWER:**  Paragraph 188 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 188.

### Response to "Count V:  Correction of Inventorship under 35 U.S.C. § 256 of the '885 Patent"

189.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:**  Jazz incorporates its answers to the preceding paragraphs.

190.    One or more of the Avadel Inventors conceived of the subject matter claimed in the '885 patent.

**ANSWER:** Paragraph 190 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 190.

191.    The '885 patent does not have written description support in its specification for any of its claims and thus does not have a priority date earlier than the filing date of those claims in which the new matter was added.

**ANSWER:** Paragraph 191 states legal conclusions for which no response is required. To the extent that a response is required, Jazz refers to the '885 patent and its file history for the contents thereof and otherwise denies the allegations of Paragraph 191.

192.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '885 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

**ANSWER:** Paragraph 192 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 192.

193.    One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

**ANSWER:** Jazz denies, or otherwise lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 193.

194.    One or more of the Avadel Inventors each made significant contributions to the reduction to practice of the subject matter claimed in the '885 patent.

**ANSWER:** Paragraph 194 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 194.

195.    One or more of the Avadel Inventors contributed more to the subject matter claimed in the '885 patent than the mere explanation of well-known concepts and/or the current state of the art.

**ANSWER:** Paragraph 195 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 195.

196.    One or more of the Avadel Inventors are inventors of the '885 patent.

**ANSWER:** Paragraph 196 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 196.

### Response to "Count VII:  Correction of Inventorship<br>under 35 U.S.C. § 256 of the '956 Patent"

197.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:** Jazz incorporates its answers to the preceding paragraphs.

198.    One or more of the Avadel Inventors conceived of the subject matter claimed in the '956 patent.

**ANSWER:** Paragraph 198 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 198.

199.    The '956 patent does not have written description support in its specification for any of its claims and thus does not have a priority date earlier than the filing date of those claims in which the new matter was added.

**ANSWER:** Paragraph 199 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz refers to the '956 patent and its file history for the contents thereof and otherwise denies the allegations of Paragraph 199.

200.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '956 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

**ANSWER:** Paragraph 200 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 200.

201.    One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

**ANSWER:** Jazz denies, or otherwise lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 201.

202.    One or more of the Avadel Inventors each made significant contributions to the reduction to practice of the subject matter claimed in the '956 patent.

**ANSWER:** Paragraph 202 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 202.

203. One or more of the Avadel Inventors contributed more to the subject matter claimed in the '956 patent than the mere explanation of well-known concepts and/or the current state of the art.

**ANSWER:** Paragraph 203 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 203.

204. One or more of the Avadel Inventors are inventors of the '956 patent.

**ANSWER:** Paragraph 204 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 204.

### Response to "Count VIII:  Correction of Inventorship under 35 U.S.C. § 256 of the '931 Patent"

205. Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:** Jazz incorporates its answers to the preceding paragraphs.

206. One or more of the Avadel Inventors conceived of the subject matter claimed in the '931 patent.

**ANSWER:** Paragraph 206 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 206.

207. The '931 patent does not have written description support in its specification for any of its claims and thus does not have a priority date earlier than the filing date of those claims in which the new matter was added.

**ANSWER:** Paragraph 207 states legal conclusions for which no response is required. To the extent that a response is required, Jazz refers to the '931 patent and its file history for the contents thereof and otherwise denies the allegations of Paragraph 207.

208. One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '931 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

**ANSWER:**  Paragraph 208 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 208.

209.   One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

**ANSWER:**  Jazz denies, or otherwise lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 209.

210.   One or more of the Avadel Inventors each made significant contributions to the reduction to practice of the subject matter claimed in the '931 patent.

**ANSWER:**  Paragraph 210 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 210.

211.   One or more of the Avadel Inventors contributed more to the subject matter claimed in the '931 patent than the mere explanation of well-known concepts and/or the current state of the art.

**ANSWER:**  Paragraph 211 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 211.

212.   One or more of the Avadel Inventors are inventors of the '931 patent.

**ANSWER:**  Paragraph 212 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 212.

**Response to "Count IX:  Correction of Inventorship
under 35 U.S.C. § 256 of the '079 patent"**

213.   Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:**  Jazz incorporates its answers to the preceding paragraphs.

214.   One or more of the Avadel Inventors conceived of ideas claimed in the '079 patent.

**ANSWER:**  Paragraph 214 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 214.

215.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '079 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

**ANSWER:**  Paragraph 215 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 215.

216.    One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

**ANSWER:**  Jazz denies, or otherwise lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 216.

217.    One or more of the Avadel Inventors each made significant contributions to the conception of the subject matter claimed in the '079 patent.

**ANSWER:**  Paragraph 217 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 217.

218.    One or more of the Avadel Inventors led to the conception and the reduction to practice of the Invention.

**ANSWER:**  Paragraph 218 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 218.

219.    One or more of the Avadel Inventors contributed more to the Invention than the mere explanation of well-known concepts and/or the current state of the art.

**ANSWER:**  Paragraph 219 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 219.

220.    One or more of the Avadel Inventors are inventors of the '079 patent.

**ANSWER:**  Paragraph 220 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 220.

### Response to "Count X:  Correction of Inventorship under 35 U.S.C. § 256 of the '782 patent"

221.    Avadel incorporates by reference the allegations made in the preceding paragraphs above.

**ANSWER:** Jazz incorporates its answers to the preceding paragraphs.

222.    One or more of the Avadel Inventors conceived of ideas claimed in the '782 patent.

**ANSWER:** Paragraph 222 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 222.

223.    One or more of the Avadel Inventors significantly contributed to the conception of the invention claimed in the '782 patent, at least by using their substantial knowledge of redesigning drugs for a modified release formulation using a multiparticulate approach.

**ANSWER:** Paragraph 223 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 223.

224.    One or more of the Avadel Inventors developed a viable once-nightly oxybate formulation product, Avadel's FT218.

**ANSWER:** Jazz denies, or otherwise lacks knowledge or information sufficient to form a belief as to the truth of, the allegations of Paragraph 224.

225.    One or more of the Avadel Inventors each made significant contributions to the conception of the subject matter claimed in the '782 patent.

**ANSWER:** Paragraph 225 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 225.

226.    One or more of the Avadel Inventors led to the conception and the reduction to practice of the Invention.

**ANSWER:** Paragraph 226 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 226.

227.    One or more of the Avadel Inventors contributed more to the Invention than the mere explanation of well-known concepts and/or the current state of the art.

**ANSWER:** Paragraph 227 states legal conclusions for which no response is required.  To the extent that a response is required, Jazz denies the allegations of Paragraph 227.

228.    One or more of the Avadel Inventors are inventors of the '782 patent.

**ANSWER:** Paragraph 228 states legal conclusions for which no response is required. To the extent that a response is required, Jazz denies the allegations of Paragraph 228.

## Response to "PRAYER FOR RELIEF"

Jazz denies that Avadel is entitled to any relief on its Claims, either as prayed for in its pleading or otherwise.

## JAZZ'S AFFIRMATIVE DEFENSES

Without prejudice to the denials set forth in this Answer and to the ability to amend this Answer to seek and allege any and all defenses not presently known or that are revealed during the course of discovery or otherwise, Jazz asserts the following affirmative defense in response to Avadel's Complaint:

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

The Complaint fails to state any claim for which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE
### (No Damages and/or Failure to Mitigate Damages)

As a further separate and affirmative defense, Defendants allege that Plaintiffs have suffered no damages, and to the extent Plaintiffs have sustained damages, which Defendants expressly deny, Plaintiffs have contributed in a direct and proximate manner to their own alleged damages by failing to act reasonably and prudently to mitigate their damages. Plaintiffs' damages, if any, must be reduced by the extent to which those damages were proximately caused by Plaintiffs' failure to mitigate their own damages.

### THIRD AFFIRMATIVE DEFENSE
**(Equitable Defenses)**

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver, equitable estoppel, unclean hands, and/or other equitable defenses.

### FOURTH AFFIRMATIVE DEFENSE
**(Independent, Intervening, and/or Superseding Events)**

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, because any damages Plaintiffs may have suffered, which Defendants expressly deny, were caused by independent, intervening, and/or superseding events beyond the control of Defendants and Defendants' conduct.

### FIFTH AFFIRMATIVE DEFENSE
**(No Trade Secrets Identified)**

As a further separate and affirmative defense, Defendants allege that Plaintiffs have not identified with adequate specificity any legally protectable trade secrets or other confidential and proprietary information for which they are entitled to the relief sought.

### SIXTH AFFIRMATIVE DEFENSE
**(Independent Product Development)**

As a further separate and affirmative defense, Defendants allege that they independently developed the inventions claimed in the Jazz Patents without reliance on, or use of, any legally protectable trade secret, confidential, or proprietary information from Plaintiffs.

### SEVENTH AFFIRMATIVE DEFENSE
**(Readily Ascertainable)**

As a further separate and affirmative defense, Defendants allege that information that Plaintiffs allege to be trade secrets is, and at all relevant times was, readily ascertainable by proper

means from publicly available information, including from Avadel public statements, publicly available patents and patent applications, and independent third party materials.

### EIGHTH AFFIRMATIVE DEFENSE
### (Failure to Keep Information Secret)

As a further separate and affirmative defense, Defendants allege that Plaintiffs failed to maintain the confidentiality of the information alleged to be trade secrets.

### NINTH AFFIRMATIVE DEFENSE
### (No Use)

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, because Defendants have not used and are not using any of the information Plaintiffs allege to be trade secrets.

### TENTH AFFIRMATIVE DEFENSE
### (No Improper Means)

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, because information allegedly misappropriated was readily ascertainable by proper means.

### ELEVENTH AFFIRMATIVE DEFENSE
### (No Breach)

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot show that any contract between Defendants and Plaintiffs was breached.

### TWELFTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

### THIRTEENTH AFFIRMATIVE DEFENSE
**(No Violation of DTSA)**

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, because any alleged act of misappropriation of trade secrets occurred before the date of the enactment of the DTSA.

### FOURTEENTH AFFIRMATIVE DEFENSE
**(No Independent Economic Value)**

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, because the alleged trade secrets that Plaintiffs have purported to identify do not have independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

### FIFTEENTH AFFIRMATIVE DEFENSE
**(Preemption)**

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.* are barred, in whole or in part, by the doctrine of federal preemption.

### SIXTEENTH AFFIRMATIVE DEFENSE
**(Collateral Estoppel)**

As a further separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred, in whole or in part, by the doctrine of collateral estoppel.

### PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully requests the following relief:

(A)     That the Court enter judgment against Plaintiffs and in favor of Defendants on the claims set forth in Plaintiffs' Complaint and that each claim be dismissed with prejudice;

(B)     That the Court determine that, pursuant to 35 U.S.C. § 285, Plaintiffs' conduct in commencing and pursing this action renders this an exceptional case and award Defendants their reasonable attorneys' fees and their costs and disbursements in this action; and

(C)     That the Court grant Defendants such other and further relief that the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Defendants*
*Jazz Pharmaceuticals, Inc. and*
*Jazz Pharmaceuticals Ireland Limited*

OF COUNSEL:

F. Dominic Cerrito
Eric C. Stops
Evangeline Shih
Andrew S. Chalson
Gabriel P. Brier
Frank C. Calvosa
Nicholas LoCastro
Krista M. Rycroft
Geoffrey A. Kirsner
Allison Silber
Andrew Shifren
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Joseph M. Paunovich
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

June 27, 2024